IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| **KYLE D. PIKALUK,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| Vs. | § | No.  5:18-cv-00215-SMH-MLH |
| | § | |
| **HORSESHOE ENTERTAINMENT LIMITED** | § | **Judge S. Maurice Hicks, Jr.** |
| **PARTNERSHIP, D/B/A "HORSESHOE HOTEL** | § | **Magistrate Judge Mark Hornsby** |
| **& CASINO", STEVEN JONES, ROB BROWN,** | § | |
| **JASON WILLIAMS, FEDERICO M. ARENDS,** | § | |
| **III, and JAMES LAFLEUR,** | § | |
| | § | |
| Defendants. | § | **Jury Trial Demanded** |

# PLAINTIFF'S APPENDIX

### RELATING TO PLAINTIFF'S OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kyle D. Pikaluk ("*Plaintiff*"), submits the following *Appendix Relating to Plaintiff's Opposition to Defendants' Motion for Summary Judgment* pursuant to the Local Rules of this Court and to set forth Plaintiff's summary judgment evidence as follows:[1]

| Exhibit No. | Description of Document or Exhibit |
|:---:|---|
| 2 | Arrest Report for Kyle Pikaluk prepared by Thomerson |
| 7 | Bossier City Police Dispatch Report (CAD Call Information) |
| 16 | Excerpt from Horseshoe Guest Safety/Security Handbook related to Defiant Trespass Policy, Practice, and Procedure |
| 17 | James Lafleur Employee Statement dated March 20, 2017 |
| 18 | WinNet Message regarding Plaintiff |

---

[1] Exhibits introduced during depositions in this case are identified by the same exhibit number designated for the exhibit in the deposition. Deposition exhibits were numbered consecutively and were not duplicated.

| 20 | Surveillance Incident Report dated March 18, 2017 – 4:05 p.m. |
| 21 | Surveillance Incident Report dated March 18, 2017 – 2:34 p.m. |
| 23 | Arends Incident Report dated March 18, 2017 |
| 25 | Louisiana Administrative Code - Chapter 35. Patron Disputes |
| 31 | Jones Employee Statement dated March 30, 2017 |
| 35 | Manual Attachment – Audio Recordings of Horseshoe call to Bossier City Police and Thomerson's Radio Communication that he would take the report |
| 36 | Manual Attachment – Johnson Bodycam Video (Entire Video) |
| 37 | Manual Attachment – Thomerson Bodycam Video (Entire Video) |
| 38 | Manual Attachment – Excerpts from Johnson Dashcam (Three Videos on Disk) |
| 39 | Manual Attachment - Horseshoe Surveillance Video – Plaintiff at Cashier's Cage on March 18, 2018 (Split View – Entire Video) |
| 40 | Manual Attachment - Horseshoe Surveillance Video – Excerpts depicting Plaintiff Entering Casino, Proceeding to Cashier's Cage, and Waiting at Cashier's Cage on March 18, 2107 (Two Videos on Disk) |
| 41 | Manual Attachment - Horseshoe Surveillance Video – Excerpts depicting Plaintiff waiting at cage, Lafleur, Williams, and Arends escorting him off the casino floor onto the ramp where police were approaching, and arrest and escort out of the casino |
| 42 | Horseshoe Gaming License and Corporate Structure filed with Louisiana Gaming Control Board |
| 43 | Excerpts of Deposition of Kyle D. Pikaluk |
| 44 | Excerpts of Deposition of Donald Razinsky |
| 45 | Excerpts of Deposition of Jordan D. Johnson |
| 46 | Excerpts of Deposition of Joseph C. Thomerson |
| 47 | Excerpts of Deposition of Steven Jones |
| 48 | Excerpts of Deposition of Robert Brown |
| 49 | Excerpts of Deposition of James Lafleur |
| 50 | Excerpts of Deposition of Federico M. Arends, III |

| 51 | Excerpts of Deposition of Jason Williams |
|----|----|
| 52 | *Answer to Plaintiff's Second Amended and Restated Complaint* – ECF Docket No. 44 – filed September 24, 2018 |
| 53 | Louisiana Administrative Code; Title 42, Section 4309. *Use of Chips and Tokens* |
| 54 | Horseshoe's Voluntary Petition Commencing Chapter 11 Bankruptcy Case No. 15-01200, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division |

Dated:  March 15, 2019                                        Respectfully submitted,

*/ s / John P. Lewis, Jr.*
John P. Lewis, Jr.
(Admitted *Pro Hac Vice*)
Texas State Bar No. 12294400
1412 Main Street, Suite 210
Dallas, Texas  75202
Telephone: 214-742-5925
Facsimile:  214-742-7110
Email: jplewisjr@mindspring.com

*/ s / Michael H. Schwartzberg*
Michael H. Schwartzberg
(#17786)
Larry A. Roach, Inc.
2917 Ryan Street
Lake Charles, Louisiana 70601
Telephone:  337-433-8504
Facsimile:  337-433-3196
Email: mschwartzberg@larryaroachinc.com

Attorneys for Plaintiff, Kyle D. Pikaluk


## CERTIFICATE OF SERVICE

        The undersigned hereby certifies that on March 15, 2019, he served a true and correct copy of the foregoing *Plaintiff's Appendix to Plaintiff's Opposition to Defendants' Motion for Summary Judgment* by email transmission and attachment upon Scott L. Zimmer, Esq., Kean Miller, LLP, 333 Texas Street, Suite 450, Shreveport, Louisiana 70139, Attorneys for Defendants Horseshoe Entertainment, LP, d/b/a "Horseshoe Hotel & Casino", Steven Jones, Rob Brown, Jason Williams, Federico M. Arends, III, and James Lafleur.


                                        */ s / John P. Lewis, Jr.*
                                        John P. Lewis, Jr.

# EXHIBIT 2

**Arrest Report for Kyle Pikaluk prepared by Thomerson**

```
CMD      5.2017  9:22PM    BOSSIER CITY ATTORNEYICE DEPARTMENT     ALL 789    /05/17
Inquiry                      Suspect Information                          15:35:38
     Last Name . . . . . . . . . . . : PIKALUK
     First Name  . . . . . . . . . . : KYLE
     Middle Name . . . . . . . . . . : D
     Name Suffix . . . . . . . . . . :
     Street Number . . . . . . . . . : 946
     Street Direction  . . . . . . . :
     Street Name . . . . . . . . . . : PRINGLE COVE
     Street Suffix . . . . . . . . . : STR          Street
     Apartment Number  . . . . . . . :
     City  . . . . . . . . . . . . . : SASKATOON
     State . . . . . . . . . . . . . :
     Zip Code  . . . . . . . . . . . :
     Date of Birth . . . . . . . . . : 3/21/1989
     POB / State . . . . . . . . . . :
Press Enter to continue.
     Country . . . . . . . . . . . . : 033        CANADA

                                                             More...

F2=Aliases    F6=SMT   F8=Property     F10=Vehicle     F11=Narrative
F12=Cancel    F14=MO/Crime Specialty   F15=Employer    F24=More Keys
```

PLAINTIFF'S
EXHIBIT
2

JUL 5 2017 3:22PM   BOSSIER CITY ATTORNEY                    No. 759   P. 2

Date/Time:  7/05/17 / 15:35:44
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                        BOSSIER CITY POLICE DEPARTMENT            Page:
Progrm: CHF004P              Narrative Print
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number:  1-17-003279

*********************** N A R R A T I V E   # 1 ***********************
SYNOPSIS                   Reported By: THOMERSON, JOSEPH C.           3/18/
                           Entered By.: THOMERSON, JOSEPH C.           3/18/

    This report is in reference to the arrest Kyle Pikaluk for remaining
    after forbidden at Horseshoe Casino on 3/18/2017.


** End of Report **

JUL. 5.2017  3:22PM   BOSSIER CITY ATTORNEY                    No. 1799   P. 3

Date/Time:  7/05/17 / 15:35:47
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                          BOSSIER CITY POLICE DEPARTMENT            Page:
Progrm: CHF004P                   Narrative Print
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number:  1-17-003279

***************************** N A R R A T I V E   # 2 ****************************
SUPPLEMENTAL                   Reported By: THOMERSON, JOSEPH C.              3/18/1
                               Entered By.: THOMERSON, JOSEPH C.              3/18/1

      On March 18, 2017 Officers responded to Horseshoe Casino in reference
      to a banned person, who was later identified as Kyle D. Pikaluk.
      1) Officers contacted Horseshoe supervisor Steven Jones who identified
      Kyle D. Pikaluk as the suspect who was banned from all Horseshoe
      Casino Properties and was notified by certified letter in 2016.
      2) K. Pikaluk denied having knowledge of being banned.
      Officers actions and observations
      3) Officers D. Razinsky and J. Thomerson placed K. Pikaluk under
      arrest with the charge of remaining after forbidden.
      4) K. Pikaluk was placed in handcuffs, double locked and transported
      to BCPD for booking by Ofc. Jordan.
      No further action taken.
      EOR/Body Cam


  ** End of Report **

# EXHIBIT 7

**Bossier City Police Dispatch Report (CAD Call Information)**

Page 1

```
------------------------------------------------------------------
3/12/18                    SUPERION, LLC CAD                PAGE   1
10:03:28                CAD CALL INFORMATION             170770275
------------------------------------------------------------------
  Call Number: 170770275     Call Type.: 032 Disorderly Person      Police
  Entry Day/Tm: 3/18/17 15:30:36      032 Disorderly Person      Police

  CmnN: HORSESHOE RIVERBOAT          Agency.........: 001 Bossier City Poli
  Location...:    711    HORSESHOE                  BLV  Apt: .A
  City......: BOSSIER CITY      Block#:   700   Loc ID: C Mapr: RB01P
  Intersectn.: TRAFFIC

  Caller Name: L: PRATT                    F: KISHUN          M:
   Address...:                                        Apt:
   City/State:              Phone#: 318-741-7827 BUS   Source:

  Call Taker.:    3664 ANDERSON        MELISSA          PDISP2S1A
  Dispatcher.:    1667 COLE            TRACY            PDCOM1S4A

                        N A R R A T I V E

    ...W/M TRESPASSING...ON LEVEL 2 OF THE CASINO...        15:30:36
    ...UNK CLOTHING DESC                                    15:31:15
    ...UNK NAME...                                          15:31:26
    ...CONTACT SECURITY SUPERVISOR                          15:32:09
    ...THEY HAVE NOT APPROACHED THE SUSP                    15:32:09
    ...UNK DRINKING...                                      15:32:16


                     P E R S O N    I N F O

  Person Type: SUSP     Suspect          User ID: ANDERSONM
  Race.: W  Sex: M Age:    -    Hgt:    -    Wgt:    -    Person #:   1
  Weapon:          Build.:         Hair...:         Eyes:
  Hat..:           Jacket:         Shirt..:         Pants:
  Shoes:           Facial:         Glasses:         SSN:          0


  Flight Dir:                  Mode:        OL#:                     /
  Last:                        F:           M:
  DOB:         0
  Addr:        0                            Apt:
  City:                     Phone#:     -    (  )
                                        -    (  )
                              Last Changed:  3/18/17 15:31:21

  Additional:


 *NONE            Unit Status History Information

   3/18/17 15:31:10  18 Route Call Time      RT  |


 201              Unit Status History Information

   3/18/17 15:32:24   4 Dispatched          D          4100 JOHNSON,JOR
   3/18/17 15:32:24  11 Assigned as Primary  PR
   3/18/17 15:33:17  32 Enroute To Scene     ER M
   3/18/17 15:34:52  20 Available            AV
```



PLAINTIFF'S EXHIBIT 7

C 000001

```
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
  3/12/18                    SUPERION, LLC CAD                 PAGE    2
 10:03:28                   CAD CALL INFORMATION               170770275
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
    3/18/17 15:39:06    4 Dispatched            D     |
    3/18/17 15:39:06    6 At Scene              AS    |
    3/18/17 15:42:10   43 In Custody/Arrested   IC    |
    3/18/17 15:59:18   20 Available             AV    |


    23                Unit Status History Information

    3/18/17 15:33:49    4 Dispatched            D     |      3166 THOMERSON,JOS
    3/18/17 15:34:05   32 Enroute To Scene      ER    |
    3/18/17 15:37:48    6 At Scene              AS    |
    3/18/17 15:59:18   20 Available             AV    |


    50                Unit Status History Information

    3/18/17 15:32:24    4 Dispatched            D     |       703 MORTON,JOH
    3/18/17 15:34:52   20 Available             AV    |


   501                Unit Status History Information

    3/18/17 15:33:59    4 Dispatched            D     |      3680 RAZINSKY,DON
    3/18/17 15:34:05   32 Enroute To Scene      ER    |
    3/18/17 15:37:48    6 At Scene              AS    |
    3/18/17 15:59:18   20 Available             AV    |




                                                      |



                       D I S P O S I T I O N S

     1  001  Incident Report          Case#  1 - 17-003279 Unit: 23
```

C 000002

# EXHIBIT 16

**Excerpt from Horseshoe Guest Safety/Security Handbook related to Defiant Trespass Policy, Practice, and Procedure**



&



## *Guest Safety/Security Department Handbook*

This handbook serves as a guide in assisting Guest Safety/Security officers with a general understanding of the operation of the security department and the expectations of our officers. It is in no way intended to be a complete legal description of all Harrah's Louisiana Downs and/or Horseshoe Casino & Hotel/Caesars Entertainment rules and regulations. Each officer is urged to seek the aid of the security supervisor, security manager, Director of Hotel & Security, Human Resources, Assistant General Manager, and General Manager if the need arises. **Please read this book carefully,** as it will answer many questions about your needs and what will be expected of you as a Guest Safety/Security officer.

Date Reviewed & Revised:     August 2012

1



CONFIDENTIAL                              HORSESHOE 0001

and place of birth.

D.  Include a full physical description.  Under Other Descriptive Information, include scars, tattoos or other information.

E.  In either a formal eviction or arrest, the individual is to be read the statement advising him that he is being formally ejected.  Include the name of the person reading the statement and at least one witness.  Have the individual sign the form at "Patron's Name" if possible.

F.  Photograph only in the case of an arrest/eviction.  The issuance of a summons charging the individual with a violation is an arrest and the subject may be photographed.

G.  List witnesses to the incident and a brief description of what lead to the arrest or ejection.

H.  List the crime the subject was charged with, and the corresponding statute number. The arresting officer will be the employee who signs the information or summons.

I.  List the complainant's name, address and telephone number.  If an employee, list the employee number, department (and outlet or area of assignment.)

J.  List the date and time of the crime if appropriate.

K.  Use continuation report for all interviews, action(s) taken, and remarks.

L.  Sign report and deliver to the security supervisor or the security dispatch office for review by a supervisor.


## DEFIANT TRESPASS

A person who has previously been ejected but who has returned to the premises should be contacted and advised of their eviction status and escorted off the property.  If the patron refuses to leave, the security supervisor will contact BCPD and have them arrested for trespassing.


1.  Detention based on Complaints from Other Patrons Involving Non-Gaming Activities

A.  If a patron reports a theft or other crime and has **identified** the alleged perpetrator:

❑  Security Personnel will attempt to detain the accused (not physically) in order to notify the proper authorities, such as the **Bossier City Police Department** or Louisiana State Police and turn the persons over to the authorities.

**Note:  Only do so if the accuser agrees to remain and to sign the necessary statement and complaint.**

B.  **The casino is not to be the complainant** in having persons arrested; the **accuser** is the complainant and should provide their information to the Louisiana State Police or the Bossier City Police Department.

C.  A patron's allegations of wrong doing against another patron is evidence that will

52

substantiate the claim that Security Personnel had reasonable or probable cause to verbally (not physically) detain a patron.

2.  Searching of Defendants

   A.  In accordance with Caesars Legal Department guidelines, Security personnel **WILL NOT CONDUCT SEARCHES OF DEFENDANTS, SUSPECTS OR PERSONS DETAINED.** In situations where you feel the search of an individual is warranted because you have reason to believe they have a weapon and there is sufficient probable cause, contact a security supervisor and be guided by his/her instructions. If the need for an immediate search arises, the security supervisor will obtain the assistance of the BCPD or the Louisiana State Police officer on duty.

   B.  If the suspect is believed to be in the possession of stolen property, contraband or items of evidentiary value, the suspect should be kept under close surveillance to prevent the loss of evidence until the arrival of law enforcement agents. The law enforcement agent will conduct the search if he/she determines the existence of sufficient probable cause.

## ARREST AND DETENTION PROCEDURES

1.  Duties of Security Officers

   A.  Primary Responsibilities

      ❑  Protection of company assets

      ❑  Protection of patrons and employees

      ❑  Enhance customer relations

2.  Rights of Security Staff

   A.  To question patrons regarding gaming activities:

   Security personnel may question any individual in the casino **reasonably** suspected of swindling or cheating while gambling, in violation of RS4:662 relative to skimming; RS4:663 relative to crime/false statements; RS4:664 relative to cheating; RS4:665 relative to exclusion or ejection, or who uses or possesses any cheating device, i.e., counterfeit chips, marked cards or loaded dice in violation of RS4:664 or any other criminal violation of the Casino Control Act.

   B.  To take a patron into custody and detain:

   Security personnel may, if they have **reasonable cause** believe a person violated regulations referred to in step 2A, take such person into custody and detain within casino premises, in a reasonable manner, for a reasonable time, in order to notify authorities, await their arrival, and turn over that person to authorities (we cannot physically detain a guest). They will be taken to the holding area and the Louisiana State Police/BCPD will make the determination.

      ❑  This includes detention of employees for the above violations, but only on

53

instruction from the Security Manager or the Director of Hotel & Security.

Note:  Reasonable cause exists if another patron makes a complaint against a patron and identifies same, or if the wrongdoing is actually witnessed by casino staff (including Security/Surveillance).  The question of **reasonable cause** is ultimately for a jury in a civil suit against the company.

C.  To eject persons from premises:  (Gaming and Non-Gaming activity)

□  Security may eject a patron from the premises who is:

➢  Cheating/Stealing

➢  Disorderly

➢  Intoxicated

➢  A repetitive petty offender who disrupts the regular and essential operations of the premises or threatens the security of the premises and other patrons.

D.  Every effort must be made to try and persuade him/her to voluntarily leave the premises before formally ejecting a patron.  Formal ejection procedures should be followed in non-arrest or detention cases only if the patron refuses to leave voluntarily.  Formal ejection procedure includes reading of notice of ejection and gathering pertinent information to submit an arrest/ejection report.

E.  The Security Manager or his designee will notify the Credit Department Supervisor to ascertain if the individual has any unpaid markers.

F.  It is imperative that Surveillance is notified promptly, prior to the ejection, if at all possible.

G.  Security personnel will forward a copy of the Ejection Report to the following:

□  Louisiana State Police

□  Credit Manager

□  Vice President of Marketing

□  Surveillance Manager

These persons are not to be detained for these types of ejections.  All information, i.e. name, address, social security numbers, should be obtained.

## JACKPOT PAYOUTS

1.  All jackpots of $1,200 or more require the preparation of a Form W-2G including name, address and social security number of the patron (if applicable) and the amount of the jackpot.  Valid identification must be presented to verify the individual's identity prior to payment.

CONFIDENTIAL                    HORSESHOE 0054

# EXHIBIT 17

**James Lafleur Employee Statement dated March 20, 2017**

Page 1

# HORSESHOE.
## CASINO · HOTEL
### BOSSIER CITY, LA

**EMPLOYEE STATEMENT FORM**

Page ___1___ of ___1___

| Employee Name: James Lafleur | ID # 161 | |
|---|---|---|
| Home Telephone Number: 318-742-0711 ext 5480 | Department: Ops | Position: ACM | Shift: Days |

*When completing this form, please remember to:*

- *Print Clearly*
- *Include all relevant information, such as your relationship to the incident, and any other persons who witnessed the incident.*

Date and Time of Incident:

I was informed by the Caro Casino Manager Jason Willing
that Kyle Pikalik was at 2nd floor main cage trying to cash
out. I approached him at the cage and addressed him by
his first name "Kyle" let me have a word with you. I asked
him to follow me. As we were walking toward the ramp I
asked him if he was from Caesar, he replied yes. I asked
him if he ever played at Caesars properties in Las Vegas. He
looked at me and said I didn't play at the Horseshoe. I
told him you were barred & trespassed at all Caesars properties
as of Octb 2016 He said he wanted to cash out
I told him he was trespassing. And that he needed to
speak with BCPD and security that was on the
ramp waiting.

Signature: _____ 161    Date: 3.20.17

EXHIBIT
Lafleur
17
12·17·18  SR

CONFIDENTIAL                    HORSESHOE 0277

# EXHIBIT 18

**WinNet Message regarding Plaintiff**

```
CMG1130A.CMR1130A          DISPLAY PATRON STATUS              08:25:51 08/01/18
 System I.D. 2848100 GOLD 02/01/2018                    MSGS  Status CASH
Patron Name PIKALUK, KYLE D                                  Rep #  X98
Second Name                        Hotel Rwd
AssocAcct Nme#                              INVALID ID (Re-Examine ID)
                                               Credit/Transit Data
 Estab Date 01/15/14     GAMING PROH        Crd Limit
   D.O.B. 03/21/89       SASKATOON          Trip Limit
Hght/Wght 5 05  150      CAN   S7K 3E6     SK  Pers Checks              .00
  Hair/Eyes BRN  BRN     Firm/Occupation Data                          .00
Glasses/Sex N  M                            In Transit                 .00
     Ss No 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                       Outst                     .00
  Mail Code H 315                        Avail Chk Lmt                  .00
Lst ID Verif   01/15/14                     FRONT MONEY                 .00
D/L St-Exp TX  04/01/15                      Total Avail                .00
   D/L No WF974709                        Pit Game Table
Verify By  WILLIAMS MYRA    Special Remarks  Funds In Adv              .00
Anniv Date 00/00/00                         Tto Available              .00
 Dep Delay 000                              Non-Pit
NOT, REQUIRED                               Write-Off                  .00


F1=Exit F2=Previous F3=Msgs F6=CredActvty F8=Hist F9=CCR F24=More Keys
Account requires activation for pit play
```



EXHIBIT
Lafleur
18
12-17-18  JR
FDX(U/O) 009-031-0009

```
CMG1050.CMR1050        DISPLAY/UPDATE PATRON MESSAGES      08:25:54 08/01/18
UBC0RC        MENU-50   INVALID ID (Re-Examine ID)              UBCDFN0323
  SYSTEM I.D. 2848100                                        STATUS CASH
PATRON NAME PIKALUK, KYLE D                       TOT AVAIL          .00
SECOND NAME                                                       REMOVE
PRI AUT            Your View is Descending New to Old             DATE
  Y   D  GUEST IS EVICTED COMPANYWIDE, CONTACT SECURITY. LHEBERT 06/23/16  999999
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
  __  _  _____  _____
                    Approved by:                     ROLLUP / ROLLDOWN
Auth Codes: D=Display Only N=Not Displayed U=Display & Update V=Void X=Details
  F2-Previous F5-Status F8-Patron History F10-Ascending  F11-Bottom F18-Winet
```

CONFIDENTIAL                    HORSESHOE 0260

Page 3

```
CMGD7198.CMR71980      DISPLAY PATRON HISTORY -GAMES          08:25:57 08/01/18
Account 2848100 MSGS GOLD 02/01/2018                    Rep X98 Status CASH
Patron Name PIKALUK, KYLE D                             Cred.Lmt.
Second Name              Hotel Rwd                      Cred Avail            .00
AssocAcct Nme#                                   INVALID ID (Re-Examine ID)
Start Date/Days                      _  03/17/17   1
From/To Day        Cur                   FRI
Games Cash Play $                                2,800
Games Cck&Sfk $/#
AvgBet/Lngth Play                        799 005:23
Group/Trip Rep                           /X98
Games Win-Loss                            31,750-
Games Theo.Win                            ▓▓▓▓▓▓
Games Comp Worth                            207

Games Most Played               <   DH          >
Hotel/Room Comp
Food/Bevg Comp
Travel/Other
Trip Cash Balance
Total Comps


F1=Exit F2=Previous F3=Msgs F5=Status F6=CredActvty F7=GRating F24=More Keys
Trips(s) w/ latest GAMES activity-03/17/17, SLOTS-00/00/00, OTHERS-00/00/00.
```

CONFIDENTIAL                    HORSESHOE 0261

Page 4

```
Pgmname GSG535RV    Harrah's Winner's Information Network  WINet      8/01/18
Property UBC        GUEST MESSAGES - Account #: 104-02384803         12:24:11

 Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON                SK S7K 3E6        Country: CAN

 Property... ____
                                                                 Expiration
Prop                         Comments                               Date
AKC PATRON IS COMPANY-WIDE TRESPASS(NOT RG) PER ANABEL MARKEL. PLEASE 99/99/99
AKC CALL SECURITY IF ON PROPERTY. ML 315. TSTALTER 062216           99/99/99
BLV NO ACTION ADVANTAGE PLAYER CALL CM,SURV 86TH ON 11/6/11 AJJ      99/99/99
BLV *TRESPASS* APPROVED COMPANYWIDE/ANABEL MARKEL                    99/99/99
CCR 12/28/11 NOTIFY SURVEILLANCE IF ON PROPERTY. PLAYER IS A MEMBER  99/99/99
CCR OF A TEAM KNOWN TO WORK CARNIVAL AND SHOE GAMES. BACKED OFF IN   99/99/99
CCR IOWA AND OTHER JURISDICTIONS. SEE WINET AND BIOMETRICA. HARPER   99/99/99
CLV 091511 HOLE CARDER ASSOCIATED WITH JACOB STREET #3338124 NO BJ   99/99/99
CLV HAS BEEN TRESPASSED ON THIS DATE/JB.                            99/99/99
COU 12/7/11 PERMANENTLY BARRED FROM BOTH IOWA PROPERTIES AS AN       99/99/99
                                                                     More...
Next... __
F1=Help  F3=List  F4=Prompt  F13=Menu
```

CONFIDENTIAL                    HORSESHOE 0262

```
Pgmname GSG535RV    Harrah's Winner's Information Network  WINet      8/01/18
Property UBC           GUEST MESSAGES - Account #: 104-02384803       12:24:11

 Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON                SK S7K 3E6     Country: CAN

 Property... ____
                                                               Expiration
Prop                          Comments                            Date
COU   UNDESIRABLE PER CM ROBERT ZINK    DGIACOVELLI             99/99/99
COU  INCIDENT # IN20110073885                                  99/99/99
COU  6/21/16 GUEST IS COMPANY WIDE TRESPASS PER BRANDI ELLIS / LEGAL  99/99/99
COU    DGIACOVELLI                                             99/99/99
DLV  062916 PATRON IS COMPANY WIDE TRESPASSED PER ANABEL MARKEL   99/99/99
FLV  06/21/16 **COMPANYWIDE TRESPASS** PLS CONTACT SECURITY IF SEEN  99/99/99
FLV  PER AMARKEL    BB4513                                     99/99/99
GBI  062216 BANNED COMPANY WIDE PER LEGAL A MARKEL             99/99/99
HBR  12/7/11 PERMANENTLY BARRED BOTH IOWA PROPERTIES THIS DATE. PATRON  99/99/99
HBR  UNDESIRABLE. ZINK.                                        99/99/99
                                                               More...
Next... _
F1=Help  F3=List  F4=Prompt  F13=Menu
```

Page 6

```
Pgmname GSG535RV     Harrah's Winner's Information Network  WINet        8/01/18
Property UBC         GUEST MESSAGES - Account #: 104-02384803           12:27:15

 Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON                    SK S7K 3E6      Country: CAN

 Property... ____
                                                                Expiration
Prop                        Comments                               Date
HBR INCIDENT # IN20110073885                                    99/99/99
HBR 6/21/16 GUEST IS COMPANY WIDE TRESPASS PER BRANDI ELLIS / LEGAL  99/99/99
HBR    DGIACOVELLI                                              99/99/99
HLT 070216 **COMPANY WIDE TRESPASS**APPROVED BY AMARKEL/LIZA TRCAGE  99/99/99
ILV MET GST IN PIT, GAVE BIZ CARD, CTOWNS 6/30/11               99/99/99
ILV 02/10/2016 GUEST IS TO BE 86'D,SEE WINET MESSAGES. LBOTSIS  99/99/99
ILV 6/21/16 GST TRESPASS ALL CET PROPERTIES. CONTACT SECURITY IF SEEN 99/99/99
ILV  QUESTIONS DIRECT TO AMARKEL@HARRAHS.COM / KB8170           99/99/99
JOL 06.22.2016 PERMANENT EXCLUSION PER WESTERN DIV.***************BL 99/99/99
LAS 6/22/16-COMPANYWIDE TRESPASS CONTACT A MARKEL..CRAPUANO     99/99/99
                                                                More...
 Next... _
 F1=Help  F3=List  F4=Prompt  F13=Menu
```

CONFIDENTIAL                    HORSESHOE 0264

```
Pgmname GSG535RV    Harrah's Winner's Information Network  WINet       8/01/18
Property UBC        GUEST MESSAGES - Account #: 104-02384803          12:27:15

  Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON              SK S7K 3E6       Country: CAN

   Property...  ____
                                                                   Expiration
Prop                         Comments                                 Date
LAU  APPROVED FOR COMPANY-WIDE TRESPASS 6/21/16 PER BRANDI ELLIS  GLF 99/99/99
MET  06/22/2016 PATRON IS TRESPASSED PER FLV COMPANY-WIDE             99/99/99
MET  APPROVED ANABEL MARKEL- NOT RESPONSABLE GAMING // JIVEY          99/99/99
NKC  6/22/16*************GAMING PROHIBITED-COMPANY BAN************    99/99/99
NKC  ****TRESPASS PROPERTY CAESARS ENTERTIANMENT***************       99/99/99
NKC  ******PER ANABEL MARKEL********NOT RESPONSIBLE GAMING********    99/99/99
NOR  COMPANY WIDE TRESPASS PLEASE CONTACT ANABEL MARKEL               99/99/99
NOR  BASED ON REGULATORY CONSIDERATIONS, A DECISION HAS BEEN MADE BY  99/99/99
NOR  MANAGEMENT OF CAESARS ENTERTAINMENT CORPORATION TO CLOSE ACCOUNT.99/99/99
PHV  6/21/16 APPROVED FOR COMPANY WIDE TRESPASS                       99/99/99
                                                                       More...
Next...  __
F1=Help  F3=List  F4=Prompt  F13=Menu
```

Page 8

```
Pgmname GSG535RV    Harrah's Winner's Information Network  WINet      8/01/18
Property UBC         GUEST MESSAGES - Account #: 104-02384803        12:28:57

  Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON                    SK S7K 3E6      Country: CAN

  Property... ____

                                                                   Expiration
Prop                          Comments                                Date
PLV NO ACTION ADVANTAGE PLAYER 86TH ON 11/6/11 CALL CM AJJ          99/99/99
PLV 6/21/16 CONPANYWIDE TRESPASS PER FLV.  CONTACT SECURITY.   CAL  99/99/99
REN 6/23/16 COMPANY WIDE TRESPASS REQUEST HAS BEEN APPROVED         99/99/99
REN PER A MARKEL//NVUJASINOVIC                                      99/99/99
RIN 062216 APPROVED FOR COMPANY WIDE TRESSPASS PER ANABEL MARKEL    99/99/99
RIN PATRON IS PROHIBITED FROM GAMING AT PROPERTY. CV7470            99/99/99
RLV 6/21/16 CITYWIDE TRESPASS P/ AMARKEL PLEASE CALL SECURITY RLV TT 99/99/99
STU 062216 BANNED COMPANY WIDE PER LEGAL A MARKEL              PT   99/99/99
TAH 1/11/16 MR. PIKALUK IS 86'D FROM HARRAH'S AND HARVEYS. W/NEMISH 99/99/99
TAH 12/15/15.                                                       99/99/99
                                                                     More...
  Next... __
  F1=Help  F3=List  F4=Prompt  F13=Menu
End of list
```

CONFIDENTIAL                              HORSESHOE 0266

Page 9

```
Pgmname GSG535RV    Harrah's Winner's Information Network  WINet        8/01/18
Property UBC        GUEST MESSAGES - Account #: 104-02384803           12:28:57

 Guest Name: PIKALUK, KYLE D
Assoc Acct:
City/St/Zip: SASKATOON                    SK S7K 3E6      Country: CAN

 Property... ____

                                                                 Expiration
Prop                           Comments                             Date
TAH 070216 **COMPANY WIDE TRESPASS**APPROVED BY AMARKEL/LIZA TR    99/99/99
UBA COMPANY WIDE TRESPASS....SSCHICKEDANZ    062216               99/99/99
UBC GUEST IS EVICTED COMPANYWIDE. CONTACT SECURITY. LHEBERT 06/23/16 99/99/99
UEL COMPANY WIDE TRESPASS                                          99/99/99
UHA EVICTED - COMPANY WIDE TRESPASS PER CAESARS ENTERTAINMENT ON   99/99/99
UHA 6/21/16 - CONTACT AMARKEL@HARRAHS.COM FOR DETAILS - LREID      99/99/99
UTU 062216 BANNED COMPANY WIDE PER LEGAL A MARKEL          PT      99/99/99
WCL PLEASE CONTACT SURVEILLANCE WHEN IN (TABLE GAMES) MARCH 20/12  99/99/99
WCL TRESPASSED AS PER CORPORATE JUNE 21, 2016                      99/99/99

                                                                   Bottom
 Next... ____
 F1=Help  F3=List  F4=Prompt  F13=Menu
End of list
```

CONFIDENTIAL                        HORSESHOE 0267

```
CMG1050.CMR1050        DISPLAY/UPDATE PATRON MESSAGES        12:23:38 08/01/18
UBC0CM        MENU-01    INVALID ID (Re-Examine ID)                 QPADEV002T
  SYSTEM I.D. 2848100                                          STATUS CASH
PATRON NAME PIKALUK, KYLE D                         TOT AVAIL            .00
SECOND NAME                                                           REMOVE
PRI AUT            Your View is Descending New to Old                   DATE
 Y    D  GUEST IS EVICTED COMPANYWIDE. CONTACT SECURITY. LHEBERT 06/23/16  999999
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
 __   __ _____   ___
                     Approved by:                    ROLLUP / ROLLDOWN
Auth Codes: D=Display Only N=Not Displayed U=Display & Update V=Void X=Details
 F2-Previous F5-Status F8-Patron History F10-Ascending  F11-Bottom F18-Winet
```

CONFIDENTIAL

HORSESHOE 0268

# EXHIBIT 20

**Surveillance Incident Report dated March 18, 2017 – 4:05 p.m.**

| Incident File Full Report | | | Incident File #IN20170025697 |
|---|---|---|---|

|  |  | Record Creation Details |  |
|---|---|---|---|
| Date/Time Occurred: | 18-Mar-2017  15:28 | Department: | Surveillance |
| Day of Week Occurred: | Saturday | Owner: | jswain |
| Date/Time Created: | 18-Mar-2017  16:05 | Operator ID: | jswain |
| Date/Time Closed: | 21-Mar-2017  12:03 | Operator Name: | |
| Closed By: | vtademy | Personnel ID: | |
|  |  | Card Number: | |
|  |  | Job Position | |
|  |  | Secondary Operator: | |

**Location of Incident:**

| Property: | Horseshoe Casino Bossier City |
|---|---|
| Location: | 03 Casino Cashier Cage |
| Sublocation: | Level 2 Cage |

**Details of Incident:**

| Daily Log #: | DL20170434744 |
|---|---|
| Incident Type: | Arrest |
| Specific: | |
| Category: | |
| Incident Status: | Closed |
| Synopsis: | Kyle Pikaluk arrested for trespassing. There is a company wide ban on this guest. Known advantage player (hole carding)   Coverage was dubbed and saved. |
| Checklist: | |

| Narrative: | Created On | Created By | Modified On | Modified By |
|---|---|---|---|---|
| | 18-Mar-2017  16:05 | jswain | | |

Cage shift manager Phyllis Pamplin contacted this office in regards to an incident at the second level cage. Kyle Pikaluk (known advantage player) was attempting to cash out $32,000 in chips from the previous nights play. Pikaluk has a company wide ban and was arrested for trespassing. Coverage was dubbed and saved to evidence.

| Executive Brief: | Cage shift manager Phyllis Pamplin contacted this office in regards to an incident at the second level cage. Kyle Pikaluk (known advantage player) was attempting to cash out $32,000 in chips from the previous nights play. Pikaluk has a company wide ban and was arrested for trespassing. Coverage was dubbed and saved to evidence. |
|---|---|



| Reporting Party: | Supervisor: |
|---|---|

Incident File Full Report                                    Incident File #IN20170025697

Reporting Party:                          Supervisor:

# EXHIBIT 21

**Surveillance Incident Report dated March 18, 2017 – 2:34 p.m.**

| Incident File Full Report | | Incident File #IN20170025442 |
|---|---|---|

| | Record Creation Details | |
|---|---|---|
| Date/Time Occurred: | 18-Mar-2017  2:23 | Department: | Surveillance |
| Day of Week Occurred: | Saturday | Owner: | cwebster |
| Date/Time Created: | 18-Mar-2017  2:34 | Operator ID: | cwebster |
| Date/Time Closed: | 18-Mar-2017  2:34 | Operator Name: | |
| Closed By: | cwebster | Personnel ID: | |
| | | Card Number: | |
| | | Job Position | |
| | | Secondary Operator: | |

**Location of Incident:**

| Property: | Horseshoe Casino Bossier City |
|---|---|
| Location: | 06 Gaming Floor - Pits |
| Sublocation: | Pit 1 |

**Details of Incident:**

| Daily Log #: | DL20170431158 |
|---|---|
| Ref/Camera #: | 631/110 |
| Incident Type: | Player analysis |
| Specific: | BJ Survey |
| Category: | |
| Incident Status: | Closed |
| Synopsis: | Blackjack survey conducted on a name refusal (white male green t-shirt) playing on BJ110 for 104 rounds or 208 hands. He bought in for $2800 at 2123. The player was betting between $400 and $3000 over two spots. The player's decision strategy is worse than basic by 0.29%. The casino advantage against this player is 0.65%. On average, the dealer busted less often than expected and the player won hands they should have lost. There is no evidence that they player is using a device to determine the correct decision strategy or moving his bets with the count. Mostly when he bets an amount he sticks to that amount for several rounds. He left without cashing out $32000 |
| Checklist: | |

| Narrative: | Created On | Created By | Modified On | Modified By |
|---|---|---|---|---|
| | 18-Mar-2017  2:34 | cwebster | | |

Blackjack survey conducted on a name refusal (white male green t-shirt) playing on BJ110 for 104 rounds or 208 hands. He bought in for $2800 at 2123. The player was betting between $400 and $3000 over two spots. The player's decision strategy is worse than basic by 0.29%. The casino advantage against this player is 0.65%. On average, the dealer busted less than expected and the player won hands they should have lost. There is no evidence that they player is using a device to determine the correct decision



| Reporting Party: | Supervisor: |
|---|---|

| Incident File Full Report | Incident File #IN20170025442 |
|---|---|

strategy or moving his bets with the count. Mostly when he bets an amount he sticks to that amount for several rounds.

**Executive Brief:** Blackjack survey conducted on a name refusal (white male green t-shirt) playing on BJ110 for 104 rounds or 208 hands. He bought in for $2860 at 2123. The player was betting between $400 and $3000 over two spots. The player's decision strategy is worse than basic by 0.29%. The casino advantage against this player is 0.65%. On average, the dealer busted less often than expected and the player won hands they should have lost. There is no evidence that this player is using a device to determine the correct decision strategy or moving his bets with the count. Mostly when he bets an amount he sticks to that amount for several rounds.

**Supplemental Entries:**

SP20170002490  Attached by bdavis  on Mar 21, 2017 12:14

**Description:** Further investigation revealed that this player si Kyle Pikaluk. He is a company wide ban. He has a profile in Biometrica that states he is an advantage player and hole carder. Below is a list of the dealers and floor supervisors who were present while he was on the game and his buy in amounts:

Dealers: Steven Washington
　　　　Robert Jones

Floor Supervisors: Joe Conger
　　　　　　　　Sara Clark

Buy-ins table on BJ110 (stayed on this game the whole time)

21:23- $800
21:29- $300
21:34- $1600

| Reporting Party: | Supervisor: |
|---|---|

# EXHIBIT 23

**Arends Incident Report dated March 18, 2017**



**Case Number:** IN-1703-145

## INCIDENT REPORT FORM

**Officer Making Report:** Federico M. Arends III_____   **Badge#** 20013   **Initials:** FA

**Occurrence Date:** _3/18/2017_   **Occurrence Day:** _Saturday_   **Occurrence Time:** 1535   AM ☐ PM ☒
**Report Date:** _3/18/2017_   **Report Day:** _Saturday_   **Report Time:** 1605   AM ☐ PM ☒
**Specific Location of Incident (Level, Slot #, Escalator #, etc.):** level 2 cage

**TYPE OF INCIDENT: Guest ☒   Employee ☐**

| | | | |
|---|---|---|---|
| ☐INJURY | ☐VARIANCE | ☐FIRE | ☒OTHER: |
| ☐ILLNESS | ☐PROPERTY DAMAGE | ☐COMPLAINT | Trespassing |
| ☐VALET | ☐COUNTERFEIT | ☐FALSE ID | |
| ☐THEFT | ☐MISCONDUCT | ☐TRESPASSING | |
| ☐ASSAULT | ☐EJECTION | ☐GAMING VIOLATION | |
| ☐FRAUD | ☐EVICTION | ☐VEHICLE ACCIDENT | |

**GUEST/EMPLOYEE INFORMATION:**

Name:  Kyle Pikaluk               Date of Birth: 3/21/1989
Street: _____   City _____   State _____   Zip _____
Primary Phone: _____   Secondary Phone: _____
Sex: M   Race: W   Drivers License: _____   TR ACCT #/Tier: Diamond/10402384803/ADT2582
Additional Descriptions: (Wt., Ht., Eye color etc.): _____
Employee ID: 800 -_____   Position: _____ Department: _____
Supervisor's Name: _____   Was Supervisor Notified? YES ☐   NO ☐

**ADDITIONALGUEST/EMPLOYEE INFORMATION** (For incidents involving more than one person):   N/A ☒

Name: _____   Was a report created for this person? YES ☐   NO ☐
If no, why?_____
Name: _____   Was a report created for this person? YES ☐   NO ☐
If no, why? _____

**INCIDENT INFORMATION:**

Chief Complaint:  Company wide trespassing ban per legal
Surveillance Called? YES ☒   NO ☐   Coverage Available? YES ☒   NO ☐   UNK☐
Name of Surveillance Operator Contacted:  Swain
Photos Taken? YES ☐   NO ☒   Photos taken by whom? _____
Witness(es)? YES ☐   NO ☒   Were statements taken? YES ☐   NO ☐
Witness #1:  Name: _____ Phone # _____   Employee ☐ Guest ☐
Witness #1:  Name: _____ Phone # _____   Employee ☐ Guest ☐
*If not injury/illness skip to next page(pg2)*

First Aid Offered? YES ☐   NO ☐   First Aid: ACCEPTED ☐   REJECTED ☐   Fire Dept Called? YES ☐   NO ☐
Transported? YES ☐   NO ☐   If yes, by whom and where? _____
** **BCFD refused** to Transport ☐
If so, was guest informed of BCFD's refusal? YES ☐   NO ☐   If no, why?_____

CONFIDENTIAL

HORSESHOE 0130

EXHIBIT
Arends
23
12-7-18

*Employee incidents only*: Was employee given Authorization to Treat Form?   YES ☐   NO ☐

## INCIDENT REPORT FORM (cont…)

**Guest/Employee Name:** Kyle Pikaluk_____        **Occurrence Date:** <u>3/18/2017</u>

**NARRATIVE OF INCIDENT (Describe in Detail circumstances of incident):**
*Include: Who, What, When, Why, Where and How.  Description of area, suspects, mode of travel etc.*

Mr Pikaluk presented himself at level 2 cage and it was discovered that he was a company wide ban per legal.  Casino Manager, Jason Williams, requested BCPD to have Mr Pikaluk arrested for trespassing.  BCPD was dispatched and Mr Pikaluk was arrested by BCPD for trespassing.  Surveillance was notified.  This is a followup from report IN-1703-138.

Additional Narrative Info: Type of shoes worn (flip flops, sneakers etc.): n/a     Floor Conditions: n/a

Weather Conditions: n/a     Signs of alcohol involvement if any: unknown

**EVIDENCE:** Was evidence seized? YES ☐  NO ☐  N/A ☒
If yes:  Describe the evidence: _____ Who seized the evidence? _____
If no:  Why wasn't the evidence seized? _____

**BCPD INFORMATION:** Was an arrest made? YES ☒   NO ☐     Police Report # (if applicable) _____
If yes: Who was arrested?  Kyle  Pikaluk  Who transported the suspect?  BCPD

**EJECTION/EVICTION:** Was an ejection/eviction enforced in this incident? YES ☐   NO ☐
If yes: What type?  8-hour ☐  24-hour ☐  Permanent ☒  Other: _____
Please describe the reason for this ejection or eviction:  Company wide ban Per Legal

**Guest/Employee signature:** _____     **Date:** _____     **Refused**

Federico M. Arends III          20013                    Steven Jones
Security Supervisor              Badge#                   **Security Manager**

_____          _____
Security Supervisor (Signature)      Date          Security Manager  (Signature)        Date

CONFIDENTIAL

HORSESHOE 0131

# EXHIBIT 25

**Louisiana Administrative Code - Chapter 35. Patron Disputes from Horseshoe**

the surveillance system plan in compliance with a new rule or a rule amendment within 30 days of the effective date.

C.   The division shall review any amendments submitted pursuant to this Section and issue a decision approving, approving with conditions, or disapproving the amendments.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1666 (July 2012).

## Chapter 34. Security

Editor's Note: The information for this Chapter was consolidated from corresponding Chapters in Parts VII, IX, and XIII prior to their being repealed.

### §3403.   Security Plans

A.   An applicant for a license shall submit to the division a security plan no later than 90 days prior to the commencement of gaming operations. The security plan shall include, at a minimum, the following:

1.   a detailed description by position of each security officer or employee which includes their duties, assignments and responsibilities;

2.   the number of security employees assigned by shift;

3.   general procedures for handling incidents requiring the assignment of a security officer;

4.   radio protocol and a description of authorized radio codes to be used;

5.   training requirements and procedures; and

6.   other information required by the division that evidences compliance with this Chapter by the applicant.

B.   Modifications to the security plan shall be submitted to the division for approval prior to implementation.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1666 (July 2012).

### §3409.   Security Logs

A.   The licensee and casino operator shall maintain a security log of all unusual incidents. Each incident without regard to materiality, shall be assigned a sequential number and an entry made in the log containing, at a minimum, the following information:

1.   the assignment number;

2.   the date;

3.   the time;

4.   the nature of the incident;

5.   the person involved in the incident; and

6.   the security department employee assigned.

B.   The security logs required by this Section shall be retained and stored by month and year.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1667 (July 2012).

## Chapter 35. Patron Disputes

Editor's Note: The information for this Chapter was consolidated from corresponding Chapters in Parts VII, IX, and XIII prior to their being repealed.

### §3501.   Patron Dispute Form

A.   Whenever a licensee or casino operator and a patron are unable to resolve a dispute regarding the payment of winnings, the licensee or casino operator shall provide the patron a patron dispute form.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1667 (July 2012).

### §3502.   Licensee Duty to Provide Patron Dispute Information

A.   Within seven days of the licensee or casino operator being notified of a written patron dispute, the licensee or casino operator shall provide the division, in writing, the identity of the parties involved in the dispute and all facts regarding the dispute.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1667 (July 2012).

## Chapter 39. Public and Confidential Records

Editor's Note: The information for this Chapter was consolidated from corresponding Chapters in Parts VII, IX, and XIII prior to their being repealed.

### §3901.   Public Records

A.   Except as provided in R.S. 27:21, records of the board and division shall be public records.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1667 (July 2012).

### §3905.   Sealing of Documents

A.   The board or hearing officer may allow any party to an administrative action to file a document or portions of a document with the board or hearing office under seal if:

1.   the document or portions of the document contain information that is confidential pursuant to the Act or these rules;


PLAINTIFF'S EXHIBIT
25

# EXHIBIT 31

**Jones Employee Statement dated March 30, 2017**

# HORSESHOE.
### ～CASINO·HOTEL～
#### BOSSIER CITY, LA

## EMPLOYEE STATEMENT FORM

Page ____1____ of ____1____

| Employee Name:  Steven Jones | | ID #800599456 | |
|---|---|---|---|
| Home Telephone Number:<br>318-741-7838 | Department:<br>Security | Position:<br>Security Manager | Shift: N/A |

*When completing this form, please remember to:*
- *Print Clearly*
- *Include all relevant information, such as your relationship to the incident, and any other persons who witnessed the incident.*

Date and Time of Incident:  03/18/2017 @ 1535 hours

On 03/18/2017, around 1430 hours, I was contacted by Assistant Casino Operations Manager James Lafleur in reference to an incident that occurred earlier around 0800 hours. ACM Lafleur advised that a guest named Kyle Pikaluk was on the property earlier. He advised that Kyle Pikaluk was banned companywide from all Caesars properties. He advised that Kyle Pikaluk was a known advantage player and was banned permanently from all Caesars Properties. He advised that Kyle Pikaluk had left the property prior to Casino Operations or Security being able to contact him. Kyle Pikaluk left the property with a large amount of chips. We discussed that we would be looking for him in case he returned to attempt to cash out the chips.

Around 1535 hours I received a phone call from Casino Operations Manager Jason Williams. He advised that Kyle Pikaluk had returned to the property and was attempting to cash out chips at the cage on level two of the casino. I contacted Jason Williams and James Lafleur just off the casino floor at level two. I was advised that Kyle Pikaluk was originally evicted permanently from Bally's Las Vegas and was then issued a companywide ban per our cooperate legal department.  Jason Williams and James Lafleir requested Kyle Pikaluk be arrested for Trespassing due to the companywide ban. Bossier City Police (BCPD) were contacted by Security dispatch and responded to the property.

I left Security Supervisor Federico Arends with Jason Williams and James Lafleur at the entrance to level two. I walked to the front of the property to meet BCPD and advise them of the situation. BCPD arrived and were briefed by me on the situation. Kyle Pikaluk was walking up the main ramp towards the front of the property when BCPD and I met him. BCPD placed Kyle Pikaluk under arrest for Trespassing. James Lafleur provided proof to BCPD of the permanent companywide eviction. BCPD escorted Kyle Pikaluk to the valet drop off area where the marked patrol unit was parked.

I had the opportunity to speak to Kyle Pikaluk prior to him being placed into the mark patrol unit. Kyle Pikaluk wanted to know why he was being arrested. I asked him if he had been previously evicted from Bally's Casino in Las Vegas, NV. He stated that he had previously been evicted from that property. I asked him if he was told that he was evicted from all Caesars properties. He stated they did tell him that but he did not know that this (Horseshoe Bossier City) was a Caesars property. He stated he never received a letter telling him that he was evicted from all Caesars properties. This was witnessed by BCPD Officer Johnson who was the arresting officer. Kyle Pikaluk was then transported to the Bossier City Jail.

End Of Statement

EXHIBIT
Jones
31
12-14-18   JR

Signature: _____   Date: 3/30/2017

CONFIDENTIAL                                      HORSESHOE 0240

# EXHIBIT 35

**Manual Attachment – Audio Recordings of Horseshoe call to Bossier City Police and Thomerson's Radio Communication that he would take the report**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| KYLE D. PIKALUK | Civil No.  5:18-cv-00215-SMH |
| Plaintiff | |
| | |
| VS. | Judge  S. MAURICE HICKS |
| HORSESHOE ENTERTAINMENT, LP, ET AL. | Magistrate Judge  MARK HORNSBY |
| Defendant | |

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:        Plaintiff's Appendix in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment

DESCRIPTION:        Exhibit 35 - Dispatch Audio Recordings

FILED BY:        John P. Lewis, Jr. and Michael Schwartzberg

FILE DATE:        March 15, 2019

**************************************NOTICE**************************************

**The attached document is an original manual attachment that could not be converted into PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The <u>original manual attachment</u> must be delivered to the divisional <u>Clerk's Office</u> of the presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's Office.[1]  The manual attachment will be maintained at this location until expiration of appeal delays.**

**Attachment sent to _____ DIVISON.**

**Prepared by: _____**

---

[1] <u>**Chambers Personnel**</u>**: When finished reviewing the manual attachment, please return to the Clerk's Office.**

# EXHIBIT 36

**Manual Attachment – Johnson Bodycam Video (Entire Video)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK                           Civil No.   5:18-cv-00215-SMH
Plaintiff

VS.                                       Judge   S. MAURICE HICKS
HORSESHOE ENTERTAINMENT, LP,      Magistrate Judge   MARK HORNSBY
ET AL.
Defendant

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:      Plaintiff's Appendix in Support of Plaintiff's Opposition to
Defendants' Motion for Summary Judgment

DESCRIPTION:      Exhibit 36 -  Johnson Bodycam Video

FILED BY:       John P. Lewis, Jr. and Michael Schwartzberg

FILE DATE:      March 15, 2019


*************************************NOTICE*************************************

**The attached document is an original manual attachment that could not be converted into
PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related
e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The _original manual attachment_ must be delivered to the divisional _Clerk's Office_ of the
presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's
Office.[1]   The manual attachment will be maintained at this location until expiration of
appeal delays.**


**Attachment sent to _____ DIVISON.**


**Prepared by: _____**

---

[1] **_Chambers Personnel_: When finished reviewing the manual attachment, please return to the Clerk's Office.**

# EXHIBIT 37

**Manual Attachment – Thomerson Bodycam Video (Entire Video)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK                          Civil No.  5:18-cv-00215-SMH
          Plaintiff

         VS.                                      Judge   S. MAURICE HICKS
HORSESHOE ENTERTAINMENT, LP,       Magistrate Judge   MARK HORNSBY
         ET AL.
         Defendant

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:        Plaintiff's Appendix in Support of Plaintiff's Opposition to
Defendants' Motion for Summary Judgment

         DESCRIPTION:       Exhibit 37 - Thomerson Bodycam Video

         FILED BY:          John P. Lewis, Jr. and Michael Schwartzberg

         FILE DATE:         March 15, 2019

**************************************NOTICE***************************************

**The attached document is an original manual attachment that could not be converted into PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The <u>original manual attachment</u> must be delivered to the divisional <u>Clerk's Office</u> of the presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's Office.[1]  The manual attachment will be maintained at this location until expiration of appeal delays.**

**Attachment sent to _____ DIVISON.**

**Prepared by: _____**

---

[1] **<u>Chambers Personnel</u>: When finished reviewing the manual attachment, please return to the Clerk's Office.**

# EXHIBIT 38

**Manual Attachment – Excerpts from Johnson Dashcam (Three Videos on Disk)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


KYLE D. PIKALUK                                    Civil No.   5:18-cv-00215-SMH
Plaintiff

VS.                                                       Judge   S. MAURICE HICKS
HORSESHOE ENTERTAINMENT, LP,            Magistrate Judge   MARK HORNSBY
ET AL.
Defendant


## NOTICE OF MANUAL ATTACHMENT


ATTACHMENTS TO:        Plaintiff's Appendix in Support of Plaintiff's Opposition to
Defendants' Motion for Summary Judgment

DESCRIPTION:        Exhibit 38 - Excerpts Johnson Dashcam Video

FILED BY:        John P. Lewis, Jr. and Michael Schwartzberg

FILE DATE:        March 15, 2019


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***NOTICE**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The attached document is an original manual attachment that could not be converted into PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The <u>original manual attachment</u> must be delivered to the divisional <u>Clerk's Office</u> of the presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's Office.[1]  The manual attachment will be maintained at this location until expiration of appeal delays.**


**Attachment sent to \_\_\_\_\_ DIVISON.**


**Prepared by: \_\_\_\_\_**

---

[1] <u>**Chambers Personnel**</u>**: When finished reviewing the manual attachment, please return to the Clerk's Office.**

# EXHIBIT 39

**Manual Attachment - Horseshoe Surveillance Video – Plaintiff at Cashier's Cage on March 18, 2018 (Split View – Entire Video)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK
Plaintiff

Civil No.   5:18-cv-00215-SMH

VS.
HORSESHOE ENTERTAINMENT, LP,
ET AL.
Defendant

Judge   S. MAURICE HICKS
Magistrate Judge   MARK HORNSBY

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:        Plaintiff's Appendix in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment

DESCRIPTION:        Exhibit 39 - Horseshoe Surveillance Video of Cashier Cage

FILED BY:         John P. Lewis, Jr. and Michael Schwartzberg

FILE DATE:        March 15, 2019

*****************************************NOTICE*****************************************

**The attached document is an original manual attachment that could not be converted into PDF and uploaded to CM/ECF. A PDF version of this notice should accompany the related e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The original manual attachment must be delivered to the divisional Clerk's Office of the presiding judge. Chambers personnel may obtain the manual attachment from the Clerk's Office.[1] The manual attachment will be maintained at this location until expiration of appeal delays.**

**Attachment sent to _____ DIVISON.**

**Prepared by: _____**

---

[1] **Chambers Personnel: When finished reviewing the manual attachment, please return to the Clerk's Office.**

# EXHIBIT 40

**Manual Attachment - Horseshoe Surveillance Video – Excerpts depicting Plaintiff Entering Casino, Proceeding to Cashier's Cage, and Waiting at Cashier's Cage on March 18, 2107 (Two Videos on Disk)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK                          Civil No.   5:18-cv-00215-SMH
        Plaintiff

        VS.                                     Judge   S. MAURICE HICKS
HORSESHOE ENTERTAINMENT, LP,        Magistrate Judge   MARK HORNSBY
        ET AL.
        Defendant

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:         Plaintiff's Appendix in Support of Plaintiff's Opposition to
Defendants' Motion for Summary Judgment

        DESCRIPTION:        Exhibit 40 -  Horseshoe Surveillance Video of Cashier Cage

        FILED BY:            John P. Lewis, Jr. and Michael Schwartzberg

        FILE DATE:          March 15, 2019


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***NOTICE**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The attached document is an original manual attachment that could not be converted into
PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related
e-filing as an attachment.**

**INSTRUCTIONS FOR FILER:**
**The underlined manual attachment must be delivered to the divisional Clerk's Office of the
presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's
Office.[1]  The manual attachment will be maintained at this location until expiration of
appeal delays.**


**Attachment sent to _____ DIVISON.**


                    **Prepared by: _____**

_____

[1] **Chambers Personnel**: When finished reviewing the manual attachment, please return to the Clerk's Office.

# EXHIBIT 41

**Manual Attachment - Horseshoe Surveillance Video – Excerpts depicting Plaintiff waiting at cage, Lafleur, Williams, and Arends escorting him off the casino floor onto the ramp where police were approaching, and arrest and escort out of the casino**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK                          Civil No.   5:18-cv-00215-SMH
Plaintiff

VS.                                                Judge   S. MAURICE HICKS
HORSESHOE ENTERTAINMENT, LP,        Magistrate Judge   MARK HORNSBY
ET AL.
Defendant

## NOTICE OF MANUAL ATTACHMENT

ATTACHMENTS TO:        Plaintiff's Appendix in Support of Plaintiff's Opposition to
Defendants' Motion for Summary Judgment

DESCRIPTION:        Exhibit 41 -  Horseshoe Surveillance Video of Arrest

FILED BY:         John P. Lewis, Jr. and Michael Schwartzberg

FILE DATE:        March 15, 2019

****************************************NOTICE****************************************

The attached document is an original manual attachment that could not be converted into
PDF and uploaded to CM/ECF.  A PDF version of this notice should accompany the related
e-filing as an attachment.

INSTRUCTIONS FOR FILER:
The original manual attachment must be delivered to the divisional Clerk's Office of the
presiding judge.  Chambers personnel may obtain the manual attachment from the Clerk's
Office.[1]  The manual attachment will be maintained at this location until expiration of
appeal delays.

Attachment sent to _____ DIVISON.

Prepared by: _____

---

[1] Chambers Personnel: When finished reviewing the manual attachment, please return to the Clerk's Office.

# EXHIBIT 42

**Horseshoe Gaming License and Corporate Structure
filed with Louisiana Gaming Control Board**

# CAESARS ENTERTAINMENT CORPORATION
# LOUISIANA OWNERSHIP INTEREST
# ORGANIZATIONAL CHART

LSP Corporate Securities – Audit
December 31, 2018

** Jazz Casino Company, L.L.C. and JCC Fulton Development, LLC are managed by Harrah's New Orleans Management Company, a wholly-owned subsidiary of Caesars Entertainment Operating Company, LLC





**State of Louisiana**
DEPARTMENT OF JUSTICE
GAMING DIVISION
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

May 31, 2018

**CERTIFIED MAIL NO.:  7013 1710 0001 9587 4974**
Mr. John P. Lewis, Jr.
Attorney and Counselor
1412 Main Street
Dallas, TX 75202

Re: Public Records Request – Horseshoe Entertainment, LP d/b/a "Horseshoe
Hotel & Casino", 711 Horseshoe Blvd., Bossier City, Louisiana

Dear Mr. Lewis:

Our office has received your public records request to the Louisiana Gaming Control Board
("Board"), dated May 24, 2018, seeking:

> Copies of all licenses, permits, or other documents issued to Horseshoe
> Entertainment, LP, d/b/a "Horseshoe Hotel & Casino", evidencing its authority to
> operate a riverboat casino in Louisiana, that were in effect at any time during the
> period from January 1, 2016, through April 1, 2017.

> This request specifically seeks all documents identifying all persons or entities
> who were a "licensee, permitee, or gaming operator" in respect of the Horseshoe
> Hotel & Casino during the period from January 1, 2016, through April 1, 2017, as
> such terms are used in La. R.S. 27:27.4.

I have been asked to respond on behalf of the Board.

Mr. John P. Lewis, Jr.
May 31, 2018
Page 2

The document responsive to your request, the license, is enclosed herein.

If you have any questions, please feel free to contact our office.

Sincerely,

**JEFF LANDRY
ATTORNEY GENERAL**

BY:    _Earl G. Pitre Jr._
       **Earl G. Pitre, Jr.**
       **Assistant Attorney General**

EGP/ssd
cc:    Ronnie Jones, Chairman

# STATE OF LOUISIANA

## LOUISIANA GAMING CONTROL BOARD



The Louisiana Gaming Control Board hereby grants **Horseshoe Entertainment, L.P. d/b/a Horseshoe Bossier City Casino & Hotel,** a license to conduct riverboat gaming at Horseshoe Bossier City Casino and Hotel in accordance with law.

Awarded this 18th day of September, 2014.

License No. *R01800198*

Expiration Date: *November 22, 2019*

*Ronnie Jones, Chairman*

# EXHIBIT 43

**Excerpts of Deposition of Kyle D. Pikaluk**

KYLE D. PIKALUK                    12/18/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF LOUISIANA

 3                     SHREVEPORT DIVISION

 4

 5     KYLE D. PIKALUK,          :    CAUSE NO.
                                 :    5:18-cv-00215-SMH-MLH
 6              Plaintiff,       :
                                 :
 7     VERSUS                    :
                                 :
 8     HORSESHOE ENTERTAINMENT   :    JUDGE S. MAURICE
       LIMITED PARTNERSHIP,      :    HICKS, JR.
 9     D/B/A "HORSESHOE HOTEL    :
       & CASINO", STEVEN JONES,  :
10     JOSEPH C. THOMERSON,      :
       D. RAZINSKY, JORDAN D.    :
11     JOHNSON, ROB BROWN,       :
       JASON WILLIAMS,           :
12     FEDERICO M. ARENDS, III,  :
       AND JAMES LAFLEUR,        :
13                               :    MAGISTRATE JUDGE
                Defendants.      :    MARK HORNSBY
14

15

16

17

18          DEPOSITION OF KYLE D. PIKALUK

                December 18, 2018
19

20

21

22

23

24
       Reported By:
25     Jayne M. Reeves, CCR
```

KYLE D. PIKALUK                                    12/18/2018

**Page 2**

```
1   APPEARANCES:
2   COUNSEL FOR PLAINTIFF:
3       MR. JOHN P. LEWIS, JR.
        Attorney at Law
4       1412 Main Street, Suite 210
        Dallas, Texas 75202
5       214.742.5925
        214.742.7110 - Facsimile
6       jplewisjr@mindspring.com
7   COUNSEL FOR DEFENDANTS:
8       MR. SCOTT L. ZIMMER
        Kean Miller, LLP
9       333 Texas Street, Suite 450
        Shreveport, Louisiana 71101
10      318.562.2700
        318.562.2751 - Facsimile
11      scott.zimmer@keanmiller.com
12  ALSO PRESENT:  Alicia Cunningham, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                    I N D E X
2                                              PAGE
3   Examination by Mr. Zimmer.................   6
4   Examination by Mr. Lewis.................  149
5
6
7
8                  E X H I B I T S
9   NUMBER        DESCRIPTION                  PAGE
10  Ex. 26        Plaintiff's Response to       32
                  First Set of Interrogatories
11                Propounded by Horseshoe
                  Entertainment, LP
12
    Ex. 27        Trespass Notice               46
13                KP-000650
14  Ex. 28        Promotional mailers from     108
                  Caesars Entertainment
15                KP Supplemental-000652
                  through 000655
16
    Ex. 29        Second Amended and           113
17                Restated Complaint
18  Ex. 30        Complaint                    138
                  KP-000010 through 000019
19
20
21
22
23
24
25
```

**Page 3**

```
1           S T I P U L A T I O N S
2
3       The deposition of KYLE D. PIKALUK,
4   taken by counsel for Defendants, pursuant to
5   Notice and agreement by and between counsel, for
6   all purposes as allowed by the Federal Rules of
7   Civil Procedure, before Jayne M. Reeves,
8   Certified Court Reporter, at the offices of Kean
9   Miller, LLP, located at 333 Texas Street, Suite
10  450, Shreveport, Louisiana, on December 18, 2018.
11      It being stipulated by and between
12  counsel that all formalities, with the exception
13  of the swearing of the witness, are waived.
14      It being further stipulated that the
15  reading and signing of the deposition are not
16  waived by counsel nor by the witness.
17      It being further stipulated that all
18  objections except as to the form of the question
19  and responsiveness of the answer are reserved
20  until the time of trial.
21
22
23
24
25
```

**Page 5**

```
1              P R O C E E D I N G S
2
3           THE VIDEOGRAPHER:  This is the
4   deposition of Kyle D. Pikaluk taken by Scott L.
5   Zimmer in the matter of Kyle D. Pikaluk versus
6   Horseshoe Entertainment, LP, et al, Civil Action
7   No. 18-cv-00215 in the United States District
8   Court, Western District of Louisiana, Shreveport
9   Division, held at the law offices of Kean Miller,
10  333 Texas Street, Suite 450, Shreveport,
11  Louisiana.  The date is Tuesday, December 18,
12  2018.  The time is now 1:01 p.m.
13          Would Counsel please introduce
14  themselves and the party they represent.
15          MR. LEWIS:  John P. Lewis, Jr.,
16  representing the Plaintiff, Kyle D. Pikaluk.
17          MR. ZIMMER:  Scott Zimmer on
18  behalf of the Defendants, Horseshoe
19  Entertainment, Steven Jones, James Lafleur, Rob
20  Brown, Jason Williams and Max Arends.
21                      ***
22
23
24
25
```

KYLE D. PIKALUK                                    12/18/2018

6

1              KYLE D. PIKALUK,
2  the witness, having been duly sworn, testified as
3  follows, to wit:
4              EXAMINATION
5  BY MR. ZIMMER:
6      Q.   Sir, could you please state your full
7  name for the record.
8      A.   Kyle David Peter Pikaluk.
9      Q.   And for the record, Mr. Pikaluk, your
10  last name is spelled P-I-K-A-L-U-K?
11     A.   Correct.
12     Q.   How many times have you been deposed
13  before, Mr. Pikaluk?
14     A.   One.
15     Q.   And that was with regard to the lawsuit
16  you filed against another casino in Las Vegas?
17     A.   Yes.  Just outside of Las Vegas,
18  actually.
19     Q.   Okay.  In Nevada?
20     A.   Yes.
21     Q.   My recollection is you gave your
22  deposition in that case around 2012.  Is that
23  about right?
24     A.   I believe it was near the end of 2013,
25  but I haven't looked at the date.

7

1      Q.   Okay.  Sure.  And perhaps I misspoke.
2  The suit would have been filed in 2012?
3      A.   Yes.
4      Q.   And you were deposed in connection with
5  that lawsuit sometime after the initial filing.
6  Right?
7      A.   Correct.
8      Q.   Okay.  My point to that was it's been a
9  little while.  So I was just going to refresh you
10  on sort of the rules of the deposition.  You
11  understand that I represent the parties that you
12  sued in this case.  Correct?
13     A.   Yes.
14     Q.   You understand that you're sworn to
15  tell the truth today just as if you were in
16  court?
17     A.   Yes.
18     Q.   Okay.  If for whatever reason,
19  Mr. Pikaluk, you do not understand my question,
20  if I ask a poor question or you're just not
21  following what I'm asking you, ask me to rephrase
22  it, and I'll be happy to do so.  Okay?
23     A.   Okay.
24     Q.   Otherwise, I'll assume you understood
25  the question as asked and answered it

8

1  accordingly.  Is that fair?
2      A.   Yes.
3      Q.   Is there anything, Mr. Pikaluk,
4  preventing you from giving accurate testimony
5  today?
6      A.   No.
7      Q.   Are you on any type of medication?
8      A.   No.
9      Q.   If for whatever reason you need to take
10  a break, just let me know, and we'll be happy to
11  do that so long as there's not a question pending
12  on the table.  Okay?
13     A.   Okay.
14     Q.   You're doing pretty good.  I saw you
15  start to slip up right there, though.  In
16  response to my questions, please answer out loud.
17  Avoid the huh-uhs and the uh-huhs if you could.
18     A.   I will try my best.
19     Q.   Okay.  Also, and I know you've heard
20  this before, but make sure you let me finish my
21  complete question before you start answering.
22  And I'll let you finish your answer before I
23  start asking my next question.  And we'll both
24  try to do that.  Can we agree to that?
25     A.   Okay.

9

1      Q.   All right.  Mr. Pikaluk, what, if
2  anything, did you do to prepare for today's
3  deposition?
4      A.   I read my previous deposition a few
5  days ago.  I conferred with my attorney on and
6  off for the last two days.
7      Q.   Okay.  And that's Mr. Lewis, who's
8  seated to your left?
9      A.   Yes.
10     Q.   All right.  Anything else?
11     A.   That's it.
12     Q.   The deposition that you read,
13  Mr. Pikaluk, that was the same one that we
14  referenced earlier from that prior lawsuit?
15     A.   Yes.
16     Q.   Remind me of the defendant in that
17  lawsuit.
18     A.   It was the Virgin River Hotel and
19  Casino in Mesquite, Nevada.
20     Q.   Did you have a copy of that deposition
21  or did you ask someone for a copy?
22     A.   I had the copy.
23     Q.   Get a bit of background information
24  from you, Mr. Pikaluk.  Where do you currently
25  reside?

KYLE D. PIKALUK                                                    12/18/2018

**10**

1     A.   At 946 Pringle Cove, Saskatoon,
2   Saskatchewan, S7T 0V6 in Canada.
3     Q.   And you said Pringle with a P?
4     A.   Yes.
5     Q.   And how long have you lived there?
6     A.   Since the winter -- since December
7   2014.
8     Q.   Does anyone live there with you or do
9   you live there alone?
10     A.   I live there by myself.
11     Q.   Do you own your home or are you
12   renting?
13     A.   I own it.
14     Q.   Did you purchase it or build it?
15     A.   I purchased it.
16     Q.   Where did you live before 946 Pringle
17   Cove?
18     A.   I lived with a friend for about a year,
19   I believe.
20     Q.   Okay.  At what address?
21     A.   The address might be a tiny bit off.  I
22   believe it was 303, Unit 206, Klassen Crescent.
23   I never had any of my mail sent there, so I --
24   the address is a little bit kind of shaky.
25     Q.   Klassen Crescent, is that the name of

**11**

1   the street or the city?
2     A.   That's the name of the street.  It's in
3   Saskatoon, Saskatchewan.
4     Q.   Saskatoon.  So that would have been
5   approximately December 2013 to December 2014?
6     A.   Yeah.
7     Q.   Roughly?
8     A.   About there.
9     Q.   What's the name of the friend that you
10   lived with?
11     A.   Kenton Nystuen, N-Y-S-T-U-E-N.
12     Q.   Where did you live before?
13     A.   I lived at my parents' house up until
14   that point.
15     Q.   What's your parents' address?
16     A.   It's 1729 Prince of Wales Avenue in
17   Saskatoon, Saskatchewan.
18     Q.   What are your parents' names?
19     A.   Wendy Pikaluk and David Pikaluk.
20     Q.   Tell me, Mr. Pikaluk, a little bit
21   about your educational background.
22     A.   I went to high school in Saskatoon.
23   And immediately upon graduation, I went to the
24   University of Saskatchewan and received a
25   four-year Bachelor of Science in engineering from

**12**

1   the University of Saskatchewan.
2     Q.   What year did you graduate from high
3   school?
4     A.   2007.
5     Q.   And so 2011 would have been when you
6   received your bachelor's?
7     A.   Correct.
8     Q.   And it's the University of --
9     A.   Saskatchewan.
10     Q.   Is it located in Saskatoon?
11     A.   Yes.
12     Q.   Did you live at home while you attended
13   the university?
14     A.   Yes.
15     Q.   Are you currently married?
16     A.   No.
17     Q.   Have you ever been married?
18     A.   No.
19     Q.   Do you have any children?
20     A.   No.
21     Q.   Are you registered to vote?
22     A.   Yes.
23     Q.   Where are you registered to vote?
24     A.   At my home address.
25     Q.   And when you say your home address,

**13**

1   that's 946 Pringle Cove?
2     A.   Yes.
3     Q.   And when did you switch your voter
4   registration?
5     A.   As soon as I bought my house.
6     Q.   Do you have a driver's license?
7     A.   Yes.
8     Q.   Issued by whom?
9     A.   The Provence of Saskatchewan.  Or the
10   issuing body, I guess, is SGI.
11     Q.   Okay.
12     A.   It's the Saskatchewan Government
13   Insurance, I believe it stands for.
14     Q.   Okay.
15         THE COURT REPORTER:  I'm sorry.
16   Say that again.
17     A.   The Saskatchewan Government Insurance.
18     Q.   (BY MR. ZIMMER)  And what address does
19   your driver's license have on it?
20     A.   946 Pringle Cove.
21     Q.   And when did you switch your address
22   for your driver's license?
23     A.   When I bought my house.
24     Q.   There's been some testimony, and some
25   of the documents reflect, a Total Rewards

KYLE D. PIKALUK                                    12/18/2018

22

1          MR. LEWIS:  Object to form.
2     A.   Sounds familiar.
3     Q.   (BY MR. ZIMMER)  And you'll see the
4  different brand of Caesars properties that you've
5  just described on the web page, such as Harrah's
6  in Vegas, The Cromwell, Bally's, Paris, Planet
7  Hollywood, things of that?  They're all on the
8  Caesars web page when you access Total Rewards.
9  Correct?
10          MR. LEWIS:  Object to form.
11    A.   I would assume.  I can't remember the
12  web page.
13    Q.   (BY MR. ZIMMER)  Right.  Well, in some
14  of the promotional material that you received
15  that you sent to us that you got in connection
16  with your Total Rewards membership, it will list
17  different Caesars entities.  Is that your
18  recollection?
19    A.   Yes.
20    Q.   Mr. Pikaluk, tell me about your trip
21  that sort of precipitated the events that we're
22  here on today.  It's my understanding you
23  traveled from Canada to the Bossier City area in
24  March of 2017.  Correct?
25    A.   Yes.

23

1     Q.   And tell me -- what I'd like to do is
2  start broadly, and let's narrow it down.  So
3  broadly, your trip, was it specific for Horseshoe
4  Bossier City?  Or did you come to the United
5  States to go other places first and ended up at
6  Horseshoe?
7     A.   It wasn't specific to Horseshoe.
8     Q.   Okay.
9     A.   My initial plan was to come to
10  Shreveport first and then potentially to some of
11  the neighboring cities.
12    Q.   Okay.  Had you ever been to Shreveport
13  before?
14    A.   Yes.
15    Q.   On how many occasions?
16    A.   I would say approximately five.
17    Q.   Had you been to Bossier City before?
18    A.   Yes.
19    Q.   On how many occasions?
20    A.   The same amount.  Five.
21    Q.   Had you been to the Horseshoe Bossier
22  City before?
23    A.   Yes.
24    Q.   Okay.  On how many occasions?
25    A.   Are you talking about specific, like

24

1  how many times I walked in and out of the casino?
2  Or on how many occasions was I in the area?
3     Q.   How many trips did you make there?
4     A.   Probably most of those five.
5     Q.   Okay.  So before March of 2017, you had
6  visited the Horseshoe Casino in Bossier City on
7  approximately five different occasions?
8     A.   Approximately.  Yeah.
9     Q.   Okay.  Did you ever stay at the hotel
10  there?
11    A.   I believe I did.
12    Q.   And before March of 2017, when would
13  have been the last time that you visited
14  Horseshoe Bossier City?
15    A.   That's a good question.  It would have
16  been two or three years prior.
17    Q.   Okay.  And when you went, did you
18  travel alone?
19          MR. LEWIS:  Objection.  Form.
20    Q.   (BY MR. ZIMMER)  On the most recent
21  visit before March 2017.
22    A.   I honestly can't recall.
23    Q.   Okay.  That most recent visit before
24  March of 2017, do you recall, Mr. Pikaluk,
25  whether you stayed at the Horseshoe Hotel on that

25

1  visit or somewhere else?
2     A.   No.  I did not.
3     Q.   Where did you stay?
4     A.   I remember staying at -- I'm not sure
5  if I stayed at casino hotels or just -- I think I
6  just Hotwired a room.
7     Q.   Okay.
8     A.   I'm not sure of the exact place.
9     Q.   How many times do you recall staying at
10  the Horseshoe Hotel?
11    A.   I think only once.
12    Q.   And do you recall approximately when
13  that was?
14    A.   It would have been -- I can't tell you
15  an exact date.  Probably sometime around 2012 to
16  2013.
17    Q.   Okay.  Do you recall when you did stay
18  at the Horseshoe Hotel, how it was that you
19  booked the room?
20    A.   I think I was staying with a friend at
21  the time.
22    Q.   Okay.  Who would that have been?
23    A.   Jeff Nemish.
24    Q.   Nemish?
25    A.   Yes.

KYLE D. PIKALUK                              12/18/2018

26

1    Q.   How do you spell that?
2    A.   N-E-M-I-S-H.
3    Q.   And do you know whether you booked the
4  room or Jeff booked the room?
5    A.   I believe he booked the room.
6    Q.   Do you ever remember booking a room at
7  the Horseshoe Bossier City in your name?
8    A.   No.
9    Q.   Okay.  On the five prior occasions
10 where you told us that you visited the Horseshoe
11 Bossier City, did you gamble while you were
12 there?
13   A.   I assume I gambled.
14   Q.   Did you present your Total Rewards
15 membership card when you gambled on those five
16 prior occasions?
17   A.   Probably a couple of times, at least.
18   Q.   So on the trip in March of 2017, when
19 you entered into the United States from Canada,
20 where did you do that?
21   A.   I flew into Minneapolis, I believe.
22   Q.   Okay.
23   A.   And then connected to Houston.
24   Q.   And did you fly into Shreveport from
25 Houston or did you drive?

27

1    A.   I drove.  I drove.
2    Q.   You rented a car?
3    A.   Yes.
4    Q.   And how long did you intend that trip
5  in March of 2017 to be?
6    A.   I believe I was planning on it to be
7  approximately a week.
8    Q.   And what was the purpose of the trip?
9    A.   To go gambling.
10   Q.   Did you have a specific facility in
11 mind that you intended to gamble?
12   A.   Not necessarily.  No.
13   Q.   Okay.  When did you arrive?
14        MR. LEWIS:  Objection.  Form.
15   Q.   (BY MR. ZIMMER)  When did you arrive in
16 the Shreveport-Bossier City area?
17   A.   I believe it was the morning of March
18 15th or 16th.
19   Q.   For that trip, Mr. Pikaluk, in March of
20 2017, were you staying at one hotel or more than
21 one?
22   A.   I was staying at the Holiday Inn
23 Express.
24   Q.   Okay.  And that was the only one you
25 intended to stay in?

28

1    A.   Yes.
2    Q.   Okay.  Which Holiday Inn Express?
3    A.   A few blocks from here in downtown
4  Shreveport.
5    Q.   Okay.  And do you recall, did you
6  reserve your room there for the entire length of
7  your stay?
8    A.   No.  I think I only booked three or
9  four nights.
10   Q.   Okay.  And why is that?
11   A.   I might choose to leave.
12   Q.   Okay.  And that's what I was asking, if
13 you intended to stay there the whole time or if
14 you were going to kind of play it by ear.
15   A.   Yep.  Yeah.  I was planning on playing
16 it by ear.
17   Q.   Okay.  Did you ever, while you were
18 down here, book any hotel rooms anywhere besides
19 the Holiday Inn Express?
20   A.   On that trip?
21   Q.   Yes, sir.
22   A.   No.  Oh, sorry.  Yes, I did.
23   Q.   Okay.
24   A.   When I first arrived in Houston, I
25 stayed overnight in Houston that night.

29

1    Q.   Spent the night before you woke up and
2  drove?
3    A.   Yes.
4    Q.   Okay.  And pardon me if I've asked this
5  already.  But on that trip, were you traveling
6  alone or did someone come with you?
7    A.   I was alone.
8    Q.   You're currently employed, I believe,
9  by the City of Saskatoon?
10   A.   Yes.  That's correct.
11   Q.   And tell us what you do for them.
12   A.   I'm an engineering technologist 15,
13 which is a --
14   Q.   What does that mean?
15   A.   Basically an engineer.
16   Q.   Okay.
17   A.   And I inspect new roadway and water and
18 sewer construction.
19   Q.   Okay.  My recollection from looking at
20 your discovery responses is you started working
21 for the City of Saskatoon in 2014?
22   A.   That's correct.
23   Q.   What month?
24   A.   May.
25   Q.   The trip that you took to the

KYLE D. PIKALUK                              12/18/2018

30

1   Shreveport-Bossier City area in March of 2017,
2   did you just take vacation from your job?
3       A.   I was laid off at that point.
4       Q.   Okay.  Were you since rehired by the
5   City?
6       A.   Yes.
7       Q.   How long was your period of
8   unemployment?
9       A.   I believe that year, it was
10  approximately four months.
11      Q.   You said "that year," which suggests
12  you've been laid off on other occasions from the
13  City?
14      A.   Yes.  My job is a seasonal construction
15  job.
16      Q.   Okay.  So just to make sure I
17  understand, the City hires you as a full-time
18  employee on an as-needed basis; you work for
19  them; and when they no longer need you, they lay
20  you off?
21      A.   Pretty much.  Yeah.
22      Q.   Okay.  Is that --
23      A.   It's a permanent seasonal position.
24      Q.   Gotcha.  Okay.  In other words, are you
25  able to tell us you're going to work from a

31

1   certain day to another certain day every given
2   year?  Or does it just depend on other factors?
3       A.   It depends a lot on the weather.
4       Q.   Okay.
5       A.   And the workload that year.
6       Q.   Okay.  Since 2014, can you give us a
7   general idea of how long you worked versus how
8   long you didn't work for the City?
9       A.   My general rule of thumb is December
10  1st is usually right around where I get laid off.
11      Q.   Okay.
12      A.   And then I would get hired back at the
13  start of April.
14      Q.   Okay.  And so when you made the trip
15  here in March of 2017, you had been laid off and
16  not yet rehired for the next season.  Correct?
17      A.   True.
18      Q.   And I believe you've indicated in
19  responses to our interrogatories that you're not
20  seeking any type of lost wages in this lawsuit.
21  Is that accurate?
22      A.   Yeah.  I believe that is accurate.
23      Q.   Okay.  Well, I need you to be sure,
24  because if you are seeking that, we need to know
25  sooner rather than later.  So did you lose any

32

1   wages --
2       A.   No.
3       Q.   -- in your regular employment at the
4   City of Saskatoon as a result of any of the
5   events made the basis of your lawsuit?
6       A.   No.
7       Q.   And also my recollection, Mr. Pikaluk,
8   based on your responses to our discovery requests
9   is that you were not employed by any business, I
10  guess, between 2008 and when you obtained the job
11  with the City in 2014.  Is that correct?
12      A.   If that's what my interrogatory answers
13  stated, then that's correct.  I have a hard time
14  with the 2008, 2009 timeline.
15      Q.   You know what, that's perfectly fair.
16      A.   So...
17      Q.   And I'm not trying to --
18      A.   It was so long ago that --
19      Q.   Sure.  I'm not trying to make you
20  guess.  We can look at it.
21           (Pikaluk Deposition Ex. 26 was
22  marked for identification.)
23      Q.   (BY MR. ZIMMER)  I show you,
24  Mr. Pikaluk, what's been marked and what we'll
25  attach to your deposition as Exhibit Number 26.

33

1   And I'll draw your attention to page 6, which
2   would be your interrogatory response to number 8.
3   Okay.  So does that refresh your recollection as
4   to --
5       A.   Yes.
6       Q.   -- your prior employment?  You worked
7   for Performance Plus Distributors up until 2008.
8   Correct?
9       A.   Yes.
10      Q.   And then the next job that you had was
11  May 2014.  Correct?
12      A.   The Western Grocers.
13      Q.   I'm sorry.  You're right.
14      A.   It's slightly out of order on this
15  paper.
16      Q.   Okay.
17      A.   But that was the next job, in 2009.
18      Q.   How long did you work for Western
19  Grocers?
20      A.   Just a few months during the summer.
21      Q.   What did you do for them?
22      A.   I was a warehouse worker.
23      Q.   Okay.  So you worked for Western
24  Grocers a few months in 2009.  And then the next
25  job that you had was with the City in 2014.

KYLE D. PIKALUK                                    12/18/2018

34

1  Correct?
2      A.  Yes.
3      Q.  And how did you support yourself from
4  2009 to 2014?
5      A.  I gambled.
6      Q.  And you are an advantage gambler.
7  Correct?
8      A.  True.
9      Q.  What does that mean to you?
10     A.  It means that I play a game and believe
11  that I have an expectation to win in the long
12  run.
13     Q.  And what do you do that gives you an
14  expectation that you're going to win in the long
15  run?
16         MR. LEWIS:  Object to form.
17     A.  As far as specific techniques or --
18     Q.  (BY MR. ZIMMER)  Yeah.
19     A.  Everything is basically math related.
20     Q.  Okay.
21     A.  If you put your money -- if you bet
22  money in an advantageous situation more times
23  than you bet money in a disadvantageous
24  situation, you're expected to win over the long
25  run.

35

1      Q.  Well, and as an advantage player, there
2  are some tactics that you deploy to help increase
3  the odds that you're going to win, such as
4  counting cards --
5      A.  Correct.
6      Q.  -- is something that you do?
7      A.  Yes.
8      Q.  And what else do you do along those
9  lines?
10     A.  I can do lots of things.
11     Q.  Well, tell me some of them.
12     A.  I can shuffle track.
13     Q.  Okay.  What is shuffle track?
14     A.  It's very similar to counting cards.
15     Q.  Okay.
16     A.  Except once you count the cards and you
17  maybe know how they're shuffled, now you know how
18  they're going to come out of the deck next time.
19     Q.  Similar to ace sequencing?
20     A.  It would be similar.
21     Q.  Okay.  And do you do ace sequencing as
22  well?
23     A.  I have in the past.
24     Q.  Okay.  And what else do you do?
25     A.  I can hole card.

36

1      Q.  Tell us what that is.
2      A.  That's where you see -- you can see the
3  dealer's card.  Or predict the dealer's card, I
4  should say.  That is usually unknown.
5      Q.  And all of those tactics give you an
6  advantage?
7      A.  Potentially, if done right.
8      Q.  Which is why you call yourself an
9  advantage player?
10     A.  Yeah.
11     Q.  Okay.  And, again, based on some of the
12  responses that you gave us, you have been asked
13  to leave a number of different casinos once they
14  determine that you are an advantage player.
15  Correct?
16     A.  True.
17     Q.  You are, to your knowledge, listed in
18  the Griffin Book?
19     A.  Yes.
20     Q.  And that's the publication by Griffin
21  Investigations that lists known advantage
22  players?
23     A.  Yes.  I have never actually seen the
24  Griffin Book.
25     Q.  Okay.

37

1      A.  They keep that under lock and key, I
2  believe.  But --
3      Q.  Can't go on Amazon and buy it, I take
4  it?
5      A.  No.
6      Q.  Okay.  Well, how did you obtain
7  knowledge that you were in the book?
8      A.  I actually learned that from my last
9  court case.
10     Q.  Okay.  And that would be the Virgin
11  River Casino case?
12     A.  True.
13     Q.  Since we're on that topic, let's look,
14  Mr. Pikaluk, at Exhibit 26, page 9.  Okay.  Are
15  you there?
16     A.  Yes.
17     Q.  Okay.  Interrogatory number 12,
18  Mr. Pikaluk, asked you to state whether you had
19  ever been evicted, excluded, trespassed, barred,
20  asked to leave or "backed off" by any casino or
21  gaming facility.  And for such event, please
22  identify the date, facility and specifics of the
23  incident.
24         And your response, first of all, was
25  to -- and I'm paraphrasing.  The document can

KYLE D. PIKALUK                                           12/18/2018

74

1  personnel from dealing with them in the past?
2      A.  No.
3      Q.  Okay.  Fair enough.  All right.  So am
4  I correct to assume you just sort of pushed over
5  the $2,200 in chips and told her you'd like to
6  cash out?
7      A.  Yes.
8      Q.  And what, if anything, did she say to
9  you?
10     A.  She asked me for my ID.
11     Q.  Okay.  And did you give it to her?
12     A.  Yes.
13     Q.  Were you expecting that?
14     A.  Yeah.
15     Q.  All right.  And then what happened?
16     A.  Well, at that point, she took my ID
17  from me.
18     Q.  Okay.
19     A.  In most instances when I'm asked to
20  give ID at the cage, it's for an age
21  verification.
22     Q.  Right.
23     A.  So it's as easy as you hand it over,
24  they take a quick look, and they hand it back.
25     Q.  Like what happens when you're on the

75

1  ramp trying to enter the gaming --
2      A.  Something very similar to that.  Yes.
3      Q.  Okay.  And that's what you assumed it
4  was on this occasion?
5      A.  Yes.
6      Q.  Okay.
7      A.  And then I stood there for about 15
8  minutes, I think.
9      Q.  All right.  Did she tell you anything
10  about what was -- why you were standing there?
11     A.  Not necessarily.  No.
12     Q.  Okay.  Well, what, if anything, do you
13  remember her -- the lady in the cage telling you
14  while you were trying to cash out your chips?
15         MR. LEWIS:  Object to form.
16     A.  I don't really think that she told me
17  anything other than, "We'll be with you shortly"
18  or "We're trying here."  Nothing really direct.
19     Q.  (BY MR. ZIMMER)  Okay.  Other than the
20  lady to whom you handed your chips or who took
21  your chips, the $2,200, did you have any
22  conversations with any of the other individuals
23  who were in the cage when you were there cashing
24  out?
25     A.  I believe a supervisor came by at some

76

1  point.  But I don't remember having any
2  conversations with anybody at the cage.
3      Q.  Okay.
4      A.  Or behind the cage.  Sorry.
5      Q.  Yes, sir.  Okay.  And all I'm trying to
6  do is see what you remember about what, if
7  anything, Horseshoe personnel who were behind the
8  cage when you were trying to cash out may have
9  told you.  And it sounds like the only thing you
10  can remember is the one lady saying, "It will be
11  just a minute" or something to that effect.  Is
12  that accurate?
13     A.  Yes.
14     Q.  Okay.  You don't remember them saying
15  anything else to you?
16     A.  I don't -- it's not that I don't
17  remember necessarily, but I don't think that they
18  did --
19     Q.  Okay.  All right.
20     A.  -- address me really.
21     Q.  All right.  At some point, other
22  Horseshoe individuals approached you?
23     A.  Yes.
24     Q.  Okay.  Tell me about that.
25     A.  A man came up behind me at the cage and

77

1  introduced himself.
2      Q.  As?
3      A.  At the time, the name went over my
4  head, I think.  But I now know him as
5  Mr. Lafleur.
6      Q.  Yes, sir.  James Lafleur introduced
7  himself to you?
8      A.  Yes.
9      Q.  Okay.  And what did he say to you?
10     A.  He said -- I think he asked me my name
11  and then said -- confirmed that it was me.  And
12  then said, "Let's go take a walk."
13     Q.  How did he confirm it was you?
14     A.  I think he just asked my name.
15     Q.  Okay.  And just to be clear, did
16  Mr. Lafleur ask you, "What is your name?"  Or did
17  he affirmatively say, "Are you Kyle Pikaluk?"
18     A.  I believe it would have been the second
19  option.  "Are you Mr. Pikaluk?" or something
20  along those lines.
21     Q.  So to the best of your recollection,
22  Mr. Lafleur said something to the effect of, "Are
23  you Mr. Pikaluk?"
24     A.  Yes.
25     Q.  And what did you say in response to

KYLE D. PIKALUK                                    12/18/2018

78

1   that?
2       A.   "Yes."
3       Q.   And then he said, "Let's take a walk"?
4       A.   Yes.
5       Q.   Okay.  When he said, "Let's take a
6   walk," did you ask him where to?
7       A.   I think he motioned in the direction of
8   the exit.
9       Q.   Okay.
10      A.   And I -- did not ask him, though.
11      Q.   Did you assume the reason that you
12  were -- that he approached you and asked you to
13  take a walk was because they determined that you
14  were an advantage player?
15      A.   Yes.
16      Q.   Okay.  Did you go straight from the
17  cage to the ramp?
18      A.   Yes.
19      Q.   Was Mr. Lafleur the only Horseshoe
20  employee that you recall walking with you or were
21  there others?
22      A.   At the time, that's all that I recall.
23      Q.   Yes, sir.
24      A.   But I have watched the videos.
25      Q.   Okay.

79

1       A.   And I believe there may have been other
2   employees kind of in the background.
3       Q.   Okay.  And you walked from the cage to
4   the ramp.  Correct?
5       A.   Yes.
6       Q.   Were there any stops that you made
7   during that walk?
8       A.   No.  The first stop would have been
9   right at the bottom of the ramp just inside of
10  the casino.
11      Q.   Okay.  And when you stopped there, was
12  someone waiting for you?
13      A.   Not at that point.  No.
14      Q.   Okay.
15      A.   We had a conversation at that point.
16      Q.   Okay.  And before you got to that
17  point, did you have any conversations with
18  Mr. Lafleur?
19      A.   At our first stop is when we had a
20  conversation.
21      Q.   Yes, sir.  And I'm going to ask you
22  about that one.
23      A.   Okay.
24      Q.   But I'm talking about from the time you
25  walked away from the cage until you got to the

80

1   first stop, during that walk did you have any
2   conversations with him?
3       A.   I don't believe so.
4       Q.   Okay.  Did you have any conversations
5   with anybody else who may have been employed by
6   Horseshoe that you can recall?
7       A.   No.
8       Q.   Okay.  So when you got to the first
9   stop, you had a conversation with -- was it
10  Mr. Lafleur or somebody else?
11      A.   It was Mr. Lafleur.
12      Q.   Okay.  And tell me about that
13  conversation.
14          MR. LEWIS:  Object to form.
15      A.   He said something along the lines of,
16  "Did you" -- "You were previously company-wide
17  trespassed from Bally's in" -- "last year," I
18  believe is what he said.  And at that point, I
19  denied knowing that I was a company-wide trespass
20  as of last year.
21      Q.   What about trespassed from Bally's?
22  You had been trespassed from Bally's.  Correct?
23      A.   Correct.  But that was quite a long
24  time before 2016.
25      Q.   Okay.  Okay.  So it was accurate that

81

1   you had been trespassed from Bally's?
2          MR. LEWIS:  Object to form.
3       Q.   (BY MR. ZIMMER)  Before March of 2017.
4   Correct?
5       A.   True.
6       Q.   And when you say you denied knowing
7   that you were a company-wide trespass, you denied
8   that to Mr. Lafleur?
9       A.   Yes.
10      Q.   And what specifically did you tell him?
11      A.   I said, "I didn't know it was a
12  company-wide trespass."
13      Q.   And did he respond to that?
14      A.   He said, "As of" -- or "In June of
15  2016, you were company-wide trespassed by
16  Bally's."
17      Q.   And did you deny that a second time
18  when he said it?
19      A.   Yes.
20      Q.   Okay.  Any other conversations with
21  Mr. Lafleur at that first stop?
22      A.   Yes.  I remember -- or sorry.  One
23  second.  This might not be at the first stop.  It
24  may be the second stop.
25      Q.   Okay.

KYLE D. PIKALUK                                    12/18/2018

82

1      A.   Yeah.  I think that was it, actually,
2   at the first stop.
3      Q.   All right.  Now, at that first stop,
4   did anybody else talk to you from Horseshoe or
5   was it just Mr. Lafleur?
6      A.   Only Mr. Lafleur.
7      Q.   Okay.  And by the way, during the walk
8   from the cage to the first stop, I mean, that's
9   something -- you went voluntarily.  Correct?
10            MR. LEWIS:  Object to form.
11     Q.   (BY MR. ZIMMER)  Physically, nobody --
12   Mr. Lafleur didn't grab you and drag you --
13     A.   No.
14     Q.   -- or anything like that?
15     A.   He didn't grab me by the arm and drag
16   me over there.  No.
17     Q.   You weren't forcefully removed from the
18   cage area and brought somewhere else by any
19   Horseshoe personnel.  Correct?
20     A.   No.
21     Q.   All right.  Okay.  Now, you said -- you
22   were talking about a second stop.
23     A.   Yes.
24     Q.   Where was that?
25     A.   That was just further up the ramp.

83

1      Q.   Okay.  Is that where the Bossier Police
2   Department folks were waiting?
3      A.   Yes.
4      Q.   Okay.  All right.  And did you talk to
5   Horseshoe personnel at that second stop?
6      A.   Yes.
7      Q.   Who did you talk to?
8      A.   At that point, I'm not 100 percent sure
9   who I was talking to.
10     Q.   Okay.
11     A.   I was trying not to get arrested, I
12   guess.
13     Q.   Well, how were you trying not to get
14   arrested?
15     A.   Well, I was -- I was -- I was really
16   shocked at that point, because they started
17   putting the handcuffs on me and searching me.
18     Q.   Who did?
19     A.   The Bossier City Police Department.
20     Q.   And nobody from Horseshoe put handcuffs
21   on you?
22     A.   No.
23     Q.   Nobody from Horseshoe searched you?
24     A.   No.
25     Q.   Okay.  Did Mr. Lafleur talk to you at

84

1   that second stop or was it somebody else?
2      A.   To the best of my knowledge, I think it
3   was Mr. Lafleur that was still -- that I was
4   engaging with.
5      Q.   Okay.  All right.  And do you recall
6   any of the substance of the conversations that
7   you had with Mr. Lafleur at that second stop?
8      A.   I told him I was willing to leave right
9   then.
10     Q.   Okay.
11     A.   I remember telling him that -- I
12   remember denying knowledge of being a
13   company-wide trespass.  And I also remember
14   telling him -- these may not be the exact words.
15   But I said even if I was company-wide trespassed
16   by a member of Bally's in Las Vegas, I didn't
17   understand how somebody in Las Vegas would have
18   the authority to say that I wouldn't be allowed
19   on the Horseshoe boat in Louisiana.
20     Q.   Did you ever make any statements,
21   Mr. Pikaluk, to any Horseshoe personnel to the
22   effect of that you were unaware that Horseshoe
23   was a Caesars-related company?
24     A.   I may have -- I may have said that to
25   the extent of I don't know what their management

85

1   structure is and who owns them.
2      Q.   But in March of 2017, you were aware
3   that Horseshoe was a Caesars-related entity.
4   Correct?
5      A.   I was aware of some of the relations.
6   But like I said, I don't know who is the general
7   manager of Horseshoe and if that's the same as
8   the general manager of Bally's or --
9      Q.   Right.
10     A.   -- so on and so forth.
11     Q.   Yeah.  And I understand.  And I'm
12   not -- I'm not getting into organizational or
13   management structure with you.  But --
14            MR. LEWIS:  Thank goodness,
15   because that will hurt our heads.
16     Q.   (BY MR. ZIMMER)  But just as a general
17   concept, like we talked about before, you've got
18   Caesars-branded entities such as Bally's, Caesars
19   Palace, the other ones that we went through
20   earlier in your deposition.  And you knew in
21   March of 2017 that Horseshoe was one of those
22   Caesars-related entities.  Correct?
23     A.   Yes.
24     Q.   Okay.  So to get back to my original
25   question.  Did you make any statements to anyone

# EXHIBIT 44

**Excerpts of Deposition of Donald Razinsky**

DONALD RAZINSKY                              11/15/2018

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION


KYLE D. PIKALUK,              : CAUSE NO.
                             : 5:18-cv-00215-SMH-MLH
                Plaintiff,   :
                             :
VERSUS                       :
                             :
HORSESHOE ENTERTAINMENT      : JUDGE S. MAURICE HICKS, JR.
LIMITED PARTNERSHIP, D/B/A   :
"HORSESHOE HOTEL &           :
CASINO", STEVEN JONES,       :
JOSEPH C. THOMERSON,         :
D. RAZINSKY, JORDAN D.       :
JOHNSON, ROB BROWN,          :
JASON WILLIAMS,              :
FEDERICO M. ARENDS, III,     :
and JAMES LAFLEUR,           :
                             : MAGISTRATE JUDGE
                Defendants.  : MARK HORNSBY


DEPOSITION OF DONALD RAZINSKY
November 15, 2018


Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

2

 1    APPEARANCES:

 2        COUNSEL FOR PLAINTIFF:

 3        MR. JOHN P. LEWIS, JR.
          Attorney at Law
 4        1412 Main Street, No. 210
          Dallas, Texas  75202
 5        214.742.5925
          214.742.5928 - Facsimile
 6        jplewisjr@mindspring.com

 7

 8        COUNSEL FOR DEFENDANTS, HORSESHOE ENTERTAINMENT
            LIMITED PARTNERSHIP, D/B/A "HORSESHOE HOTEL &
 9          CASINO", STEVEN JONES, ROB BROWN, JASON WILLIAMS
            FEDERICO M. ARENDS III AND JAMES LAFLEUR:

10        MS. ANN RENE HANKINS
          Kean Miller
11        333 Texas Street, Suite 450
          Shreveport, Louisiana  71101
12        318.562.2700
          318.562.2751 - Facsimile
13        annrene.hankins@keanmiller.com

14

15        COUNSEL FOR DEFENDANTS, JOSEPH C. THOMERSON, DAVID
            RAZINSKY, AND JORDAN D. JOHNSON:

16        MR. EDWIN H. BYRD III
          Pettiette, Armand, Dunkelman, Woodley,
17          Byrd & Cromwell, LLP
          400 Texas Street, Suite 400
18        Shreveport, Louisiana  71101
          318.221.1800
19        318.226.0390 - Facsimile
          ebyrd@padwbc.com

20

21    ///

22    ///

23    ///

24    ///

25    ///

DONALD RAZINSKY                                    11/15/2018

46

1      A.   Correct.

2      Q.   That would be inconsistent with the policies,

3   practices, and procedures of the department.

4      A.   Not necessarily.  I mean, he's in a secure

5   area, in handcuffs; so you can move away from the

6   vehicle.

7      Q.   Well, he was in a public parking garage.

8   Wasn't he?

9      A.   Yes, sir.

10     Q.   You said yes?

11     A.   Yes, sir.

12     Q.   So he was not in a secure area.  Was he?

13     A.   Inside the patrol car, he is.

14     Q.   Is the patrol car completely locked?

15     A.   Yes.

16     Q.   I see.  Did you observe -- withdraw that.

17          Do you recall telling me earlier that you

18   observed everything, and there was no reason for you

19   to speak up or to intervene in the events because

20   everything was being done properly and accordingly;

21   right?

22     A.   Yes, sir.

23     Q.   Or words to that effect.

24     A.   To the best of my knowledge.

25     Q.   Then why wasn't Mr. Pikaluk given any Miranda

DONALD RAZINSKY                           11/15/2018

47

1   warnings at the time of his arrest?

2        A.   There was no questioning involved.

3        Q.   You're sure about that.

4        A.   As far as I know.

5        Q.   Do you agree with me you did not see the giving

6   of Miranda warnings on the videos that you reviewed.

7        A.   Correct.

8        Q.   And it's your testimony that there's no --

9   you only give those Miranda warnings when you intend

10   to question or interrogate a suspect?

11        A.   For the most part, yes.

12        Q.   And if you're -- if you're not going to

13   directly ask him questions, he doesn't need Miranda

14   warnings.

15        A.   Well, not necessarily, no.  It depends on the

16   circumstance.

17        Q.   Okay.  As a reserve police officer for the

18   Bossier City Police Department, can you give me your

19   understanding as to when Miranda warnings should be

20   given to someone who has been arrested.

21        A.   A lot of times if there's going to be -- a

22   theft, crime to that effect, we'll Mirandize them at

23   that point.  Or any other suspicious activity, we're

24   going to find out more information.

25        Q.   Is there any reason other than the lack of

# **EXHIBIT 45**

**Excerpts of Deposition of Jordan D. Johnson**

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION


KYLE D. PIKALUK,               : CAUSE NO.
                               : 5:18-cv-00215-SMH-MLH
                  Plaintiff,   :
                               :
VERSUS                         :
                               :
HORSESHOE ENTERTAINMENT        : JUDGE S. MAURICE HICKS, JR.
LIMITED PARTNERSHIP, D/B/A     :
"HORSESHOE HOTEL &             :
CASINO", STEVEN JONES,         :
JOSEPH C. THOMERSON,           :
D. RAZINSKY, JORDAN D.         :
JOHNSON, ROB BROWN,            :
JASON WILLIAMS,                :
FEDERICO M. ARENDS, III,       :
and JAMES LAFLEUR,             :
                               : MAGISTRATE JUDGE
                  Defendants.  : MARK HORNSBY


DEPOSITION OF JORDAN D. JOHNSON
November 16, 2018


Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

JORDAN D. JOHNSON                                          11/16/2018

2

1   APPEARANCES:

2       COUNSEL FOR PLAINTIFF:

3       MR. JOHN P. LEWIS, JR.
        Attorney at Law
4       1412 Main Street, No. 210
        Dallas, Texas  75202
5       214.742.5925
        214.742.5928 - Facsimile
6       jplewisjr@mindspring.com

7

        COUNSEL FOR DEFENDANTS, HORSESHOE ENTERTAINMENT
8         LIMITED PARTNERSHIP, D/B/A "HORSESHOE HOTEL &
          CASINO", STEVEN JONES, ROB BROWN, JASON WILLIAMS
9         FEDERICO M. ARENDS III AND JAMES LAFLEUR:

10      MR. SCOTT L. ZIMMER
        Kean Miller
11      333 Texas Street, Suite 450
        Shreveport, Louisiana  71101
12      318.562.2700
        318.562.2751 - Facsimile
13      scott.zimmer@keanmiller.com

14

        COUNSEL FOR DEFENDANTS, JOSEPH C. THOMERSON, DAVID
15        RAZINSKY, AND JORDAN D. JOHNSON:

16      MR. EDWIN H. BYRD III
        Pettiette, Armand, Dunkelman, Woodley,
17        Byrd & Cromwell, LLP
        400 Texas Street, Suite 400
18      Shreveport, Louisiana  71101
        318.221.1800
19      318.226.0390 - Facsimile
        ebyrd@padwbc.com

20

21   ///

22   ///

23   ///

24   ///

25   ///

JORDAN D. JOHNSON                          11/16/2018

55

1      Q.   And what was your response to -- remember?

2      A.   I just kind of gave him an uh-huh.  Okay.  I

3  got you.

4      Q.   Okay.  Did Mr. Pikaluk tell you that the

5  casino could not produce any paperwork showing that he

6  had been banned?

7      A.   I don't recall.

8      Q.   Okay.  Do you recall having been promised

9  paperwork from the casino showing that he had been

10 banned?

11     A.   Nobody promised me anything, but I did

12 overhear a conversation where they were saying they

13 were going to give the paperwork to Sergeant

14 Thomerson.

15     Q.   And so you were aware that there should be

16 paperwork evidencing --

17     A.   Correct.

18     Q.   -- a prior ban.

19     A.   Correct.

20     Q.   Did you ever see that paperwork?

21     A.   No, but I didn't handle any of the paperwork.

22     Q.   Okay.  And did the existence of that

23 paperwork affect the decision to arrest Mr. Pikaluk

24 one way or the other, to your knowledge?

25     A.   I can't answer that question.  I didn't make

JORDAN D. JOHNSON                           11/16/2018

82

1  did you know whether he could be banned from the

2  property just because he was an advantage player?

3      A.  To my knowledge, you can ban anybody from a

4  property if they're not wanted here.

5      Q.  Okay.

6      A.  Or there.  Excuse me.

7      Q.  That was the understanding you had at the

8  time he was arrested.

9      A.  Yes.

10         MR. BYRD:  I've got to take this real quick.

11         MR. LEWIS:  Oh, sure.  I'm almost finished,

12  by the way.

13         (Recess taken from 10:42 a.m. to 10:50 a.m.)

14      Q.  (By Mr. Lewis)  Now, again, just to put it in

15  context.  You would respond to trespassing calls to

16  all of the casinos in the Bossier City -- in Bossier

17  City, not just the Horseshoe; right?

18      A.  Yes.

19      Q.  When you were a police officer.

20      A.  Correct.

21      Q.  And would your -- would the -- your response

22  be different based upon the casino or was it

23  consistent throughout?

24      A.  It's consistent.

25      Q.  So if a casino, regardless of whether it was

JORDAN D. JOHNSON                           11/16/2018

83

1  Margaritaville, Boomtown, Diamond Jack's or the
2  Horseshoe, requested assistance with a trespasser, you
3  would respond the same way.
4      A.  Correct.
5      Q.  And you would arrive, and you would meet
6  someone representing the casino, usually security.
7      A.  Correct.
8      Q.  And they would tell you, suspect, been
9  banned, knew he was banned, is back on the property;
10  right?
11      A.  Correct.
12      Q.  Then you would arrest that suspect.
13      A.  Correct.
14      Q.  That was consistent in your practice, and the
15  casinos -- you had a history with casinos arresting
16  trespassers.
17      A.  Correct.
18      Q.  Are you aware of any other Bossier City
19  police officer that would have a different practice or
20  procedure?
21      A.  No.
22      Q.  It's consistent throughout.
23      A.  Correct.
24      Q.  It's kind of the way you were trained with
25  that on-the-job training we talked about?

# EXHIBIT 46

**Excerpts of Deposition of Joseph C. Thomerson**

JOSEPH C. THOMERSON                                      11/15/2018

```
            IN THE UNITED STATES DISTRICT COURT

               WESTERN DISTRICT OF LOUISIANA

                    SHREVEPORT DIVISION


KYLE D. PIKALUK,           : CAUSE NO.
                           : 5:18-cv-00215-SMH-MLH
                Plaintiff, :
                           :
VERSUS                     :
                           :
HORSESHOE ENTERTAINMENT    : JUDGE S. MAURICE HICKS, JR.
LIMITED PARTNERSHIP, D/B/A :
"HORSESHOE HOTEL &         :
CASINO", STEVEN JONES,     :
JOSEPH C. THOMERSON,       :
D. RAZINSKY, JORDAN D.     :
JOHNSON, ROB BROWN,        :
JASON WILLIAMS,            :
FEDERICO M. ARENDS, III,   :
and JAMES LAFLEUR,         :
                           : MAGISTRATE JUDGE
                Defendants. : MARK HORNSBY
```

```
            DEPOSITION OF JOSEPH C. THOMERSON
                   November 15, 2018
```

```
Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public
```

JOSEPH C. THOMERSON                          11/15/2018

2

```
 1   APPEARANCES:

 2       COUNSEL FOR PLAINTIFF:

 3       MR. JOHN P. LEWIS, JR.
         Attorney at Law
 4       1412 Main Street, No. 210
         Dallas, Texas  75202
 5       214.742.5925
         214.742.5928 - Facsimile
 6       jplewisjr@mindspring.com

 7

 8       COUNSEL FOR DEFENDANTS, HORSESHOE ENTERTAINMENT
           LIMITED PARTNERSHIP, D/B/A "HORSESHOE HOTEL &
           CASINO", STEVEN JONES, ROB BROWN, JASON WILLIAMS
 9         FEDERICO M. ARENDS III AND JAMES LAFLEUR:

10       MS. ANN RENE HANKINS
         Kean Miller
11       333 Texas Street, Suite 450
         Shreveport, Louisiana  71101
12       318.562.2700
         318.562.2751 - Facsimile
13       annrene.hankins@keanmiller.com

14

15       COUNSEL FOR DEFENDANTS, JOSEPH C. THOMERSON, DAVID
           RAZINSKY, AND JORDAN D. JOHNSON:

16       MR. EDWIN H. BYRD III
         Pettiette, Armand, Dunkelman, Woodley,
17         Byrd & Cromwell, LLP
         400 Texas Street, Suite 400
18       Shreveport, Louisiana  71101
         318.221.1800
19       318.226.0390 - Facsimile
         ebyrd@padwbc.com

20

21   ///

22   ///

23   ///

24   ///

25   ///
```

JOSEPH C. THOMERSON                    11/15/2018

116

1          MR. BYRD:  Objection to form.

2      A.  I asked for the letter to attach it to the

3  report.  I don't remember seeing it, and I believed

4  the statements that were given to me by Steven Jones

5  that it was a valid complaint.

6      Q.  (By Mr. Lewis)  Did you ask Mr. Jones what

7  was the basis for his statements to you?

8      A.  I don't understand your question.

9      Q.  Well, he told you he'd been banned and that

10  he had received a certified letter.  I think you

11  testified to that; right?  Isn't that what he told you

12  at first?

13      A.  He told me he'd been banned, he knew that he

14  was banned -- Mr. Pikaluk was banned.  That he had

15  been sent certified letters that he was banned.

16      Q.  And when you didn't receive the certified

17  letters that day, did you ask Mr. Jones, where are

18  they?

19      A.  I asked him to provide me a copy so I could

20  attach it to the report.

21      Q.  And you didn't get a copy because it's not

22  attached to the report; right?

23          MS. HANKINS:  Object to the form.

24      A.  I don't recall seeing the letter.

25      Q.  (By Mr. Lewis)  And did that cause you, at

JOSEPH C. THOMERSON                                    11/15/2018

129

1      A.   I mean, I've heard them say it and stuff, but
2   I don't -- I don't know nothing about it.
3      Q.   Okay.  And you didn't ask Mr. Jones, do you
4   have an eviction report for Mr. Pikaluk on the date of
5   the incident?
6      A.   I didn't ask him for an eviction notice, no,
7   sir.
8      Q.   Okay.  If they had -- they didn't show you an
9   eviction report.  Did they?
10     A.   Not that I can recall.
11     Q.   What could Mr. Pikaluk have done that day to
12  prevent you from arresting him?
13     A.   Not show up on the boat.
14     Q.   Anything else?
15     A.   I don't understand.
16     Q.   I mean, is there anything else he could have
17  done that would have prevented you from arresting him?
18     A.   Not be on the property when he was banned.
19     Q.   Is there anything he could have said to you
20  or to Officer Johnson that would have prevented him
21  from being arrested?
22     A.   What he could have shown me --
23     Q.   No.  Is there anything he could have said to
24  you or told you that would have prevented him from
25  being arrested that day?

JOSEPH C. THOMERSON                                    11/15/2018

131

1    banned.

2          MR. BYRD:  Objection to form.

3    A.  I don't know how to answer that.  I mean.

4    Q.  (By Mr. Lewis)  Is there -- is there anything

5    he could have told you that would have changed your

6    mind as to whether he had been banned?

7          MR. BYRD:  It's the same thing you just said

8    three or four times.

9    A.  I don't know.

10   Q.  (By Mr. Lewis)  Is there anything he could

11   have told you that would have changed your mind as to

12   whether he knew he had been banned?

13   A.  I don't know.

14   Q.  All right.  Did you ever use the expression

15   Jack dooky?

16   A.  Jack dooky?

17   Q.  Jack dooky.  Do you use that expression?

18   A.  (Nods head, yes.)

19   Q.  You're grinning.  What does it mean?

20   A.  Jack shit.

21   Q.  And do you recall using that expression

22   during the events of this incident?

23   A.  After it was over.

24   Q.  After he'd been arrested.

25   A.  And he was gone.

JOSEPH C. THOMERSON                        11/15/2018

132

1      Q.   Okay.  And you were joking with one of the

2   casino people; right?

3          MS. HANKINS:  Object to the form.

4      A.   I was not -- I don't want to say joking, just

5   a comment.  I'm not even sure I remember who I said it

6   to.

7      Q.   (By Mr. Lewis)  It was a casino man, though.

8   Wasn't it?  Somebody with the casino?

9      A.   I'm thinking it was tall black gentleman.

10     Q.   That's your memory?

11     A.   A tall black gentleman in a suit or was it

12  the Hispanic man with the mustache?

13     Q.   It's the Hispanic man with the mustache.

14  Mr. Arends.

15     A.   Who?

16     Q.   It's Mr. Arends.

17         MS. HANKINS:  Object to the form.

18         MR. BYRD:  So what's the question?

19         MS. HANKINS:  Yeah.  Is there a question?

20         MR. BYRD:  When he just sits there like that,

21  just wait for him to ask a question.  Okay?

22         THE WITNESS:  Okay.

23     Q.   (By Mr. Lewis)  Okay.  So you remember making

24  that comment to him; right?

25     A.   Yes.

# EXHIBIT 47

**Excerpts of Deposition of Steven Jones**



**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        WESTERN DISTRICT OF LOUISIANA
 3           SHREVEPORT DIVISION
 4
 5   KYLE D. PIKALUK,      :  CAUSE NO.
              :  5:18-cv-00215-SMH-MLH
 6      Plaintiff,  :
              :
 7   VERSUS       :
              :
 8   HORSESHOE ENTERTAINMENT  :  JUDGE S. MAURICE
     LIMITED PARTNERSHIP,   :  HICKS, JR.
 9   D/B/A "HORSESHOE HOTEL  :
     & CASINO", STEVEN JONES, :
10   JOSEPH C. THOMERSON,   :
     D. RAZINSKY, JORDAN D.  :
11   JOHNSON, ROB BROWN,    :
     JASON WILLIAMS,       :
12   FEDERICO M. ARENDS, III, :
     AND JAMES LAFLEUR,     :
13              :  MAGISTRATE JUDGE
        Defendants.  :  MARK HORNSBY
14
15
16
17
         DEPOSITION OF STEVEN MICHAEL JONES, JR.
18
           December 19, 2018
19
20
21
22
23
24
     Reported By:
25   Jayne M. Reeves, CCR
```

**2**

```
 1   APPEARANCES:
 2   COUNSEL FOR PLAINTIFF:
 3      MR. JOHN P. LEWIS, JR.
        Attorney at Law
 4      1412 Main Street, Suite 210
        Dallas, Texas 75202
 5      214.742.5925
        214.742.7110 - Facsimile
 6      jplewisjr@mindspring.com
 7   COUNSEL FOR DEFENDANTS:
 8      MR. SCOTT L. ZIMMER
        Kean Miller, LLP
 9      333 Texas Street, Suite 450
        Shreveport, Louisiana 71101
10      318.562.2700
        318.562.2751 - Facsimile
11      scott.zimmer@keanmiller.com
12   ALSO PRESENT:  Kyle D. Pikaluk
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1           S T I P U L A T I O N S
 2
 3      The deposition of STEVEN MICHAEL JONES,
 4   JR., taken by counsel for Plaintiff, pursuant to
 5   Notice and agreement by and between counsel, for
 6   all purposes as allowed by the Federal Rules of
 7   Civil Procedure, before Jayne M. Reeves,
 8   Certified Court Reporter, at the offices of Kean
 9   Miller, LLP, located at 333 Texas Street, Suite
10   450, Shreveport, Louisiana, on December 19, 2018.
11      It being stipulated by and between
12   counsel that all formalities, with the exception
13   of the swearing of the witness, are waived.
14      It being further stipulated that the
15   reading and signing of the deposition are waived
16   by counsel and by the witness.
17      It being further stipulated that all
18   objections except as to the form of the question
19   and responsiveness of the answer are reserved
20   until the time of trial.
21
22
23
24
25
```

**4**

```
 1           I N D E X
 2                  PAGE
 3   Examination by Mr. Lewis...................  6
 4
 5
 6
 7           E X H I B I T S
 8   NUMBER      DESCRIPTION         PAGE
 9   Ex. 31    Employee Statement Form     24
10   Ex. 32    Incident Report Form       30
             Horseshoe 0128
11
     Ex. 33    Security Supervisor's      60
12            Activity Report
             dated 3/18/2017
13            Horseshoe 0278
14
15
16
17
18
19
20
21
22
23
24
25
```

STEVEN MICHAEL JONES, JR.                                    12/19/2018

9

1     Q.   In your career at Horseshoe.  At the
2  Horseshoe.  We'll start there.
3     A.   This would be number two.
4     Q.   And prior to that, you were working --
5  you were a police officer for the Bossier City
6  Police Department, weren't you?
7     A.   Yes, sir.
8     Q.   Did you give depositions in that
9  capacity?
10     A.   I believe I did one when I was a police
11  officer.
12     Q.   But you would testify in court as a
13  police officer?
14     A.   Yes, sir.
15     Q.   So you're familiar with the
16  question-and-answer process?
17     A.   Yes, sir.
18     Q.   And you do understand that when you're
19  being deposed, you're under oath, you've sworn to
20  tell the truth, and you're going to be testifying
21  under penalties of perjury?
22     A.   Yes, sir.
23     Q.   And what is your current position at
24  the Horseshoe?
25     A.   The regional security manager for

10

1  Northwest Louisiana.
2     Q.   And when did you assume that position?
3     A.   That would be August 2016.
4     Q.   August?
5     A.   Yes, sir.
6     Q.   2016?
7     A.   Either the very last day of August or
8  the first day of September.  I believe it was
9  August the 27th or 28th.
10     Q.   And what position did you hold at the
11  Horseshoe prior to that time?
12     A.   This is my first and only position I've
13  held at Horseshoe.
14     Q.   And that's currently your position?
15     A.   Yes, sir.
16     Q.   So is it fair to say you started
17  working for the Horseshoe in August of 2016?
18     A.   Yes, sir.
19     Q.   So when Mr. Pikaluk was arrested, you'd
20  been on the job less than a year?
21     A.   Yes, sir.
22     Q.   And as I understand it, you left -- you
23  were a police officer for approximately eight
24  years?
25     A.   Yes, sir.

11

1     Q.   When you left Bossier City Police
2  Department, what was your rank?
3     A.   Police officer first class.
4     Q.   And you left because the Horseshoe was
5  a better opportunity?
6     A.   Yes, sir.
7     Q.   More money --
8     A.   Yes, sir.
9     Q.   -- among other things?  Better hours?
10     A.   Not necessarily.
11     Q.   Better work environment?
12     A.   Yes, sir.
13     Q.   And had you had any prior experience
14  working for any casino anywhere?
15     A.   I worked off-duty part-time, like a
16  side job at Horseshoe for a couple years as a
17  police officer.  But working, you know, directly
18  for them, no.
19     Q.   So approximately how many years before
20  joining the Horseshoe full-time did you work as
21  an off-duty officer?
22     A.   It was sometime in 2014 that I started.
23  I don't recall when.  I believe it was the summer
24  of 2014, because I remember working at the pool
25  at the -- I was working at the pool when I

12

1  started.
2     Q.   The pool area?
3     A.   So it had to be summer.
4     Q.   And, again, so that the jury
5  understands what working off-duty entails, the
6  casinos -- did you work at any other casino
7  off-duty?
8     A.   I don't remember.  I don't believe I
9  did work at any.  I know there's officers that
10  work at Margaritaville, but I don't believe I
11  ever worked that detail.
12     Q.   So the Horseshoe will hire Bossier City
13  police officers to work at the casino at various
14  times, primarily weekends and special events; and
15  then Horseshoe will pay that police officer an
16  hourly rate?
17     A.   Yes, sir.
18     Q.   And the purpose for hiring an off-duty
19  police officer is, one, to have a law enforcement
20  presence on the casino itself?
21     A.   Yes, sir.
22     Q.   And to support the casino's regular
23  security staff?
24     A.   Back to what you just said.  You said
25  on the casino floor.  The officers --

17

1  Q.  Do you receive bonuses?
2  A.  Yes, sir.
3  Q.  And what's the normal bonus?  Or what
4  have you received so far?
5  A.  I've received one bonus for 2,500 and
6  one for 9,000.
7  Q.  And is the bonus annually or --
8  A.  Annual.
9  Q.  And will you be getting a bonus, say,
10  in January?
11  A.  I hope so.
12  Q.  What I meant is your next expectation,
13  if you get one, would be January for two
14  thousand --
15  A.  January, February.  They haven't set a
16  date yet.
17  Q.  Now, when you worked for the Bossier
18  City Police Department, while you were on duty,
19  did you respond to calls or dispatch requests
20  from the Horseshoe?
21  A.  Yes, sir.
22  Q.  And how frequently was that?
23  A.  Oh, I couldn't recall exactly how many
24  times I went.  My last year, I was assigned to
25  the Boardwalk, and so I was very close to the

18

1  Horseshoe.  So if a call came out, I would
2  typically respond to back up the officer -- the
3  other officer.
4  Q.  You say the other officer.  Are you
5  talking about an off-duty officer?
6  A.  No, sir.  The Boardwalk unit is
7  specific to the Boardwalk.  And then you have
8  other officers that are actually in vehicles
9  patrolling the street.  And so instead of them
10  sending two police officers from the street, they
11  would send one, and I could go to keep another
12  one still out on the street.  Just to help out.
13  Q.  Okay.
14  A.  But they were on-duty police officers.
15  Q.  Okay.  And were you responding several
16  times a week when you were at the Boardwalk?
17  A.  Oh, it wasn't that frequently.  Maybe a
18  couple times a month.
19  Q.  And throughout your eight years, I
20  mean, was there any period of time that you would
21  not respond to calls at the Horseshoe?
22  A.  No, sir.  If I was available and
23  dispatch sent me, I would respond.
24  Q.  And, again, I'm not insinuating that
25  you were assigned to the Horseshoe.  It's just

19

1  trying to figure out what your experience is in
2  responding to calls.  And I know that would
3  depend upon your particular assignment on a
4  particular day, what district you were in and
5  other things, and what else you might have been
6  doing when the dispatch request came.  Is that
7  fair?
8  A.  Yes, sir.
9  Q.  But throughout the eight-year period,
10  it's fair that you would respond periodically in
11  each of those eight years -- if you were
12  available, you would respond to a call at the
13  Horseshoe?
14  A.  Yes, sir.
15  Q.  And during your eight years as a police
16  officer, was Mr. Brown the head of security as
17  far as you knew?
18  A.  I'm not exactly sure when he started at
19  the Horseshoe.  But as far as I knew, he was
20  the -- when I started working up there off-duty,
21  he was the director of security.
22  Q.  And before then when you were
23  responding to calls at the Horseshoe, would you
24  interact with Mr. Brown?
25  A.  I can't recall that far back.

20

1  Q.  Were there any other security employees
2  that you can recall interacting with when you
3  would respond to calls?
4  A.  I would respond with whoever the
5  security supervisor or lead on duty at the time
6  was.  But I don't recall any specific names.
7  Q.  And during those eight years you were a
8  Bossier City police officer, would you arrest
9  people at the Horseshoe for criminal trespassing?
10  A.  I can't remember every arrest, but I'm
11  sure I probably did arrest somebody for
12  trespassing the Horseshoe at some point.
13  Q.  That would be something you would
14  expect, but you don't recall ever having done it?
15  A.  Correct.
16  Q.  But you do understand there are two
17  types of criminal trespass in Louisiana?
18  A.  It's been a few years.
19  Q.  Well, let me -- one form of criminal
20  trespass is refusing to leave property after
21  being requested to do so by the owner.  That's
22  one -- refusal to leave.  Is that one form?
23  A.  I believe it is.
24  Q.  And a second type of criminal trespass
25  is coming onto the property when you're not

STEVEN MICHAEL JONES, JR.                                    12/19/2018

21

1    authorized to be on the property.  Unauthorized
2    presence on the property.  That's the second
3    type.  Right?
4            MR. ZIMMER:  Objection.  Form.
5        A.  I would have to pull out a statute
6    book.  But I don't know specifically what the
7    statutes read -- how they read.
8        Q.  (BY MR. LEWIS)  Okay.  Well, when we
9    use the term "trespassing," what do you normally
10   think of?
11       A.  What do I normally think of?
12       Q.  Yeah.  What has the person done if it's
13   a criminal trespass?
14       A.  I would say coming onto the property
15   after they've been told not to.
16       Q.  Not so much a refusal to leave after
17   being requested to leave?  Or is it one and the
18   same thing in your mind?
19       A.  Actually, I think there's one that's
20   remaining after forbidden.  I don't know the
21   exact statute numbers, but I do recall there's
22   one remaining after forbidden.  I guess that's
23   the one that's if they're refusing to leave.
24       Q.  But normally when you think of
25   trespass, you're thinking of coming back onto the

22

1    property after being told not to?
2        A.  Yes.
3        Q.  That's not the legal terms, but that's
4    generally how you understand the law to be?
5        A.  Yes, sir.
6        Q.  And, again, it's trespass because the
7    person is not authorized or allowed to be there?
8        A.  Yes.
9        Q.  While working at the Bossier City
10   Police Department, did you get to know Joseph
11   Thomerson?
12       A.  Yes, sir.
13       Q.  And he was already on the force when
14   you joined the force, wasn't he?
15       A.  Yes, sir.
16       Q.  Did you ever patrol with him?
17       A.  I believe I did.  I believe we were
18   both assigned the day shift at one time.  I
19   believe he was a supervisor.
20       Q.  And he was superior to you in rank
21   throughout your tenure --
22       A.  Yes, sir.
23       Q.  -- at the Bossier City Police
24   Department?
25       A.  Yes.

23

1        Q.  You've got to let me finish for her
2    benefit --
3        A.  I'm sorry.
4        Q.  -- especially.  And I also don't want
5    you answering a question because you think you
6    know what my question is when I may have changed
7    it at the end.  I know it will go faster if we
8    talk over each other, but we need to have a good,
9    clear record so if we use this in court, it's
10   clear what people said and there's no confusion.
11   And I'll try not to do it to you.  I'm probably
12   as guilty as anybody.
13           While you were on the force, did you
14   meet Jordan Johnson?
15       A.  Yes, sir.
16       Q.  Did you ever patrol with him?
17       A.  Yes, sir.
18       Q.  And you understand those are the two
19   police officers -- or two of the police officers
20   that responded to the Horseshoe for the incident
21   involving Mr. Pikaluk?
22       A.  Yes, sir.
23       Q.  I should have done this earlier, but I
24   apologize.  What did you do to prepare for the
25   deposition today?

24

1        A.  Let's see.  I reviewed my statement,
2    met with the attorney Sunday.
3        Q.  And the attorney is Mr. Zimmer?
4        A.  Yes, sir.
5        Q.  Did you meet with anyone else to
6    prepare for this deposition?
7        A.  There was somebody else in the room
8    Sunday.  I don't recall her name.
9        Q.  You understood it was one of
10   Mr. Zimmer's colleagues --
11       A.  Yes, sir.
12       Q.  -- at the law firm?  You reviewed your
13   statement.  Did you review your interrogatory
14   answers?
15       A.  Yes, sir.
16       Q.  Did you review any videotape?
17       A.  No, sir.
18       Q.  Did you review any documents that have
19   been produced in this litigation by anybody other
20   than your statement?
21       A.  No, sir.  Just my statement and the
22   answers to my questions.
23           (Jones Deposition Ex. 31 was
24   marked for identification.)
25       Q.  (BY MR. LEWIS)  Mr. Jones, you've been

STEVEN MICHAEL JONES, JR.                                12/19/2018

41

1  higher-level security personnel that can make
2  those statements and tell the patron, "You're
3  being evicted, and you'll receive this letter"?
4      A.  No, sir.
5      Q.  I understand Mr. Brown may send those
6  letters out to evicted patrons.  Is that
7  something he does frequently?
8      A.  I'm trying to think if he's ever --
9  since I've been there if he's ever sent one
10  himself.  I don't believe -- I can't think of a
11  time that he has written one, signed it, and sent
12  it himself and not had me do it.
13      Q.  Okay.  Is there anyone else within the
14  Horseshoe security that would send those letters
15  out besides you?
16      A.  Michael Golden, the assistant security
17  manager.  He would send any for the Louisiana
18  Downs property.  But not for the Horseshoe.
19      Q.  That's a different property?
20      A.  Yes, sir.
21      Q.  Different casino?
22      A.  Yes, sir.
23      Q.  You don't send those letters for
24  Louisiana Downs, and he doesn't send letters for
25  the Horseshoe?

42

1      A.  Up until the beginning of this year, I
2  would send them for both properties.  But we
3  started letting him do the ones for Louisiana
4  Downs.  If I'm on vacation for an extended period
5  of time, he might send some for Horseshoe.  But I
6  couldn't recall if he's actually done this
7  year.  He's offered, but I don't believe we've
8  actually -- I told him just wait until I get
9  back.
10      Q.  Now, you send this letter out.  Is it a
11  form letter?
12      A.  Is it --
13      Q.  Is it a form letter?  Everybody that
14  gets this letter, does it have the same thing in
15  there?
16      A.  Yes, sir.  Generally.
17      Q.  It's going to be addressed to a
18  different person each time.  Right?
19      A.  Correct.
20      Q.  The date of the incident or the
21  original ejection is going to be different; is
22  that right?
23      A.  Correct.
24      Q.  And you might let the patron know that
25  it's permanent or it's six weeks.  The length of

43

1  the exclusion will be different depending upon
2  the patron and the decisions that are made.
3  Right?
4      A.  Yes, sir.
5      Q.  All the other language is the same?
6      A.  Yes, sir.
7      Q.  And how do you ensure that the person
8  receives that letter?
9      A.  We send it via certified mail, U.S.
10  Postal Service.
11      Q.  And certified mail means that it's
12  going to be signed by somebody, and they're going
13  to get a receipt back?
14      A.  Yes, sir.
15      Q.  We call them green cards over in Texas.
16  What do you call them here?
17      A.  They are green, but I don't have a name
18  for them.
19      Q.  Are they sent certified mail, return
20  receipt requested?
21      A.  Yes, sir.
22      Q.  And does the certified mail request ask
23  that the specific person to whom the letter is
24  addressed sign for it or can just anybody sign
25  for it?

44

1      A.  I don't know specifically.  I have seen
2  some come back to me where someone else signed
3  for it.  So I would have to say anybody can
4  probably sign for it.
5      Q.  You don't restrict who can sign for it
6  when you send it out?
7      A.  No, sir.
8      Q.  Do you understand that you can do that
9  as part of the certified mail process?
10      A.  I've always checked the same boxes on
11  there.  Since I started, I haven't.
12      Q.  And when you get the green card -- you
13  keep a copy of that letter in your file.  Right?
14      A.  Yes, sir.
15      Q.  And you sign those letters.  Right?
16      A.  Yes, sir.
17      Q.  And when you get that green card back
18  or that receipt back from the post office, do you
19  staple it to the letter and put it back in the
20  file?
21      A.  Yes, sir.
22      Q.  So you've got that card right there
23  with the letter showing some evidence of receipt?
24      A.  Yes, sir.  Sometimes the letter comes
25  back undelivered.  And that gets stapled with the

# EXHIBIT 48

**Excerpts of Deposition of Robert Brown**

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF LOUISIANA
 3                 SHREVEPORT DIVISION
 4
 5   KYLE D. PIKALUK,      : CAUSE NO.
                           : 5:18-cv-00215-SMH-MLH
 6       Plaintiff,        :
                           :
 7   VERSUS                :
                           :
 8   HORSESHOE ENTERTAINMENT  :  JUDGE S. MAURICE
     LIMITED PARTNERSHIP,     :  HICKS, JR.
 9   D/B/A "HORSESHOE HOTEL   :
     & CASINO", STEVEN JONES, :
10   JOSEPH C. THOMERSON,     :
     D. RAZINSKY, JORDAN D.   :
11   JOHNSON, ROB BROWN,      :
     JASON WILLIAMS,          :
12   FEDERICO M. ARENDS, III, :
     AND JAMES LAFLEUR,       :
13                           :  MAGISTRATE JUDGE
         Defendants.  :  MARK HORNSBY
14
15
16
17
            DEPOSITION OF ROBERT LAMONT BROWN
18
              December 18, 2018
19
20
21
22
23
24
     Reported By:
25   Jayne M. Reeves, CCR
```

**2**

```
 1   APPEARANCES:
 2   COUNSEL FOR PLAINTIFF:
 3       MR. JOHN P. LEWIS, JR.
         Attorney at Law
 4       1412 Main Street, Suite 210
         Dallas, Texas 75202
 5       214.742.5925
         214.742.7110 - Facsimile
 6       jplewisjr@mindspring.com
 7   COUNSEL FOR DEFENDANTS:
 8       MR. SCOTT L. ZIMMER
         Kean Miller, LLP
 9       333 Texas Street, Suite 450
         Shreveport, Louisiana 71101
10       318.562.2700
         318.562.2751 - Facsimile
11       scott.zimmer@keanmiller.com
12   ALSO PRESENT:  Kyle D. Pikaluk
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1             S T I P U L A T I O N S
 2
 3          The deposition of ROBERT LAMONT BROWN,
 4   taken by counsel for Plaintiff, pursuant to
 5   Notice and agreement by and between counsel, for
 6   all purposes as allowed by the Federal Rules of
 7   Civil Procedure, before Jayne M. Reeves,
 8   Certified Court Reporter, at the offices of Kean
 9   Miller, LLP, located at 333 Texas Street, Suite
10   450, Shreveport, Louisiana, on December 18, 2018.
11          It being stipulated by and between
12   counsel that all formalities, with the exception
13   of the swearing of the witness, are waived.
14          It being further stipulated that the
15   reading and signing of the deposition are waived
16   by counsel and by the witness.
17          It being further stipulated that all
18   objections except as to the form of the question
19   and responsiveness of the answer are reserved
20   until the time of trial.
21
22
23
24
25
```

**4**

```
 1               I N D E X
 2                              PAGE
 3   Examination by Mr. Lewis.................  6
 4
 5
 6
 7             E X H I B I T S
 8   NUMBER        DESCRIPTION          PAGE
 9   Ex. 24     Security Officer Training   28
                Manual
10              Horseshoe 0071
11   Ex. 25     Louisiana Administrative    85
                Code, Chapter 35, Patron
12              Disputes
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ROBERT LAMONT BROWN                                    12/18/2018

5

1         ROBERT LAMONT BROWN,
2   the witness, having been duly sworn, testified as
3   follows, to wit:
4              EXAMINATION
5   BY MR. LEWIS:
6      Q.  Good morning, Mr. Brown.  Would you
7   state your full and complete name for the record,
8   please.
9      A.  My name is Robert LaMont Brown.
10     Q.  And where do you currently reside?
11     A.  I reside at 87 River Road, Shreveport,
12  Louisiana 71105.
13     Q.  And what's your current -- who's your
14  current employer?
15     A.  I work for Horseshoe Casino.
16     Q.  And what's your job title there?
17     A.  Director of security, hotel and marine
18  operations.
19     Q.  I'm not going to ask you about marine
20  operations.
21     A.  That's fine.
22     Q.  Have you given a deposition in the past
23  in any civil or criminal matter?
24     A.  I have.
25     Q.  Do you remember approximately on how

6

1   many occasions?
2      A.  Over the course of my time with
3   Harrah's, maybe five.
4      Q.  And have they always involved some sort
5   of claim against Harrah's?
6      A.  Yes.
7      Q.  And you would be deposed in your
8   capacity as one of the employees that either
9   witnessed or somehow was involved in the incident
10  that gave rise to the suit?
11     A.  Yes.
12     Q.  So you're generally familiar with the
13  process of what we're going to go through today?
14     A.  Yes.  It's been a while.  But, yes, I
15  do.
16     Q.  You say it's been a while.  When do you
17  recall -- how long ago was your last deposition?
18     A.  Two years maybe.
19     Q.  Okay.  Well, I'm not going to bother
20  with trying to refresh you.  It's going to be
21  pretty similar.  And if you have questions or
22  whatever, you just ask, and we'll clarify things.
23     A.  Thank you.
24     Q.  First of all, are you taking any
25  medications today that would impair or affect

7

1   your memory or your ability to answer the
2   questions truthfully?
3      A.  No, sir.
4      Q.  You do understand, like in your other
5   depositions, I assume, that you're testifying
6   under oath under penalties of perjury the same as
7   if you were in a courtroom before a judge or a
8   jury?
9      A.  I do, sir.
10     Q.  Can you tell me what you did to prepare
11  for the deposition this morning?
12     A.  About four to six weeks ago when I knew
13  that this was a possibility, I did review the
14  tape of the situation.  And then last week, Scott
15  and I met to go over my interrog -- the responses
16  that I had given already.
17     Q.  Okay.  When you refer to the tape,
18  you're talking about the surveillance video that
19  the Horseshoe has produced in this case?
20     A.  Yes, sir.
21     Q.  Do you recall viewing any other
22  videotape?
23     A.  About this situation?
24     Q.  Yes, sir.
25     A.  No.

8

1      Q.  Are you aware that there are some
2   videotape produced by the police officers that
3   were involved?
4      A.  No.  I'm not aware of that.
5      Q.  You've not seen those videotapes?
6      A.  No, sir.  I have not.
7      Q.  You've had the opportunity to review
8   those videotapes if you had wished or thought it
9   was necessary?
10     A.  The Bossier City tapes?
11     Q.  Yes.
12     A.  No.  I'm not aware I had that right.
13     Q.  Did you review any documents other than
14  your interrogatory answers to prepare for this
15  deposition today?
16     A.  No, I did not.
17     Q.  Did you discuss -- other than with
18  Mr. Zimmer or someone from his office, did you
19  discuss this upcoming deposition with anyone?
20     A.  No, I did not.
21     Q.  Between the time that you knew you were
22  going to be deposed and today, have you talked
23  about the incident with anybody else within the
24  Horseshoe?
25     A.  No, I did not.

ROBERT LAMONT BROWN                                          12/18/2018

13

1      Q.   Safety of guests is of primary
2   importance?
3      A.   It is.  Very much so.
4      Q.   And any other -- you protect the
5   property itself physically?
6      A.   Yes, sir.
7      Q.   You protect the chips and the bank
8   roll, the cash?
9      A.   Yes, sir.
10      Q.   And you protect the guests from either
11   other guests or other -- I don't guess they have
12   to be protected from the dealers very often, do
13   they?
14      A.   Not very often.  No, sir.  Most of ours
15   are medical.
16      Q.   I forgot about the EMT part.
17      A.   Yes.
18      Q.   Anything else that we've missed that's
19   within security's department?
20      A.   No, sir.  That's the basic.
21      Q.   And you report to someone else, though,
22   don't you?
23      A.   I do, sir.
24      Q.   And who do you report to?
25      A.   I report to the general manager

14

1   himself, Mike Rich.
2      Q.   Okay.  Now, between you and Steven
3   Jones, are you Steven Jones's boss or is --
4      A.   I am, sir.
5      Q.   -- he your boss?
6      A.   No.  Mr. Jones works for me.
7      Q.   So you're the head of security.  Is
8   that for all shifts?
9      A.   Yes, sir.
10      Q.   So it doesn't make any difference what
11   shift; you're going to be the top security guy?
12      A.   I am.  Yes, sir.
13      Q.   And I noticed in your interrogatory
14   answers that you've worked for casinos for well
15   over 20 years.  Has it always been in the
16   security department or has it been in the --
17      A.   No, sir.  It was always the hotel
18   division.  I only took over security -- and
19   you'll forgive me -- six years ago, seven years
20   ago.
21      Q.   That's while you were at the Horseshoe
22   in Bossier City?
23      A.   I came to Bossier City over 10 years
24   ago to run their hotel.
25      Q.   Okay.  That reminds me.  I should have

15

1   done this earlier.  I apologize.
2      Throughout your deposition, I'm going
3   to refer to the Horseshoe.  And I've been
4   referring to the Horseshoe, and I've not been
5   using its official formal name.  Right?
6      A.   Well, the Horseshoe is the Horseshoe.
7   Yes, sir.
8      Q.   Okay.  But there are a number of
9   different Horseshoes throughout the United
10   States.  Is that --
11      A.   Yes, sir.  There are.  Yes.  Correct.
12      Q.   And whenever I use the term
13   "Horseshoe," I'm going to be referring to the
14   Horseshoe that's across the river in Bossier
15   City.
16      A.   Okay.
17      Q.   You understand that?
18      A.   Yes, sir.  I do.
19      Q.   And that's okay with you?
20      A.   Of course.
21      Q.   And when I've been using it earlier,
22   that's who I've been referring -- that's the
23   particular Horseshoe I'm referring to.
24      A.   Yes, sir.
25      Q.   Okay.  And if I ask you a question and

16

1   I'm meaning a different Horseshoe, say, in Tunica
2   or across the river from Louisville in Indiana,
3   I'll actually talk -- I'll mention that.  Okay?
4      A.   All right.
5      Q.   And if you're going to give me an
6   answer that is more specific to a different
7   Horseshoe, then will you do the same for me?
8      A.   Most certainly, sir.
9      Q.   Okay.  You worked for other Horseshoes,
10   say, in -- you work for a Horseshoe in Tunica,
11   didn't you?
12      A.   For a little while.  Yes, sir.
13      Q.   And you worked for other Harrah's
14   companies as well?
15      A.   I have for over 20 years.  Yes, sir.
16      Q.   And I think you actually worked for
17   Harrah's before they acquired the Horseshoe
18   across the river?
19      A.   Yes, sir.  I'm a Harrah's Entertainment
20   employee.
21      Q.   Okay.  But originally you were in the
22   hotel operations?
23      A.   Yes, sir.
24      Q.   And you're still in the -- you're still
25   responsible for the hotel over at the Horseshoe?

ROBERT LAMONT BROWN                                    12/18/2018

97

1    wasn't like we told you and sent you a letter
2    U.S. mail.  This is you have rejected the letter
3    or did not sign for it at the address that you
4    had given us that day.  Then it is Fed Ex'd to
5    you as well to try again in a different avenue.
6    We try very hard to make sure everyone is
7    notified.
8        Q.   So even if the letter is not received,
9    you'll still follow the policy and the practice
10   of not cashing the chips?
11       A.   Yes, sir.
12            MR. ZIMMER:  Objection.  Asked and
13   answered.
14       Q.   (BY MR. LEWIS)  And that includes the
15   patrons own money for buying into the chips?
16       A.   Again, that's one of those that we just
17   have to -- we'd have to be in the situation to
18   verify where we're at.
19       Q.   Well, here's the reason I ask the
20   question.  And maybe I didn't hear your answer
21   correctly.  So if I misheard it, you tell me.
22            I thought you told me that your
23   practice at the Horseshoe in the letters that you
24   send out --
25       A.   It specifically says it will not

98

1    happen.
2        Q.   -- says you're not going to pay their
3    winnings.  I thought you used the word
4    "winnings."
5        A.   I would have to get the document.
6        Q.   But it doesn't say you're not going to
7    get your money back if you bought in, does it?
8        A.   Again, I'd have to get the letter right
9    now and look at it to tell you exactly what it
10   says.
11       Q.   But in this instance, the Horseshoe is
12   not even giving Mr. Pikaluk back his buy-in, have
13   they?
14       A.   Not at this moment.  No.
15       Q.   They took his money?
16            MR. ZIMMER:  Objection.  Form.
17       Q.   (BY MR. LEWIS)  Didn't they?
18       A.   At the moment, he still has his chips.
19   So I've not taken anything from him.
20       Q.   So long as you agree to cash them or
21   they are cashed?
22       A.   Yes.
23       Q.   You don't consider refusing to give him
24   his money back a form of theft?
25            MR. ZIMMER:  Objection.  Form.

99

1        A.   No.
2            MR. ZIMMER:  It's argumentative.
3        Q.   (BY MR. LEWIS)  Why not?
4        A.   Because he still has his chips at this
5    moment.  He also knows he was not supposed to be
6    on our properties.
7        Q.   How does he know that?
8        A.   He has been evicted from every property
9    there.  You read the list yourself.  You had me
10   identify each and every property.  And many of
11   them were Horseshoe properties.  It's hard for me
12   to imagine that after two and a half -- two years
13   that he shows up at the Horseshoe in Bossier City
14   and doesn't realize that we're attributed to
15   Horseshoe Baltimore or Indiana or Council Bluffs
16   or -- they all had the word Horseshoe in front of
17   them.
18       Q.   How do you know that he knew he was
19   subject to a company-wide ban?
20       A.   Again, I would assume he received some
21   notification.
22       Q.   Did you ever see that notification?
23       A.   No, sir.  I did not.
24       Q.   Did you ever see that notification --
25   you didn't have that notification when he was

100

1    arrested.  Right?
2        A.   I had a note that said that he had been
3    done.  Yes, sir.
4        Q.   So all that occurred at the Horseshoe
5    that afternoon is based on these notes in the
6    CMS?
7        A.   That is correct, sir.
8        Q.   You didn't require any evidence that he
9    had -- your practice is to get receipts back from
10   any of these letters.  Right?
11       A.   That is our practice.  Yes.
12       Q.   And it's registered mail.  Correct?
13       A.   Yes, sir.
14       Q.   You don't know what the practices are
15   otherwise.  Correct?
16       A.   No, I do not.
17       Q.   And just again so that this record is
18   clear, the Horseshoe did not ever send
19   Mr. Pikaluk a letter saying, You're banned?
20       A.   The Horseshoe itself did not.  No, sir.
21       Q.   And never sent Mr. Pikaluk a letter
22   saying, Not only are you banned.  You're banned
23   from every Caesars property worldwide, including
24   Dubai, or words to that effect?
25       A.   I'm sorry.  The Horseshoe sent that

ROBERT LAMONT BROWN                                          12/18/2018

101

1    letter?  No.  The Horseshoe itself did not.
2    Again, the Horseshoe, Bossier City, did not.
3         Q.   And you don't know if a letter like
4    that was ever even sent to Mr. Pikaluk other than
5    it indicates, you think, in these CMS messages?
6         A.   Correct.
7              MR. ZIMMER:  Objection.  Form.
8         A.   But I would have no reason not to
9    believe it.
10        Q.   (BY MR. LEWIS)  Turn to that exhibit.
11   I think it's 18.
12        A.   Okay.
13        Q.   Review that for me, please.  And can
14   you point to me any message or entry in that
15   document that reflects that Mr. Pikaluk actually
16   received some notice --
17        A.   There is not --
18        Q.   -- or some form?  You already know
19   that?  You don't have to look?
20        A.   No.  I read every one with you.  You
21   had me read each one.  We went line by line, sir.
22        Q.   So there's nothing in your documents
23   that you maintained saying he got the notice?
24        A.   No.
25             MR. ZIMMER:  Objection.  Form.

102

1    Misstates prior testimony.
2         Q.   (BY MR. LEWIS)  Is there anything in
3    that document that even tells you where such a
4    notice would have been sent?
5         A.   No.
6         Q.   What evidence did the Horseshoe have on
7    that Saturday afternoon that Mr. Pikaluk had ever
8    received that notice?
9         A.   There is none other than what that note
10   says, that he is a permanent ban from the
11   properties.
12        Q.   Did anybody on your staff -- and that's
13   Mr. Arends and Mr. Jones -- ever tell you they
14   had contacted someone within the Caesars
15   organization to find out whether Mr. Pikaluk had
16   been notified; and if so, had he received it?
17        A.   No, they did not.
18        Q.   I assume Mr. Lafleur or Mr. Williams
19   didn't tell you that either, did they?
20        A.   We've never spoken about this.
21        Q.   Now, if you had told the Bossier City
22   police officers that Mr. Pikaluk was an advantage
23   player, a card counter, had been banned from all
24   of our properties, was subject to a company-wide
25   ban, and had been notified of that several times,

103

1    that would not be a correct statement?
2              MR. ZIMMER:  Object to the
3    hypothetical.
4         A.   I don't understand the question.  I'm
5    sorry.
6         Q.   (BY MR. LEWIS)  You don't recall
7    telling Sergeant Thomerson that Mr. Pikaluk was
8    an advantage player?
9         A.   I didn't have any conversation with
10   Sergeant Joe Thomerson other than to say hello to
11   him.  And that decision had already been made
12   whether to arrest or not.
13        Q.   You're sure of that?
14        A.   I'm positive.
15        Q.   And you don't recall having any
16   conversation with Sergeant Thomerson about
17   cashing Mr. Pikaluk's chips?
18        A.   I had no conversation with Sergeant Joe
19   Thomerson about that.
20        Q.   When those chips are in Mr. Pikaluk's
21   pocket, whose money is it?
22        A.   I would assume his.
23        Q.   You don't recall telling Sergeant
24   Thomerson that, "He's got $30,000 of my money in
25   his front pocket"?

104

1         A.   I have never said that sentence.
2         Q.   You sure of that?
3         A.   I'm positive of that.
4              MR. LEWIS:  Let me take just a
5    quick break.
6              (Break.)
7         Q.   (BY MR. LEWIS)  Mr. Brown, would you
8    turn to Exhibit Number 21?  It should be in that
9    stack in front of you, please.
10             MR. ZIMMER:  What is it?
11             MR. LEWIS:  It's an Incident File
12   Full Report from surveillance.
13        A.   I'm sorry.  What number?
14        Q.   (BY MR. LEWIS)  21.  There may be two
15   of those.
16        A.   There's 20 and 21.  Yes, sir.
17        Q.   We can turn to 20 first to keep it
18   numerical.  Do you recognize that document as a
19   surveillance report by Horseshoe surveillance?
20        A.   Yes, sir.
21        Q.   About Mr. Pikaluk?
22        A.   Yes.
23        Q.   And it's about his play at the
24   Horseshoe Casino?
25        A.   Yes.

# EXHIBIT 49

**Excerpts of Deposition of James Lafleur**

JAMES JOHN LAFLEUR                                             12/17/2018

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF LOUISIANA
 3                 SHREVEPORT DIVISION
 4   KYLE D. PIKALUK,    :  CAUSE NO.
                         :  5:18-cv-00215-SMH-MLH
 5        Plaintiff,     :
 6   VERSUS             :
 7                       :
 8   HORSESHOE ENTERTAINMENT  :  JUDGE S. MAURICE
     LIMITED PARTNERSHIP,  :  HICKS, JR.
 9   D/B/A "HORSESHOE HOTEL  :
     & CASINO", STEVEN JONES, :
10   JOSEPH C. THOMERSON,   :
     D. RAZINSKY, JORDAN D.  :
11   JOHNSON, ROB BROWN,    :
     JASON WILLIAMS,       :
12   FEDERICO M. ARENDS, III, :
     AND JAMES LAFLEUR,    :
13                 :  MAGISTRATE JUDGE
          Defendants.   :  MARK HORNSBY
14
15
16
17
         DEPOSITION OF JAMES JOHN LAFLEUR
18
            December 17, 2018
19
20
21
22
23
24
     Reported By:
25   Jayne M. Reeves, CCR
```

**Page 2**

```
 1   APPEARANCES:
 2   COUNSEL FOR PLAINTIFF:
 3     MR. JOHN P. LEWIS, JR.
        Attorney at Law
 4      1412 Main Street, Suite 210
        Dallas, Texas 75202
 5      214.742.5925
        214.742.7110 - Facsimile
 6      jplewisjr@mindspring.com
 7   COUNSEL FOR DEFENDANTS:
 8     MR. SCOTT L. ZIMMER
        MS. ANN RENE HANKINS
 9      Kean Miller, LLP
        333 Texas Street, Suite 450
10      Shreveport, Louisiana 71101
        318.562.2700
11      318.562.2751 - Facsimile
        scott.zimmer@keanmiller.com
12
     ALSO PRESENT:  Kyle D. Pikaluk
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            S T I P U L A T I O N S
 2
 3        The deposition of JAMES JOHN LAFLEUR,
 4   taken by counsel for Plaintiff, pursuant to
 5   Notice and agreement by and between counsel, for
 6   all purposes as allowed by the Federal Rules of
 7   Civil Procedure, before Jayne M. Reeves,
 8   Certified Court Reporter, at the offices of Kean
 9   Miller, LLP, located at 333 Texas Street, Suite
10   450, Shreveport, Louisiana, on December 17, 2018.
11        It being stipulated by and between
12   counsel that all formalities, with the exception
13   of the swearing of the witness, are waived.
14        It being further stipulated that the
15   reading and signing of the deposition are waived
16   by counsel and by the witness.
17        It being further stipulated that all
18   objections except as to the form of the question
19   and responsiveness of the answer are reserved
20   until the time of trial.
21
22
23
24
25
```

**Page 4**

```
 1               I N D E X
 2                           PAGE
 3   Examination by Mr. Lewis................  5
 4
 5
 6          E X H I B I T S
 7   NUMBER     DESCRIPTION        PAGE
 8   Ex. 14    Caesars Entertainment    21
          Code of Business Conduct
 9        and Ethics, February 2018
10   Ex. 15    Rules of the Road      24
11   Ex. 16    Horseshoe Casino Hotel,   26
          Bossier City, Louisiana
12        Guest Safety/Security
          Department Handbook
13
     Ex. 17    Employee Statement Form   67
14
     Ex. 18    CMS/WINet documents     93
15
     Ex. 19    Incident File Summary Report  96
16
     Ex. 20    Incident File Full Report   97
17
     Ex. 21    Incident File Full Report   97
18
     Ex. 22    Letter to Kyle Pikaluk from  98
19        Caesars Entertainment dated
          June 21, 2016
20
21
22
23
24
25
```

JAMES JOHN LAFLEUR                                    12/17/2018

**5**

1          P R O C E E D I N G S
2
3          MR. LEWIS:  The usual agreements
4    and so forth.
5               MR. ZIMMER:  Taken pursuant to the
6    rules.
7               MR. LEWIS:  Taken pursuant to the
8    rules.
9                    ***
10         JAMES JOHN LAFLEUR,
11   the witness, having been duly sworn, testified as
12   follows, to wit:
13              EXAMINATION
14   BY MR. LEWIS:
15        Q.   Good morning, Mr. Lafleur.  My name is
16   John Lewis.  And I have the privilege of
17   representing Kyle Pikaluk, who is the plaintiff
18   in a federal court lawsuit brought against
19   yourself and numerous other defendants on account
20   of an incident at the Horseshoe Casino on March
21   18, 2017.  Do you understand who I am and who I
22   represent?
23        A.   Yes, sir.
24        Q.   I want to be sure I pronounce your name
25   correctly.  It's a French name, is it not?

**6**

1         A.   Yes, sir.
2         Q.   Is it Lafleur --
3         A.   Yes, sir.
4         Q.   -- or Lafleur?
5         A.   Either one is fine.
6         Q.   Either one.  I won't insult you if I
7    mispronounce it?
8         A.   No, sir.
9         Q.   I'll try to do the best I can.  Would
10   you state your full and complete name for the
11   record, please.
12        A.   James John Lafleur.
13        Q.   And where do you reside?
14        A.   In Bossier City.
15        Q.   What's your street address?
16        A.   6110 Hollyhock Lane.
17        Q.   And your Zip code?
18        A.   71112.
19        Q.   Are you married?
20        A.   Yes, sir.
21        Q.   And do you have children?
22        A.   Yes, sir.
23        Q.   What's your wife's name?
24        A.   Rosa.
25        Q.   And how long have you resided at that

**7**

1    address?
2         A.   Since 2006.
3         Q.   And you're employed by the Horseshoe
4    Casino?
5         A.   Yes, sir.
6         Q.   And according to your interrogatory
7    answers, you've been employed at the Horseshoe
8    since approximately 1994?
9         A.   Yes, sir.
10        Q.   And before that -- let me withdraw
11   that.
12             When you first were employed by the
13   Horseshoe Casino, was it owned by Jack Binion and
14   his companies?
15        A.   Yes, sir.
16        Q.   And it later became owned indirectly by
17   what is called Caesars Entertainment?
18        A.   Yes, sir.
19        Q.   When you were first employed at the
20   Horseshoe, was your position -- your current --
21   let me back up and do it this way.
22             Your current position is assistant
23   casino manager?
24        A.   Yes, sir.
25        Q.   Was that your position when you were

**8**

1    first hired back in 1994?
2         A.   No, sir.
3         Q.   Can you walk me through the progression
4    of positions that you've held at the Horseshoe
5    during your career?
6         A.   It's been numerous, so...
7         Q.   Well, we've got time.
8         A.   A liquor steward, a dealer, a dual rate
9    supervisor, a supervisor, a pit manager, a dual
10   rate pit manager, assistant shift manager,
11   assistant shift manager.
12        Q.   Okay.  When did you first become the
13   assistant casino manager?
14        A.   I'm thinking it was around 2015.
15        Q.   I apologize.  I skipped over some of
16   the preliminaries I should have done.  Have you
17   ever given a deposition before?
18        A.   No, sir.
19        Q.   This is your first time?
20        A.   Yes, sir.
21        Q.   You understand that you're here to
22   provide information regarding the arrest of
23   Mr. Pikaluk that has led to a lawsuit?
24        A.   Yes, sir.
25        Q.   And you understand that you're

# EXHIBIT 50

**Excerpts of Deposition of Federico M. Arends, III**

FEDERICO MAXIMILIANO ARENDS III                    12/17/2018



**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF LOUISIANA
 3              SHREVEPORT DIVISION
 4
 5   KYLE D. PIKALUK,      :  CAUSE NO.
                           :  5:18-cv-00215-SMH-MLH
 6       Plaintiff,        :
                           :
 7   VERSUS               :
                           :
 8   HORSESHOE ENTERTAINMENT  :  JUDGE S. MAURICE
     LIMITED PARTNERSHIP,   :  HICKS, JR.
 9   D/B/A "HORSESHOE HOTEL  :
     & CASINO", STEVEN JONES, :
10   JOSEPH C. THOMERSON,   :
     D. RAZINSKY, JORDAN D.  :
11   JOHNSON, ROB BROWN,    :
     JASON WILLIAMS,        :
12   FEDERICO M. ARENDS, III, :
     AND JAMES LAFLEUR,     :
13                 :  MAGISTRATE JUDGE
         Defendants.   :  MARK HORNSBY
14
15
16
17
18   DEPOSITION OF FEDERICO MAXIMILIANO ARENDS, III

         December 17, 2018
19
20
21
22
23
24
     Reported By:
25   Jayne M. Reeves, CCR
```

**2**

```
 1   APPEARANCES:
 2   COUNSEL FOR PLAINTIFF:
 3      MR. JOHN P. LEWIS, JR.
         Attorney at Law
 4       1412 Main Street, Suite 210
         Dallas, Texas 75202
 5       214.742.5925
         214.742.7110 - Facsimile
 6       jplewisjr@mindspring.com
 7   COUNSEL FOR DEFENDANTS:
 8      MR. SCOTT L. ZIMMER
         MS. ANN RENE HANKINS
 9       Kean Miller, LLP
         333 Texas Street, Suite 450
10       Shreveport, Louisiana 71101
         318.562.2700
11       318.562.2751 - Facsimile
         scott.zimmer@keanmiller.com
12
     ALSO PRESENT:  Kyle D. Pikaluk
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1            S T I P U L A T I O N S
 2
 3        The deposition of FEDERICO MAXIMILIANO
 4   ARENDS, III, taken by counsel for Plaintiff,
 5   pursuant to Notice and agreement by and between
 6   counsel, for all purposes as allowed by the
 7   Federal Rules of Civil Procedure, before Jayne M.
 8   Reeves, Certified Court Reporter, at the offices
 9   of Kean Miller, LLP, located at 333 Texas Street,
10   Suite 450, Shreveport, Louisiana, on December 17,
11   2018.
12        It being stipulated by and between
13   counsel that all formalities, with the exception
14   of the swearing of the witness, are waived.
15        It being further stipulated that the
16   reading and signing of the deposition are waived
17   by counsel and by the witness.
18        It being further stipulated that all
19   objections except as to the form of the question
20   and responsiveness of the answer are reserved
21   until the time of trial.
22
23
24
25
```

**4**

```
 1              I N D E X
 2                          PAGE
 3   Examination by Mr. Lewis.................  5
 4   Examination by Mr. Zimmer................  65
 5
 6
 7            E X H I B I T S
 8   NUMBER        DESCRIPTION         PAGE
 9   Ex. 23     Incident Report Form      15
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1          FEDERICO MAXIMILIANO ARENDS, III,
2    the witness, having been duly sworn, testified as
3    follows, to wit:
4                    EXAMINATION
5    BY MR. LEWIS:
6        Q.   Good afternoon.  My name is John Lewis.
7    I'm one of the lawyers that represents Kyle
8    Pikaluk, who's the plaintiff in the lawsuit that
9    has been filed against you and other defendants
10   here in federal court in Shreveport over his
11   arrest at the Horseshoe on March 18, 2017.  Do
12   you understand who I am and who I represent?
13       A.   Yes.
14       Q.   And do you understand that you're here
15   to provide deposition testimony in connection
16   with that lawsuit?
17       A.   Yes.
18       Q.   Have you -- I guess I should ask him to
19   state his name.
20            Would you state your name for the
21   record.
22       A.   Federico Maximiliano Arends, III.
23       Q.   And do you go by Max?
24       A.   Yes.
25       Q.   And have you ever been deposed before?

6

1        A.   Yes.
2        Q.   Approximately how many times?
3        A.   I don't recall.
4        Q.   How long ago was the last deposition
5    you recall giving?
6        A.   About three weeks ago.
7        Q.   Was it in conjunction with any claims
8    against the Horseshoe Casino?
9        A.   I don't recall if that's what it was.
10       Q.   So you gave a deposition three weeks
11   ago, but you don't know what the case was about?
12       A.   Not really.  It was a slip-and-fall.
13       Q.   At the Horseshoe?
14       A.   Yes.
15       Q.   And so is it fair to say you're
16   familiar with the process, the questions and
17   answers that goes on in a deposition?
18       A.   Yes.
19       Q.   During the deposition, I'm going to be
20   referring frequently to the Horseshoe.  Do you
21   understand that when I refer to the Horseshoe,
22   I'm referring to the Horseshoe Hotel and Casino
23   in Bossier City, Louisiana, and no other casino
24   by that name?
25       A.   Yes.

7

1        Q.   And I understand you're employed by the
2    Horseshoe?
3        A.   Yes.
4        Q.   And what is your title there?
5        A.   At this time?
6        Q.   At this time.
7        A.   Shift manager of security.
8        Q.   What was your title on March 18, 2017?
9        A.   Supervisor of security.
10       Q.   So you've been promoted since then?
11       A.   Yes, sir.
12       Q.   And what shift are you the shift
13   manager for?
14       A.   All three.
15       Q.   And when you were the supervisor back
16   in March of 2017, were you on the day shift?
17       A.   I believe so.
18       Q.   Can you tell me what you did to prepare
19   for your deposition today?
20       A.   All I had was had a meeting with the
21   attorney.
22       Q.   Did you review any documents?
23       A.   Yes, sir.
24       Q.   Can you tell me what documents you
25   reviewed?

8

1        A.   It was the statement I made and my
2    incident report.
3        Q.   Anything else?
4        A.   And the deposition that they turned in
5    to you.  The paperwork that they turned in to
6    you.
7        Q.   What we call interrogatories?
8        A.   I believe so.  I'm not an attorney.
9        Q.   Can you recall anything else you may
10   have reviewed?
11       A.   No, sir.
12       Q.   Any video of --
13       A.   No, sir.
14       Q.   So that she can take down and make a
15   clear transcript, I'll try not to talk over you,
16   and I would ask that you not talk over me.  Let
17   me finish the question so, one, to be sure you
18   understand what the question is; and two, so she
19   can get a good record.  Can we do that?
20       A.   Yes.
21       Q.   I'll try.  I'll break it, I know.  And
22   I'm sure you will also.  But let's try to do it
23   that way.
24            Have you ever seen the video that's
25   been produced in this case by the police?

# EXHIBIT 51

**Excerpts of Excerpts of Deposition of Jason Williams**



**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF LOUISIANA
 3             SHREVEPORT DIVISION
 4
 5   KYLE D. PIKALUK,      :  CAUSE NO.
               : 5:18-cv-00215-SMH-MLH
 6      Plaintiff,   :
 7   VERSUS           :
               :
 8   HORSESHOE ENTERTAINMENT  :  JUDGE S. MAURICE
     LIMITED PARTNERSHIP,    :  HICKS, JR.
 9   D/B/A "HORSESHOE HOTEL  :
     & CASINO", STEVEN JONES, :
10   JOSEPH C. THOMERSON,   :
     D. RAZINSKY, JORDAN D.  :
11   JOHNSON, ROB BROWN,    :
     JASON WILLIAMS,       :
12   FEDERICO M. ARENDS, III, :
     AND JAMES LAFLEUR,     :
13             : MAGISTRATE JUDGE
        Defendants.  :  MARK HORNSBY
14
15
16
17
        DEPOSITION OF JASON ALAN WILLIAMS
18
          December 19, 2018
19
20
21
22
23
24
        Reported By:
25     Jayne M. Reeves, CCR
```

**Page 2**

```
 1  APPEARANCES:
 2  COUNSEL FOR PLAINTIFF:
 3    MR. JOHN P. LEWIS, JR.
      Attorney at Law
 4    1412 Main Street, Suite 210
      Dallas, Texas 75202
 5    214.742.5925
      214.742.7110 - Facsimile
 6    jplewisjr@mindspring.com
 7  COUNSEL FOR DEFENDANTS:
 8    MR. SCOTT L. ZIMMER
      Kean Miller, LLP
 9    333 Texas Street, Suite 450
      Shreveport, Louisiana 71101
10    318.562.2700
      318.562.2751 - Facsimile
11    scott.zimmer@keanmiller.com
12  ALSO PRESENT:  Kyle D. Pikaluk
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1             S T I P U L A T I O N S
 2
 3        The deposition of JASON ALAN WILLIAMS,
 4   taken by counsel for Plaintiff, pursuant to
 5   Notice and agreement by and between counsel, for
 6   all purposes as allowed by the Federal Rules of
 7   Civil Procedure, before Jayne M. Reeves,
 8   Certified Court Reporter, at the offices of Kean
 9   Miller, LLP, located at 333 Texas Street, Suite
10   450, Shreveport, Louisiana, on December 19, 2018.
11        It being stipulated by and between
12   counsel that all formalities, with the exception
13   of the swearing of the witness, are waived.
14        It being further stipulated that the
15   reading and signing of the deposition are waived
16   by counsel and by the witness.
17        It being further stipulated that all
18   objections except as to the form of the question
19   and responsiveness of the answer are reserved
20   until the time of trial.
21
22
23
24
25
```

**Page 4**

```
 1             I N D E X
 2                        PAGE
 3   Examination by Mr. Lewis.................   6
 4
 5
 6
 7             E X H I B I T S
 8   NUMBER        DESCRIPTION          PAGE
 9   Ex. 34     Patron history        83
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JASON ALAN WILLIAMS                                    12/19/2019

---

**5**

1    JASON ALAN WILLIAMS,
2   the witness, having been duly sworn, testified as
3   follows, to wit:
4           EXAMINATION
5   BY MR. LEWIS:
6       Q.  Good afternoon, Mr. Williams.  My name
7   is John Lewis.  I'm a lawyer in Dallas that has
8   the privilege of representing Kyle Pikaluk, who
9   is with us today sitting to my left.  Do you
10  recognize him?
11      A.  It's been a long time.  Not really, to
12  be honest with you.  No.
13      Q.  Well, I represent him in a federal
14  court lawsuit that's been filed here in
15  Shreveport against you and several other
16  defendants on account of his arrest at the
17  Horseshoe on March 17 -- I mean March 18, 2017.
18  You understand who I am and who I represent?
19      A.  Yes, sir.
20      Q.  And why we're here today?
21      A.  Yes.
22      Q.  For the record, would you state your
23  full and complete name.
24      A.  Jason Alan Williams.
25      Q.  And where do you reside, Mr. Williams?

---

**6**

1       A.  Hosston, Louisiana.
2       Q.  Okay.  What's your street address?
3       A.  14981 Oak Street.
4       Q.  And who is your current employer?
5       A.  Horseshoe Bossier City.
6       Q.  Have you ever given a deposition
7   before?
8       A.  Yes, sir.
9       Q.  Approximately how many times do you
10  recall being deposed?
11      A.  How many times have I given a
12  deposition?
13      Q.  Yes, sir.
14      A.  One other time.
15      Q.  And how long ago was that?
16      A.  A week and a half ago.
17      Q.  So was it related to a Horseshoe case?
18      A.  Yes, sir.
19      Q.  And, again, just so that we can speed
20  this up a little bit, I understand there's a lot
21  of Horseshoe Casinos across the country.
22      A.  Yes, sir.
23      Q.  Is that right?
24      A.  There's a few.
25      Q.  Well, I mean, I don't know --

---

**7**

1       A.  I don't know the exact number.
2       Q.  But today we're going to talk about the
3   Horseshoe Bossier City, which is across the river
4   where you work.  Okay?
5       A.  Uh-huh.
6       Q.  I don't think I'll ask you any
7   questions about any of the other Horseshoes, but
8   I might.
9       A.  Okay.
10      Q.  But unless I say differently, when I
11  say Horseshoe, we're going to be talking about
12  the one you work at.  Is that okay with you?
13      A.  Sounds good.
14      Q.  When you answer my questions and when
15  you talk about Horseshoe, unless you tell me it's
16  a different one, I'm going to assume that the
17  Horseshoe means the one across the river.
18      A.  Yes, sir.
19      Q.  And you understand since -- by the way,
20  the one about a week or so ago, what kind of case
21  was that?
22      A.  I don't know if I can discuss that,
23  because it's still ongoing.  It's a case with the
24  NLRB.
25      Q.  Labor relations?

---

**8**

1       A.  Labor relations.
2       Q.  Employment stuff?
3       A.  Employment stuff.  Yes, sir.
4       Q.  So nobody has tried to unionize you
5   yet?
6       A.  No.  Well, they were trying.  But
7   that's part of it.  Yes, sir.
8       Q.  Okay.  We're not here on a union case.
9   Okay?
10      A.  Yeah.  But it's still going, so I don't
11  know how much I can legally talk about.
12      Q.  That's all I want to know is what kind
13  it was.
14      A.  Yes, sir.
15      Q.  And you've answered the question.
16  We're going to move on, because that stuff bores
17  me.
18      A.  Well, I understand.
19      Q.  Let's get the preliminaries out of the
20  way.  You understand you're under oath, sworn to
21  tell the truth?
22      A.  Yes, sir.
23      Q.  And that you're under the penalties of
24  perjury if for some reason you commit perjury?
25      A.  Yes, sir.

---

JASON ALAN WILLIAMS                                     12/19/2019

9

1    Q.   Correct?  Same as if you're in a
2  courtroom before a judge and jury?
3    A.   Yes, sir.
4    Q.   And I'm assuming you don't suffer from
5  any medical, emotional or mental condition that
6  would affect your ability to either recall events
7  or to tell the truth?
8    A.   No, sir.
9    Q.   And you're not under the influence of
10  any drugs or medications or alcohol or other
11  substances that would affect your memory or
12  affect your ability to tell the truth today?
13    A.   No, sir.
14    Q.   And you know I'm going to ask you
15  questions.  And we're going to hopefully not talk
16  over each other --
17    A.   Yes, sir.
18    Q.   -- so she can write it down, make a
19  transcript.  We'll all have a chance to read it.
20  So you'll answer my questions orally with a
21  verbal response and not a physical response?
22    A.   Yes, sir.
23    Q.   Okay.  And can you tell me what you did
24  to prepare for your deposition today?
25    A.   I met with Scott, and we went over my

10

1  interrogatories.  That's a hard word to say.
2    Q.   You met with Mr. Zimmer.  Was anyone
3  else present?
4    A.   Yes, sir.
5    Q.   Can you tell me who that was?
6    A.   I don't recall her name.
7    Q.   One of Mr. Zimmer's colleagues?
8    A.   Yes.
9    Q.   Works for his law firm?
10    A.   Yes, sir.
11    Q.   Anybody else?
12    A.   No, sir.
13    Q.   Did you review any documents other than
14  the interrogatory answers that you had given?
15    A.   The only other document was a cage chip
16  cashing policy.  That's the only one other than
17  my interrogatories.
18    Q.   Cage -- are you talking about the
19  policies, practices, procedures of Horseshoe for
20  cashing chips?
21    A.   It was a documentation that was
22  shown -- it was a cage documentation.  I had
23  never seen it before, so I didn't know what it
24  was.
25    Q.   I mean, is it a Horseshoe document?

11

1    A.   Yes, sir.
2    Q.   It's not a document that's generated by
3  the State of Louisiana, is it?
4    A.   No.
5    Q.   So you looked at a document that has
6  the procedures for cashiers at the cage as to how
7  to --
8    A.   I'm assuming --
9    Q.   -- redeem and cash chips?
10    A.   Yes.  I'm assuming.  Yes.  I'd never
11  seen it before.  It's not my department, so...
12    Q.   Any other documents that you looked at?
13    A.   No, sir.
14    Q.   Did you listen to any audio of the
15  events in question?
16    A.   No, sir.
17    Q.   Did you review any video --
18    A.   No, sir.
19    Q.   -- of the events in question?  We're
20  talking over each other a little bit.  I'll try
21  to slow down.
22        When you were joined as a party in this
23  lawsuit, did you receive a copy of the second
24  amended complaint that Mr. Pikaluk filed against
25  you and the other defendants?

12

1    A.   I don't remember reviewing that.
2    Q.   What is your understanding of the
3  nature of the claims that Mr. Pikaluk is
4  asserting against you personally?
5    A.   The only thing I know that's against us
6  is for the arrest part, to my understanding.
7    Q.   Against you personally?
8    A.   Against me personally?
9    Q.   Is for the arrest?
10    A.   Yes.
11    Q.   You understand that a part of that
12  lawsuit involves the refusal to cash chips?
13    A.   I understand that.  Yes.
14    Q.   And you understand those claims are
15  against the company?
16    A.   Yes, sir.
17    Q.   You have no obligation personally to
18  cash those chips, do you?
19    A.   That's correct.
20    Q.   The Horseshoe is your current employer;
21  is that right?
22    A.   Yes, sir.
23    Q.   And the last I knew, you were a casino
24  manager.  Is that still your position?
25    A.   Yes, sir.

JASON ALAN WILLIAMS                                          12/19/2019

13

1      Q.   And you're a casino manager on what
2    shift?
3      A.   Currently I work all the shifts.  I'm
4    over the slot and beverage department currently.
5    At the time of this incident that we're talking
6    about, I would have been over the day shift
7    tables slots and beverage departments.
8      Q.   So now you're just slots and beverage?
9      A.   Yes, sir.  As of --
10     Q.   No more table games?
11     A.   No, sir.
12     Q.   Is that a promotion or demotion or --
13     A.   Yes, it was.  It was a promotion.  We
14   just changed things up a little bit.
15     Q.   Just a reorganization internally?
16     A.   A little bit.  Yes, sir.
17     Q.   And I think I know the answer to this,
18   but let's get it on the record in your own words.
19   The day shift starts at what time?
20     A.   At 11:00 a.m.
21     Q.   And it ends at what time?
22     A.   7:00 p.m.
23     Q.   And that would be even on a Saturday?
24     A.   That's correct.
25     Q.   And on the date of the incident in

14

1    question, there was an assistant casino manager
2    working with you --
3      A.   Yes, sir.
4      Q.   -- on the day shift?
5      A.   Yes, sir.
6      Q.   And that's James Lafleur?
7      A.   Yes, sir.
8      Q.   And you're his supervisor?
9      A.   Yes, sir.
10     Q.   And he reports to you?
11     A.   Yes.
12     Q.   And you report to, I think someone
13   named Mr. Dodds, Roger Dodds?
14     A.   Yes, sir.
15     Q.   And Mr. Dodds, in turn, reports to
16   someone named -- is it Mike Rich?
17     A.   Yes, sir.
18     Q.   Do you report to anybody who offices in
19   Las Vegas?
20     A.   No, sir.
21     Q.   Do you receive instructions on how to
22   do your job from anyone in Las Vegas?
23     A.   No, sir.
24     Q.   Have you ever -- that's a bad question.
25   Let's not go there.

15

1           You've not given a statement about the
2    incident that brings us here today.  Right?
3      A.   No, sir.
4      Q.   You know Mr. Lafleur has given a
5    statement.  Right?
6      A.   Yes, sir.
7      Q.   Have you read his statement?
8      A.   Yes.
9      Q.   But not recently?
10     A.   No, sir.
11     Q.   Do you know that Mr. Arends has given a
12   statement?
13     A.   Yes, sir.
14     Q.   Have you read his statement?
15     A.   Yes, sir.
16     Q.   But not recently?
17     A.   No, sir.
18     Q.   You know that Ms. Guillory filed an
19   Incident Report related to Mr. Pikaluk?
20     A.   I did not know that.
21     Q.   So you haven't read that?
22     A.   No, sir.
23     Q.   Do you know that Mr. Jones has given a
24   statement related to the incident?
25     A.   Yes, sir.

16

1      Q.   You've read that statement?
2      A.   Yes, sir.
3      Q.   But not recently?
4      A.   No, sir.
5      Q.   How long ago do you recall -- did you
6    read all those statements at or about the same
7    time or were they spread out over a period of
8    time?
9      A.   I don't recall when I read those
10   statements.  Been some time ago.
11     Q.   But they would have been -- you read
12   them all at about the same time?  You didn't read
13   them --
14     A.   Yes, sir.
15     Q.   Why didn't you give a statement?
16     A.   I didn't have a lot of involvement in
17   this incident.
18     Q.   Go ahead.  I'm sorry.
19     A.   I'm sorry.  I was more distant with the
20   communications as far as what took place.  I
21   visually was behind most of the interactions.
22     Q.   Okay.  So nobody asked that you provide
23   a statement?
24     A.   No, sir.
25     Q.   Did you ask anyone to provide a

# EXHIBIT 52

**Answer to Plaintiff's Second Amended and Restated Complaint
ECF Docket No. 44 – filed September 24, 2018**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KYLE D. PIKALUK

VERSUS

HORSESHOE ENTERTAINMENT, LP,
D/B/A "HORSESHOE HOTEL AND
CASINO", STEVEN JONES, JOSEPH C.
THOMERSON, D. RAZINSKY AND
JORDAN D. JOHNSON

CASE NO. 5:18-CV-00215

JUDGE HICKS

MAGISTRATE JUDGE HORNSBY

**JURY TRIAL REQUESTED**

## <u>ANSWER TO PLAINTIFF'S SECOND<br>AMENDED AND RESTATED COMPLAINT</u>

NOW INTO COURT, through undersigned counsel, comes HORSESHOE
ENTERTAINMENT, LP, STEVEN JONES, ROB BROWN, JASON WILLIAMS,
FEDERICO M. ARENDS, III AND JAMES LAFLEUR, named defendants herein, who
for answer to the Second Amended and Restated Complaint, deny each and every
allegation contained therein, except as may be hereinafter expressly admitted and state:

<u>FIRST DEFENSE</u>

The Second Amended and Restated Complaint fail to state a claim against
Defendants upon which relief can be granted.

<u>SECOND DEFENSE</u>

Defendants specifically deny that they have conducted themselves in any form or
manner which was a violation of plaintiff's civil rights, and deny ever subjecting plaintiff
or having caused plaintiff to be subjected to a deprivation of any constitutionally secured

right or rights, privileges or immunities.  Defendants specifically deny any liability for or indebtedness for any alleged damages complained of by plaintiff.

### THIRD DEFENSE

To the extent any claim may survive, Defendants show that plaintiff is not entitled to recover punitive or exemplary damages; and in the alternative, Defendants are not liable for punitive or exemplary damages as they performed no "official conduct," nor has there been conduct motivated by evil intent or reckless or callous indifference to plaintiff's constitutional rights.

### FOURTH DEFENSE

Pleading in the alternative, Defendants show that plaintiff's claims and damages, if any, were caused solely by the fault and/or actions of plaintiff and/or third parties for whom Defendants are not responsible.  Pleading further in the alternative, in the event liability or an award is determined as to Defendants, such liability or award should be eliminated altogether or reduced in proportion to the degree of fault and/or responsibility of plaintiff or any third parties for whom Defendants are not answerable.

### FIFTH DEFENSE

Defendants affirmatively show that they are private defendants, not state actors, and no conduct of Defendants complained of by plaintiff constitutes state action under color of law.

## SIXTH DEFENSE AND CLAIM

Defendants are entitled to an award of costs and attorney's fees as prevailing parties under 42 U.S.C. 1988.

## SEVENTH DEFENSE

Defendants deny all of the allegations and contentions set forth by plaintiff in the numbered paragraphs of his Second amended and restated complaint, except as may be expressly hereinafter admitted, and to the individual paragraphs, Defendants answer as follows:

1.

The allegations of paragraph 1 of the Second Amended and Restated Complaint are denied for lack of sufficient information to justify a belief therein.

2.

The allegations of paragraph 2 of the Second Amended and Restated Complaint are admitted.

3.

The allegations of paragraph 3 of the Second Amended and Restated Complaint are denied, due to the vagueness of the allegations set forth therein, except to admit that Horseshoe Entertainment may be considered an "affiliate" of Caesars Entertainment Corporation. Further answering, it is admitted that the referenced "description" is available on http://investor.caesars.com/.

4.

In part due to the vague reference to some unidentified group of "casinos and/or hotels[,]" the allegations of paragraph 4 of the Second Amended and Restated Complaint are denied for lack of sufficient information to justify a belief therein.

5.

The allegations of paragraph 5 of the Second Amended and Restated Complaint are admitted to the extent that they are consistent with the referenced "reports," and denied to that extent that they are inconsistent with the referenced "reports."

6.

The statements of paragraph 6 of the Second Amended and Restated Complaint are admitted.

7.

The statements of paragraph 7 of the Second Amended and Restated Complaint are admitted.

8.

The statements of paragraph 8 of the Second Amended and Restated Complaint are admitted.

9.

The statements of paragraph 9 of the Second Amended and Restated Complaint are admitted.

10.

The statements of paragraph 10 of the Second Amended and Restated Complaint are admitted.

11.

The statements of paragraph 11 of the Second Amended and Restated Complaint are denied, except to admit that Jones, Brown, Williams, Arends and Lafleur are employees of Horseshoe Entertainment. Further answering, Defendants specifically deny that Jones, Brown, Williams, Arends and Lafleur committed any "willful, malicious, intentional or negligent acts or omissions."

12.

The statements of paragraph 12 of the Second Amended and Restated Complaint do not require an answer from these Defendants. To the extent a response is required, they are denied for lack of sufficient information to justify a belief therein.

13.

The statements of paragraph 13 of the Second Amended and Restated Complaint are admitted only to statement that Jones was previously employed by the Bossier City Police Department and now by Horseshoe. All other statements are denied.

14.

The allegations of paragraph 14 of the Second Amended and Restated Complaint are denied.

15.

The statements of paragraph 15 of the Second Amended and Restated Complaint are denied.

16.

The allegations of paragraph 16 of the Second Amended and Restated Complaint are denied except to admit that jurisdiction and venue are proper.

17.

The allegations of paragraph 17 of the Second Amended and Restated Complaint are admitted, to the extent they accurately convey the applicable legal principles; otherwise, the allegations are denied.

18.

The allegations of paragraph 18 of the Second Amended and Restated Complaint are admitted.

19.

The allegations of paragraph 19 of the Second Amended and Restated Complaint are denied, except to admit that, at all times relevant herein, Horseshoe Entertainment legally operated a casino facility in Bossier City, Louisiana. Defendants specifically deny that plaintiff was an invitee. To the contrary, plaintiff had previously been banned, a fact which was known to plaintiff before he trespassed on the Horseshoe property at the time of the alleged incident.

20.

The allegations of paragraph 20 of the Second Amended and Restated Complaint are denied.   Defendants show that plaintiff had been previously banned from the property, a fact known to plaintiff.

21.

The allegations of paragraph 21 of the Second Amended and Restated Complaint are denied.  Further answering, Defendants show that plaintiff's ban was sent on behalf of Caesars and all affiliates, including Horseshoe.

22.

The allegations of paragraph 22 of the Second Amended and Restated Complaint are denied for lack of sufficient information to justify a belief therein, except to admit that Plaintiff entered the casino area through the entrance ramp.   Further answering, Defendants show that Plaintiff had been banned from the Horseshoe property.

23.

The allegations of paragraph 23 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff entered the casino area through the entrance ramp.   Further answering, Defendants show that Plaintiff had been banned from the Horseshoe property.

24.

The allegations of paragraph 24 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff presented his passport at the checkpoint on the ramp leading to the casino.

25.

The allegations of paragraph 25 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein, except to admit that Plaintiff sought to redeem chips/tokens, and was asked for identification.

26.

The allegations of paragraph 26 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff's tokens were not cashed or redeemed.

27.

The allegations of paragraph 27 of the Second Amended and Restated Complaint are denied as to Plaintiff's belief.

28.

The allegations of paragraph 28 of the Second Amended and Restated Complaint are denied.

29.

The allegations of paragraph 29 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff was not belligerent and did not create a disturbance.

30.

The allegations of paragraph 30 of the Second Amended and Restated Complaint are denied, except to admit that Plaintiff alleges he was not banned from "this boat."

31.

The allegations of paragraph 31 of the Second Amended and Restated Complaint are denied.

32.

The allegations of paragraph 32 of the Second Amended and Restated Complaint are denied, except to admit that the plaintiff was escorted up the entry ramp.

33.

The allegations of paragraph 33 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

34.

The allegations of paragraph 34 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff had been previously banned from the property.

35.

The allegations of paragraph 35 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

36.

The allegations of paragraph 36 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

37.

The allegations of paragraph 37 of the Second Amended and Restated Complaint are denied.

38.

The allegations of paragraph 38 of the Second Amended and Restated Complaint are denied.

39.

The allegations of paragraph 39 of the Second Amended and Restated Complaint are denied.

40.

The allegations of paragraph 40 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff's chips/tokens were not, and have not been, redeemed.

41.

The allegations of paragraph 41 of the Second Amended and Restated Complaint are denied.

42.

The allegations of paragraph 42 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

43.

The allegations of paragraph 43 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

44.

The allegations of paragraph 44 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff's chips/tokens have not been redeemed.

45.

The allegations of paragraph 45 of the Second Amended and Restated Complaint are denied are denied based on a lack of sufficient information to justify a belief therein, except to admit that no adverse action was taken against Defendants by the Louisiana State Police as a result of any complaint by Plaintiff.

46.

The allegations of paragraph 46 of the Second Amended and Restated Complaint are denied.

47.

The allegations of paragraph 47 of the Second Amended and Restated Complaint are denied.

48.

The allegations of paragraph 48 of the Second Amended and Restated Complaint are denied.

49.

The allegations of paragraph 49 of the Complaint and Amended and Restated Complaint are denied.

50.

In part due to the vague and ambiguous nature of the terms "advantage player" and "targeted," the allegations of paragraph 50 of the Second Amended and Restated Complaint are denied.

51.

The allegations of paragraph 51 of the Second Amended and Restated Complaint are denied.

52.

The allegations of paragraph 52 of the Second Amended and Restated Complaint are denied, except to admit that plaintiff's chips/tokens have not been redeemed.

53.

The allegations of paragraph 53 of the Complaint and Amended and Restated Complaint are denied.

54.

The allegations of paragraph 54 of the Second Amended and Restated Complaint are denied.

55.

The allegations of paragraph 55 of the Second Amended and Restated Complaint are legal conclusions for which no responsive pleading is required. To the extent that a response is required, the allegations of paragraph 55 are of the Complaint and Amended and Restated Complaint are denied to the extent that they are inconsistent with the law of a particular jurisdiction.

56.

The allegations of paragraph 56 of the Second Amended and Restated Complaint are denied.

57.

The allegations of paragraph 57 of the Second Amended and Restated Complaint are denied.

58.

The allegations of paragraph 58 of the Second Amended and Restated Complaint alleging wrongful actions of Jones, Williams, Brown, Arends and Lafleur are denied.

59.

The allegations of paragraph 59 of the Second Amended and Restated Complaint are denied based on a lack of sufficient information to justify a belief therein.

60.

The allegations of paragraph 60 of the Second Amended and Restated Complaint do not require an answer from these Defendants. To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through fifty-nine.

61.

The allegations of paragraph 61 of the Second Amended and Restated Complaint are denied.

62.

The allegations of paragraph 62 of the Second Amended and Restated Complaint are denied.

63.

The allegations of paragraph 63 of the Second Amended and Restated Complaint do not require an answer from these Defendants. To the extent a response is required,

Defendants incorporate their responses to the prior allegations in paragraphs one through sixty-two.

64.

The allegations of paragraph 64 of the Second Amended and Restated Complaint are denied.

65.

The allegations of paragraph 65 of the Second Amended and Restated Complaint are denied.

66.

The allegations of paragraph 66 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through sixty-five.

67.

The allegations of paragraph 67 of the Second Amended and Restated Complaint are denied.

68.

The allegations of paragraph 68 of the Second Amended and Restated Complaint are denied.

69.

The allegations of paragraph 69 of the Second Amended and Restated Complaint are denied.

70.

The allegations of paragraph 70 of the Second Amended and Restated Complaint are denied.

71.

The allegations of paragraph 71 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through seventy.

72.

The allegations of paragraph 72 of the Second Amended and Restated Complaint are denied.

73.

The allegations of paragraph 73 of the Second Amended and Restated Complaint are denied.

74.

The allegations of paragraph 74 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required,

Defendants incorporate their responses to the prior allegations in paragraphs one through seventy-three.

## 75.

The allegations of paragraph 75 of the Second Amended and Restated Complaint are denied.

## 76.

The allegations of paragraph 76 of the Second Amended and Restated Complaint are denied.

## 77.

The allegations of paragraph 77 of the Second Amended and Restated Complaint are denied.

## 78.

The allegations of paragraph 78 of the Second Amended and Restated Complaint are denied.

## 79.

The allegations of paragraph 79 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through seventy-eight.

80.

The allegations of paragraph 80 of the Second Amended and Restated Complaint are denied. Further answering, Defendants are private actors, and did not act under the color of law.

81.

The allegations of paragraph 81 of the Second Amended and Restated Complaint are denied.

82.

The allegations of paragraph 82 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through eighty-one.

83.

With respect to the allegations of paragraph 83 of the Complaint and Amended and Restated Complaint, Defendants admit they had the duties imposed by law, but deny that the breached any of those duties. With the exception of the admissions made herein, Defendants deny the remaining allegations in paragraph 83 of the Complaint and Amended and Restated Complaint.

84.

The allegations of paragraph 84 of the Second Amended and Restated Complaint are denied, except to admit that Horseshoe has not redeemed Plaintiff's chips/tokens.

85.

The allegations of paragraph 85 of the Second Amended and Restated Complaint are denied.

86.

The allegations of paragraph 86 of the Second Amended and Restated Complaint are denied.

87.

The allegations of paragraph 87 of the Second Amended and Restated Complaint do not require an answer from these Defendants. To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through eighty-six.

88.

The allegations of paragraph 88 of the Second Amended and Restated Complaint are denied.

89.

The allegations of paragraph 89 of the Second Amended and Restated Complaint are denied.

90.

The allegations of paragraph 90 of the Second Amended and Restated Complaint are denied.

91.

The allegations of paragraph 91 of the Second Amended and Restated Complaint are denied.

92.

The allegations of paragraph 92 of the Second Amended and Restated Complaint are denied.

93.

The allegations of paragraph 93 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through ninety-two.

94.

The allegations of paragraph 94 of the Second Amended and Restated Complaint are denied.  Further answering, Defendants are entitled to recover fees and costs as prevailing parties.

95.

The allegations of paragraph 95 of the Second Amended and Restated Complaint are denied.

96.

The allegations of paragraph 96 of the Second Amended and Restated Complaint do not require an answer from these Defendants.  To the extent a response is required, Defendants incorporate their responses to the prior allegations in paragraphs one through ninety-five.

97.

The allegations of paragraph 97 of the Second Amended and Restated Complaint are denied, except to admit that Defendants were notified of plaintiff's intention to assert a claim prior to the complaint being filed.

98.

The allegations of paragraph 98 of the Second Amended and Restated Complaint are denied.

99.

The allegations of paragraph 99 of the Second Amended and Restated Complaint are denied.

100.

Defendants reserve the right to supplement or amend to add additional defenses and allegations as they are identified through discovery.

101.

Defendants request a trial by jury on all issues herein.

WHEREFORE, defendants, HORSESHOE ENTERTAINMENT, LP, STEVEN JONES, ROB BROWN, JASON WILLIAMS, FEDERICO M. ARENDS, III AND JAMES LAFLEUR pray that after all due proceedings are had there be a judgment herein as follows:

(1)    In favor of defendants, HORSESHOE ENTERTAINMENT, LP, STEVEN JONES, ROB BROWN, JASON WILLIAMS, FEDERICO M. ARENDS, III AND JAMES LAFLEUR and against plaintiff, rejecting his demands and dismissing the claims of plaintiff, with prejudice, at his sole cost;

(2)    Alternatively, should there be any negligence or fault of Defendants then negligence or fault of Kyle D. Pikaluk and/or any responsible third parties should reduce any judgment therein made in accordance with the law;

(3)    Awarding Defendants all costs and attorney's fees;

(4)    For trial by jury; and

(5)    For all other such relief as may be appropriate.

KEAN MILLER LLP


By: */s/ Scott L. Zimmer*
    Scott L. Zimmer, T.A. #26151
    Ann Rene Hankins #36022

333 Texas Street, Suite 450
Shreveport, LA 71101
Telephone:  (318) 562-2700
Telecopier: (318) 562-2751

ATTORNEYS FOR DEFENDANTS,
HORSESHOE ENTERTAINMENT, LP,
STEVEN JONES, ROB BROWN, JASON
WILLIAMS, FEDERICO M. ARENDS, III
AND JAMES LAFLEUR

## CERTIFICATE OF SERVICE

I certify that I caused the foregoing document be filed with the Court's CM/ECF system on September 24th, 2018, which will provide electronic notification of the filing to counsel for all parties which have appeared in this matter.

    *s/ Scott L. Zimmer*
    OF COUNSEL

# EXHIBIT 53

**Louisiana Administrative Code; Title 42, Section 4309. Use of Chips and Tokens**

AUTHORITY NOTE: Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE: Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1682 (July 2012).

### §4305. Specifications for Chips

A. Unless the division approves otherwise, chips shall be disk-shaped, shall be 0.130 inch thick, and shall have a diameter of:

1. 1.55 inches for chips used at games other than baccarat;

2. 1.55 inches or 1.6875 inches for chips used at baccarat; and

3. 1.6875 inches for chips used exclusively at race books or other counter games.

B. Each side of each chip issued exclusively for use at a race book, or a particular game, shall bear an inscription clearly indicating that use of the chip is so restricted.

C. Each denomination of value chip(s) shall have a different primary color. The primary color to be utilized by the licensee or casino operator for each denomination of value chip(s) shall be:

1. $.50 light blue;

2. $1 white;

3. $2.50 pink;

4. $5 red;

5. $25 green;

6. $100 black;

7. $500 purple;

8. $1,000 fire orange;

9. $5,000 gray;

10. $10,000 yellow;

11. $25,000 bright blue;

12. $100,000 gold.

AUTHORITY NOTE: Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE: Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1682 (July 2012).

### §4307. Specifications for Tokens

A. Unless the division approves otherwise, tokens shall be disk-shaped and shall measure as follows:

1. $0.25 tokens shall be from 0.983 through 0.989 inches in diameter, from 0.064 through 0.070 inches thick, and if the token has reeds or serrations on its edges, the number of reeds or serrations shall not exceed 100;

2. $1 denomination tokens shall be from 1.459 through 1.474 inches in diameter, from 0.095 through 0.115 inch thick, and, if the token has re...

edges, the number of reeds or serrations shall not exceed 150;

3. $5 denomination tokens shall be 1.75 inches in diameter, from 0.115 through 0.135 inch thick, and, if the token has reeds or serrations on its edges, the number of reeds or serrations shall not exceed 175;

4. $25 denomination tokens shall be larger than 1.75 inches but no larger than 1.95 inches in diameter, except that such tokens may be 1.654 inches (42 millimeters) in diameter if made of 99.9 percent pure silver, shall be 0.10 inch thick, and, if the token has reeds or serrations on its edges, the number of reeds or serrations shall not exceed 200; and

5. tokens of other denominations shall have such measurements and edge reeds or serrations as the division may approve or require.

B. Tokens shall not be manufactured from material possessing sufficient magnetic properties so as to be accepted by a coin mechanism, other than that of an electronic gaming device.

C. Tokens shall not be manufactured from a three-layered material consisting of a copper-nickel alloy clad on both sides of a pure copper core, nor from a copper-based material, unless the total of zinc, nickel, aluminum, magnesium, and other alloying materials is at least 20 percent of the token's weight.

AUTHORITY NOTE: Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE: Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1683 (July 2012).

### §4309. Use of Chips and Tokens

A. A licensee or casino operator that uses chips or tokens at its gaming establishment shall:

1. comply with all applicable statutes, regulations, and policies of Louisiana and of the United States pertaining to chips or tokens;

2. sell chips and tokens only to patrons of its gaming establishment and only at their request;

3. promptly redeem its own chips and tokens from its patrons;

4. post conspicuous signs at its establishment notifying patrons that federal law prohibits the use of the tokens, and that state law prohibits the use of the chips, outside the establishment for any monetary purpose; and

5. take reasonable steps, including examining chips and tokens and segregating those issued by another licensee or casino operator, to prevent sales of chips and tokens issued by another licensee or casino operator.

B. A licensee and casino operator shall not accept chips or tokens as payment for any goods or services offered at the gaming establishment with the exception of the specific use for which the chips or tokens were issued, and shall not give

PLAINTIFF'S EXHIBIT
53
Blumberg No. 5113

chips or tokens as change in any other non-gaming transaction.

C.   A licensee and casino operator shall promptly redeem its chips and tokens if presented by:

1.   a patron;

2.   another licensee or casino operator who represents that it redeemed the chips and tokens from its patrons or received them unknowingly, inadvertently, or unavoidably;

3.   an employee of the licensee or casino operator who presents the chips and tokens in the normal course of employment; or

4.   an employee of the licensee or casino operator who received the chip or token as gratuity or tip.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1683 (July 2012).

### §4311.   Receipt of Gaming Chips or Tokens from Manufacturer or Supplier

A.   When chips or tokens are received from the manufacturer or supplier thereof, they shall be opened and checked by at least two employees of the licensee or casino operator from different departments. Any deviation between the invoice accompanying the chips or tokens and the actual chips or tokens received or any defects found in such chips or tokens shall be reported promptly to the division. A division agent shall be notified of the time of delivery of any chips or tokens to the licensee or casino operator.

B.   After checking the chips received, the licensee or casino operator shall document in a chip inventory ledger the denomination of the chips received, the number of each denomination of chips received the number and description of all non-value chips received, the date of such receipt and the signature of the individuals who checked such chips.

C.   If any of the chips received are to be held in reserve and not utilized either at the gaming tables or at a cashier's cage, they shall be stored in a separate locked compartment either in the vault or in a cashier's cage and shall be recorded in the chip inventory ledger as reserve chips.

D.   Any chips received that are part of the secondary set of chips of the licensee or casino operator shall be recorded in the chip inventory ledger as such and shall be stored in a locked compartment in the casino vault separate from the reserve chips.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1683 (July 2012).

### §4313.   Inventory of Chips

A.   Chips shall be taken from or returned to either the reserve chip inventory or the secondary set of chips in the presence of at least two individuals. The denominations,

number and amount of chips so taken or returned shall be recorded in the chip inventory ledger together with the date and signatures of the individuals conducting this process.

B.   On a daily basis, the licensee or casino operator shall compute and record the unredeemed liability for each denomination of chips in circulation and cause the result of such inventory to be recorded in the chip inventory ledger. On a monthly basis, each licensee or casino operator shall inventory chips in reserve and the result of such inventory shall be recorded in the chip inventory ledger. The procedures to be utilized to compute the unredeemed liability and to inventory chips in circulation and reserve shall be included in the internal controls. A physical inventory of chips in reserve shall be required annually if the inventory procedures incorporate the sealing of the locked compartment.

C.   During non-gaming hours all chips in the possession of the licensee or casino operator shall be stored in the chip bank, in the vault, or in a locked compartment in a cashier's cage except that chips may be locked in a transparent compartment on gaming tables provided that there is adequate security as approved by the division.

AUTHORITY NOTE:   Promulgated in accordance with R.S. 27:15 and 24.

HISTORICAL NOTE:   Promulgated by the Department of Public Safety and Corrections, Gaming Control Board, LR 38:1684 (July 2012).

### §4315.   Redemption and Disposal of Discontinued Chips and Tokens

A.   A licensee or casino operator that permanently removes from use or that replaces approved chips or tokens at its casino, or that ceases operating its casino, shall prepare a plan for redeeming discontinued chips and tokens that remain outstanding at the time of discontinuance. The licensee or casino operator shall submit the plan in writing to the division not later than 30 days before the proposed removal, replacement, or cessation of gaming operations, unless the cause for discontinuance of the chips or tokens cannot be reasonably anticipated, in which event the licensee or casino operator shall submit the plan as soon as reasonably practicable. The division may approve the plan or require reasonable modifications as a condition of approval. Upon approval of the plan, the licensee or casino operator shall implement the plan as approved.

B.   In addition to such other reasonable provisions as the division may approve or require, the plan shall provide for:

1.   redemption of outstanding or discontinued chips and tokens, in accordance with this Subsection, for at least 120 days after the removal or replacement of the chips or tokens, for at least 120 days after operations cease, or for a period as the division may approve or require;

2.   redemption of the chips and tokens at the casino or at such other location as the division may approve;

3.   publication of notice of the discontinuance of the chips and tokens, the redemption period and the redemption location with times of operation in at least two newspapers

# EXHIBIT 54

**Horseshoe Bankruptcy Petition**

B 1 (Official Form 1) (4/13)

| United States Bankruptcy Court<br>Northern District of Illinois | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Horseshoe Entertainment** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**Horseshoe Bossier City** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) Complete EIN (if<br>more than one, state all):<br>**72-1249477** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) Complete EIN (if<br>more than one, state all): |

| Street Address of Debtor (No. and Street, City, and State):<br><br>**One Caesars Palace Dr.**<br>**Las Vegas, Nevada**     ZIP CODE **89109** | Street Address of Joint Debtor (No. and Street, City, and State):<br><br>    ZIP CODE |
|---|---|
| County of Residence or of the Principal Place of Business:<br>**Clark County, Nevada** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br><br>    ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br><br>    ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>**Bossier City, Louisiana** |     ZIP CODE |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☒ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>   11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other | ☐ Chapter 7    ☐ Chapter 15 Petition for Recognition of<br>☐ Chapter 9          a Foreign Main Proceeding<br>☒ Chapter 11<br>☐ Chapter 12    ☐ Chapter 15 Petition for Recognition of<br>☐ Chapter 13          a Foreign Nonmain Proceeding |

| Chapter 15 Debtors | Tax-Exempt Entity<br>(Check box, if applicable.) | Nature of Debts<br>(Check one box.) |
|---|---|---|
| Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding by,<br>regarding, or against debtor is pending: | ☐ Debtor is a tax-exempt organization under<br>title 26 of the United States Code (the Internal<br>Revenue Code). | ☐ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."    ☒ Debts are primarily<br>business debts. |

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed<br>application for the court's consideration certifying that the debtor is unable to pay fee<br>except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach<br>signed application for the court's consideration. See Official Form 3B. | **Check one box:**<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>**Check if:**<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or<br>affiliates) are less than $2,490,925 (*amount subject to adjustment on 4/01/16 and every<br>three years thereafter*).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>**Check all applicable boxes:**<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors,<br>in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to<br>unsecured creditors. | |

Estimated Number of Creditors (on a consolidated basis)

| ☐<br>1-49 | ☐<br>50-99 | ☐<br>100-199 | ☐<br>200-999 | ☐<br>1,000-<br>5,000 | ☐<br>5,001-<br>10,000 | ☐<br>10,001-<br>25,000 | ☐<br>25,001-<br>50,000 | ☐<br>50,001-<br>100,000 | ☒<br>Over<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|

Estimated Assets (on a consolidated basis)

| ☐<br>$0- to<br>$50,000 | ☐<br>$50,001 to<br>$100,000 | ☐<br>$100,001 to<br>$500,000 | ☐<br>$500,001 to<br>$1 million | ☐<br>$1,000,001 to<br>$10 million | ☐<br>$10,000,001<br>to $50 million | ☐<br>$50,000,001 to<br>$100 million | ☐<br>$100,000,001<br>to $500 million | ☐<br>$500,000,001<br>to $1 billion | ☒<br>More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|

Estimated Liabilities (on a consolidated basis)

| ☐<br>$0- to<br>$50,000 | ☐<br>$50,001 to<br>$100,000 | ☐<br>$100,001 to<br>$500,000 | ☐<br>$500,001 to<br>$1 million | ☐<br>$1,000,001 to<br>$10 million | ☐<br>$10,000,001<br>to $50 million | ☐<br>$50,000,001 to<br>$100 million | ☐<br>$100,000,001<br>to $500 million | ☒<br>$500,000,001<br>to $1 billion | ☐<br>More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|

B 1 (Official Form 1) (4/13)

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Horseshoe Entertainment |
|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet.) | | |
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet.) | | |
|---|---|---|
| Name of Debtor:<br>    See Attached Rider 1 | Case Number: | Date Filed: |
| District:<br>    Northern District of Illinois | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual<br>whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>   Signature of Attorney for Debtor(s)        (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

☒ No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐ Exhibit D, completed and signed by the debtor, is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D, also completed and signed by the joint debtor, is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☐ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☒ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

B 1 (Official Form 1) (4/13)

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | Horseshoe Entertainment |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition. |
| [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. | (Check only **one** box.) |
| [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b). | ☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached. |
| I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | ☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
| X _____ <br> Signature of Debtor | |
| X _____ <br> Signature of Joint Debtor | X _____ <br> (Signature of Foreign Representative) |
| _____ <br> Telephone Number (If not represented by attorney) | _____ <br> (Printed Name of Foreign Representative) |
| _____ <br> Date | _____ <br> Date |

| Signature of Attorney* | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| X /s/ David R. Seligman <br> Signature of Attorney for Debtor(s) <br> **David R. Seligman, P.C.** <br> Printed Name of Attorney for Debtor(s) <br> **Kirkland & Ellis LLP** <br> Firm Name <br> **300 North LaSalle** <br> **Chicago, Illinois 60654** <br> Address <br> **(312) 862-2000** <br> Telephone Number <br> **January 15, 2015** <br> Date | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official form 19B is attached. |
| * In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | _____ <br> Printed Name and title, if any, of Bankruptcy Petition Preparer <br> _____ <br> Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.) |

| Signature of Debtor (Corporation/Partnership) | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. | |
| The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. | _____ <br> Address |
| X /s/ Gary W. Loveman <br> Signature of Authorized Individual <br> **Gary W. Loveman** <br> Printed Name of Authorized Individual <br> **Authorized Signatory** <br> Title of Authorized Individual <br> **January 15, 2015** <br> Date | X _____ <br> Signature <br> _____ <br> Date |
| | Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social Security number is provided above. |
| | Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual. |
| | If more than one person prepared this document, attach additional sheets conforming to the appropriate official form of each person. |
| | *A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.* |

## Rider 1

### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Northern District of Illinois for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Caesars Entertainment Operating Company, Inc.

| The Debtors | |
|---|---|
| • Caesars Entertainment Operating Company, Inc. | • 190 Flamingo, LLC |
| • 3535 LV Corp. | • 3535 LV Parent, LLC |
| • AJP Holdings, LLC | • AJP Parent, LLC |
| • B I Gaming Corporation | • Bally's Las Vegas Manager, LLC |
| • Bally's Midwest Casino, Inc. | • Bally's Park Place, Inc. |
| • Benco, Inc. | • Biloxi Hammond, LLC |
| • Biloxi Village Walk Development, LLC | • BL Development Corp. |
| • Boardwalk Regency Corporation | • BPP Providence Acquisition Company, LLC |
| • Caesars Air, LLC | • Caesars Baltimore Acquisition Company, LLC |
| • Caesars Baltimore Development Company, LLC | • Caesars Baltimore Management Company, LLC |
| • Caesars Entertainment Canada Holding, Inc. | • Caesars Entertainment Finance Corp. |
| • Caesars Entertainment Golf, Inc. | • Caesars Entertainment Retail, Inc. |
| • Caesars Entertainment Windsor Limited | • Caesars Escrow Corporation |
| • Caesars India Sponsor Company, LLC | • Caesars License Company, LLC |
| • Caesars Marketing Services Corporation | • Caesars Massachusetts Acquisition Company, LLC |
| • Caesars Massachusetts Development Company, LLC | • Caesars Massachusetts Investment Company, LLC |
| • Caesars Massachusetts Management Company, LLC | • Caesars New Jersey, Inc. |
| • Caesars Operating Escrow LLC | • Caesars Palace Corporation |
| • Caesars Palace Realty Corp. | • Caesars Palace Sports Promotions, Inc. |
| • Caesars Riverboat Casino, LLC | • Caesars Trex, Inc. |
| • Caesars United Kingdom, Inc. | • Caesars World Marketing Corporation |
| • Caesars World Merchandising, Inc. | • Caesars World, Inc. |
| • California Clearing Corporation | • Casino Computer Programming, Inc. |
| • CG Services, LLC | • Chester Facility Holding Company, LLC |
| • Christian County Land Acquisition Company, LLC | • Consolidated Supplies, Services and Systems |
| • Corner Investment Company Newco, LLC | • Cromwell Manager, LLC |
| • CZL Development Company, LLC | • CZL Management Company, LLC |
| • DCH Exchange, LLC | • DCH Lender, LLC |
| • Des Plaines Development Limited Partnership | • Desert Palace, Inc. |
| • Durante Holdings, LLC | • East Beach Development Corporation |
| • FHR Corporation | • FHR Parent, LLC |
| • Flamingo-Laughlin Parent, LLC | • Flamingo-Laughlin, Inc. |
| • GCA Acquisition Subsidiary, Inc. | • GNOC, Corp. |
| • Grand Casinos of Biloxi, LLC | • Grand Casinos of Mississippi, LLC - Gulfport |

| The Debtors | |
|---|---|
| • Grand Casinos, Inc. | • Grand Media Buying, Inc. |
| • Harrah South Shore Corporation | • Harrah's Arizona Corporation |
| • Harrah's Bossier City Investment Company, L.L.C. | • Harrah's Bossier City Management Company, LLC, a Nevada limited liability company |
| • Harrah's Chester Downs Investment Company, LLC | • Harrah's Chester Downs Management Company, LLC |
| • Harrah's Illinois Corporation | • Harrah's Interactive Investment Company |
| • Harrah's International Holding Company, Inc. | • Harrah's Investments, Inc. |
| • Harrah's Iowa Arena Management, LLC | • Harrah's Management Company |
| • Harrah's Maryland Heights Operating Company | • Harrah's MH Project, LLC |
| • Harrah's NC Casino Company, LLC | • Harrah's New Orleans Management Company |
| • Harrah's North Kansas City LLC | • Harrah's Operating Company Memphis, LLC |
| • Harrah's Pittsburgh Management Company | • Harrah's Reno Holding Company, Inc. |
| • Harrah's Shreveport Investment Company, LLC | • Harrah's Shreveport Management Company, LLC |
| • Harrah's Shreveport/Bossier City Holding Company, LLC | • Harrah's Shreveport/Bossier City Investment Company, LLC |
| • Harrah's Southwest Michigan Casino Corporation | • Harrah's Travel, Inc. |
| • Harrah's West Warwick Gaming Company, LLC | • Harveys BR Management Company, Inc. |
| • Harveys C.C. Management Company, Inc. | • Harveys Iowa Management Company, Inc. |
| • Harveys Tahoe Management Company, Inc. | • H-BAY, LLC |
| • HBR Realty Company, Inc. | • HCAL, LLC |
| • HCR Services Company, Inc. | • HEI Holding Company One, Inc. |
| • HEI Holding Company Two, Inc. | • HHLV Management Company, LLC |
| • HIE Holdings Topco, Inc. | • Hole in the Wall, LLC |
| • Horseshoe Entertainment | • Horseshoe Gaming Holding, LLC |
| • Horseshoe GP, LLC | • Horseshoe Hammond, LLC |
| • Horseshoe Shreveport, L.L.C. | • HTM Holding, Inc. |
| • JCC Holding Company II Newco, LLC | • Koval Holdings Company, LLC |
| • Koval Investment Company, LLC | • Las Vegas Golf Management, LLC |
| • Las Vegas Resort Development, Inc. | • Laundry Parent, LLC |
| • LVH Corporation | • LVH Parent, LLC |
| • Martial Development Corp. | • Nevada Marketing, LLC |
| • New Gaming Capital Partnership, a Nevada Limited Partnership | • Ocean Showboat, Inc. |
| • Octavius Linq Holding Co., LLC | • Parball Corporation |
| • Parball Parent, LLC | • PH Employees Parent, LLC |
| • PHW Investments, LLC | • PHW Las Vegas, LLC |
| • PHW Manager, LLC | • Players Bluegrass Downs, Inc. |
| • Players Development, Inc. | • Players Holding, LLC |
| • Players International, LLC | • Players LC, LLC |
| • Players Maryland Heights Nevada, LLC | • Players Resources, Inc. |
| • Players Riverboat II, LLC | • Players Riverboat Management, LLC |
| • Players Riverboat, LLC | • Players Services, Inc. |
| • Reno Crossroads LLC | • Reno Projects, Inc. |
| • Rio Development Company, Inc. | • Robinson Property Group Corp. |
| • Roman Entertainment Corporation of Indiana | • Roman Holding Corporation of Indiana |

| The Debtors | |
|---|---|
| • Showboat Atlantic City Mezz 1, LLC | • Showboat Atlantic City Mezz 2, LLC |
| • Showboat Atlantic City Mezz 3, LLC | • Showboat Atlantic City Mezz 4, LLC |
| • Showboat Atlantic City Mezz 5, LLC | • Showboat Atlantic City Mezz 6, LLC |
| • Showboat Atlantic City Mezz 7, LLC | • Showboat Atlantic City Mezz 8, LLC |
| • Showboat Atlantic City Mezz 9, LLC | • Showboat Atlantic City Operating Company, LLC |
| • Showboat Atlantic City Propco, LLC | • Showboat Holding, Inc. |
| • Southern Illinois Riverboat/Casino Cruises, Inc. | • Tahoe Garage Propco, LLC |
| • The Quad Manager, LLC | • TRB Flamingo, LLC |
| • Trigger Real Estate Corporation | • Tunica Roadhouse Corporation |
| • Village Walk Construction, LLC | • Winnick Holdings, LLC |
| • Winnick Parent, LLC | |

**Horseshoe Entertainment**

**Unanimous Written Consent of Directors
in Lieu of Meeting**

**Dated as of January 14, 2015**

The undersigned, being the member(s), the manager(s), the partner(s), or the member(s) of the board of directors, (each a "Board of Directors"), as applicable, for each of the entities listed above and set forth on **Schedule 1** hereto (each a "Company"), **DO HEREBY CONSENT** to the taking of the following actions in lieu of a meeting of the Board of Directors of the Company and **DO HEREBY ADOPT** the following resolutions by unanimous written consent (this "Written Consent") pursuant to applicable state law.

**Chapter 11 Filing**

WHEREAS, the Board of Directors has considered presentations by the management and the financial and legal advisors of the Company regarding the liabilities and liquidity situation of the Company, the strategic alternatives available to it and the effect of the foregoing on the Company's business; and

WHEREAS, the Board of Directors has had the opportunity to consult with the management and the financial and legal advisors of the Company and fully consider each of the strategic alternatives available to the Company.

NOW, THEREFORE, BE IT,

RESOLVED, that in the judgment of the Board of Directors, it is desirable and in the best interests of the Company, its creditors and other parties in interest, that the Company shall be and hereby is authorized to file or cause to be filed a voluntary petition for relief (such voluntary petition, and the voluntary petitions to be filed by the Company's affiliates, collectively, the "Chapter 11 Cases") under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in a court of proper jurisdiction (the "Bankruptcy Court"); and

RESOLVED, that any officers of the Company and Gary W. Loveman (collectively, the "Authorized Signatories"), acting alone or with one or more other Authorized Signatories be, and they hereby are, authorized, empowered and directed to execute and file on behalf of the Company all petitions, schedules, lists and other motions, papers, or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business.

**Retention of Professionals**

RESOLVED, that each of the Authorized Signatories be, and they hereby are, authorized and directed to employ the law firm of Kirkland & Ellis LLP as general bankruptcy counsel to represent and assist the Company in carrying out its duties under the

KE .

Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any pleadings; and in connection therewith, each of the Authorized Signatories, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Kirkland & Ellis LLP.

RESOLVED, that each of the Authorized Signatories be, and they hereby are, authorized and directed to employ the firm of AP Services, LLC to provide Caesars Entertainment Operating Company, Inc. with a Chief Restructuring Officer and certain additional personnel and designate Randall Eisenberg as Chief Restructuring Officer of Caesars Entertainment Operating Company, Inc. along with certain additional personnel, as restructuring advisors to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Signatories (other than Randall Eisenberg), with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of AP Services, LLC.

RESOLVED, that each of the Authorized Signatories be, and they hereby are, authorized and directed to employ the firm of Prime Clerk LLC as notice and claims agent to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Signatories, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of Prime Clerk LLC.

RESOLVED, that each of the Authorized Signatories be, and they hereby are, authorized and directed to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, each of the Authorized Signatories, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers and fees, and to cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary.

RESOLVED, that each of the Authorized Signatories be, and they hereby are, with power of delegation, authorized, empowered and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Signatories deem necessary, proper, or desirable in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case.

**Cash Collateral and Adequate Protection**

RESOLVED, that, in connection with the commencement of the Chapter 11 Cases, each of the Authorized Signatories, acting alone or with one or more other Authorized Signatories, is authorized and directed to seek approval of a cash collateral order in interim and final form (a "<u>Cash Collateral Order</u>"), and any Authorized Signatory be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of the Company, necessary to implement the Cash Collateral Order, as well as any additional or further agreements for the use of cash collateral in connection with the Company's Chapter 11 Cases, which agreement(s) may require the Company to grant liens to the Company's existing lenders and each other agreement, instrument, or document to be executed and delivered in connection therewith, by or on behalf of the Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Signatory approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof.

**General**

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Signatories, each of the Authorized Signatories (and their designees and delegates) be, and they hereby are, authorized and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such agreements, certificates, instruments and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such officer's or officers' judgment, shall be necessary, advisable or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein.

RESOLVED, that all members of the Board of Directors of the Company have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waive any right to have received such notice.

RESOLVED, that all acts, actions and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement or certificate has been specifically authorized in advance by resolution of the Board of Directors.

RESOLVED, that each of the Authorized Signatories (and their designees and delegates) be and hereby are authorized and empowered to take all actions or to not take any action in the name of the Company with respect to the transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member or managing member of each direct subsidiary of the Company, in each case, as such Authorized Signatory shall

deem necessary or desirable in such Authorized Signatory's reasonable business judgment as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date above first written.

LIMITED PARTNER

Horseshoe Gaming Holding, LLC

By: _____
Name: Gary W. Loveman
Title: President

GENERAL PARTNER

New Gaming Capital Partnership
By: Horseshoe Gaming Holding, LLC

By: _____
Name: Gary W. Loveman
Title: President, Horseshoe Gaming
Holding, LLC

and

New Gaming Capital Partnership
By: Horseshoe GP, LLC
By: _____
Name: Gary W. Loveman
Title: President, Horseshoe GP, LLC

### Schedule 1

1. Horseshoe Entertainment

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-[_____] (___) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## CONSOLIDATED LIST OF CREDITORS
## HOLDING THE TOP 50 LARGEST UNSECURED CLAIMS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. The following is the consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated List") based on the Debtors' books and records as of approximately January 14, 2015. The Consolidated List is prepared in accordance with rule 1007(d) of the Federal Rules of Bankruptcy Procedure. The Consolidated List does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(31) or (2) secured creditors. The information contained herein shall neither constitute an admission of liability by, nor bind, the Debtors. The information herein, including the failure of the Debtors to list any claim as contingent, unliquidated, or disputed, does not constitute a waiver of the Debtors' right to contest the validity, priority, or amount of any claim.

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1 | LAW DEBENTURE TRUST COMPANY OF NEW YORK | LAW DEBENTURE TRUST COMPANY OF NEW YORK<br>Attn: Kevin O'Brien, CEO<br>400 Madison Ave., 4th Floor<br>New York, NY 10017<br>Email: N/A<br>Fax: (212) 750 1361<br>Phone: (212) 750 6474 | Unsecured Notes | | $530,000,000.00 |
| 2 | CLARK COUNTY | CLARK COUNTY<br>Attn: Steve Sisolak, Chair<br>500 S Grand Central Pkwy<br>1st Floor<br>Las Vegas, NV 89155<br>Email: kevin.gullette@clarkcountynv.gov; dainfo@clarkcountyda.com;<br>Fax: N/A<br>Phone: (702) 455-6000 | Special Improvement Bonds | | $46,900,000.00 |
| 3 | IOWA GAMING COMMISSION | IOWA GAMING COMMISSION<br>Attn: Brian J. Ohorilko, Administrator<br>Capitol Medical Office Building<br>1300 Des Moines Street, Ste. 100<br>Des Moines, IA 50309-5508<br>Email: irgc@iowa.gov<br>Fax: (515) 242-6560<br>Phone: (515) 281-7352 | Dog Racing Exit Costs | | $42,625,055.84 |
| 4 | IGT | IGT<br>Attn: Patti S. Hart, CEO<br>6355 South Buffalo Drive<br>Las Vegas, NV 89113-2133<br>Email: pr@igt.com<br>Fax: (702) 896-8686<br>Phone: (702) 669-7777 | Trade Payable and Slot Financing | | $28,544,568.76 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 5 | HILTON HOTELS CORPORATION | HILTON HOTELS CORPORATION<br>Attn:  Kristin Campbell, General Counsel<br>7930 Jones Branch Drive<br>McLean, VA 22102<br>Email:  kristin.campbell@hilton.com<br>Fax:  N/A<br>Phone:  (703) 883-1000 | Pension Plan Litigation | Contingent, Unliquidated, Disputed | $25,000,000.00 |
| 6 | HOUSE OF BLUES | HOUSE OF BLUES<br>Attn:  Ron Benison, CEO<br>7060 Hollywood Blvd.<br>Hollywood, CA 90028<br>Email:  legalhob@livenation.com<br>Fax:  N/A<br>Phone:  (323) 769-4600 | Lease | Unliquidated | $13,792,438.00 |
| 7 | BOARD OF LEVEE COMMISSIONERS FOR THE YAZOO-MISSISSIPPI DELTA | BOARD OF LEVEE COMMISSIONERS FOR THE YAZOO-MISSISSIPPI DELTA<br>Attn:  Willie Gregory, President<br>140 Delta Avenue<br>Clarksdale, MS 38614<br>Email:  N/A<br>Fax:  (662) 624-2450<br>Phone:  (662) 624-4397 | Lease | Unliquidated | $10,539,916.67 |
| 8 | SIMON GROUP | SIMON GROUP<br>Attn:  James M. Barkley, General Counsel<br>225 West Washington Street<br>Indianapolis, IN 46204<br>Email:  jbarkley@simon.com;<br>rtucker@simon.com<br>Fax:  (317) 263-7901<br>Phone:  (317) 636-1600 | Deferred Income / Signing Bonus | | $4,578,082.00 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 9 | EARL OF SANDWICH | EARL OF SANDWICH<br>Attn: Steve Heeley, CEO<br>4700 Millenia Blvd. Suite 400<br>Orlando, FL 32839<br>Email: info@earlofsandwichusa.com<br>Fax: (407) 992-2987<br>Phone: (877) 426-3275 | Lease | | $4,500,000.00 |
| 10 | VISA | VISA<br>Attn: Kelly Mahon Tullier, General Counsel<br>900 Metro Center Blvd (at Vintage Park Dr.)<br>Foster City, CA 94404<br>Email: ktullier@visa.com<br>Fax: N/A<br>Phone: (650) 432-7644 | Deferred Income / Signing Bonus | | $3,431,469.71 |
| 11 | EXPRESS SCRIPTS INC | EXPRESS SCRIPTS INC<br>Attn: Time Wentworth, President<br>One Express Way<br>St Louis, MO 63121<br>Email: twentworth@express-scripts.com<br>Fax: (800) 417-8163<br>Phone: N/A | Trade Payable | | $3,257,277.29 |
| 12 | NORTH KANSAS CITY | NORTH KANSAS CITY<br>Attn: Don Stielow, Mayor<br>City Hall<br>2010 Howell<br>N. Kansas City, MO 64116<br>Email: dstielow@nkc.org<br>Fax: N/A<br>Phone: (816) 274-6000 | Lease | | $2,416,944.83 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 13 | JOHNNY ROCKETS | JOHNNY ROCKETS<br>Attn: John Fuller, CEO<br>20 Enterprise, Suite 300<br>Aliso Viejo, CA 92656<br>Email: N/A<br>Fax: (866) 209-9523<br>Phone: (949) 643-6100 | Lease | Unliquidated | $1,975,455.00 |
| 14 | ENCORE EVENT TECHNOLOGIES | ENCORE EVENT TECHNOLOGIES<br>Attn: Phil Cooper, CEO<br>5150 South Decatur Blvd<br>Las Vegas, NV 89118<br>Email: N/A<br>Fax: (702) 739-8831<br>Phone: (702) 739-8803 | Deferred Income / Signing Bonus | | $1,472,293.57 |
| 15 | BRAND INTERACTION | BRAND INTERACTION<br>Attn: Eric Simon<br>45 West 21st Street<br>Floor 2<br>New York, NY 10010<br>Email: info@brandinteractiongroup.com<br>Fax: (917) 591-9437<br>Phone: (212) 699-1885 | Cancellation Fee | | $1,454,000.00 |
| 16 | WMS GAMING | WMS GAMING<br>Attn: Katie Lever, General Counsel<br>c/o Scientific Games Corporation<br>750 Lexington Avenue<br>New York, NY 10022<br>Email: N/A<br>Fax: (702) 257-7750<br>Phone: (212) 754-2233 | Trade Payable and Slot Financing | | $1,231,090.15 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 17 | STANDARD TEXTILE CO INC. | STANDARD TEXTILE CO INC.<br>Attn: Gary Heiman, CEO<br>One Knollcrest Drive<br>Cincinnati, OH 45237<br>Email: info@standardtextile.com<br>Fax: 513.761.0467<br>Phone: 800.999.0400 | Trade Payable | | $1,096,053.45 |
| 18 | SOUTHERN WINE & SPIRITS | SOUTHERN WINE & SPIRITS<br>Attn: Wayne Chaplin, CEO<br>300 E. Crossroads Parkway<br>Bolingbrook Corporate Center<br>Bolingbrook, IL 60440-3516<br>Email: N/A<br>Fax: 630-685-3700<br>Phone: 630-685-3000 | Trade Payable | | $968,192.76 |
| 19 | HALIFAX SECURITY INC. | HALIFAX SECURITY INC.<br>Attn: Jason Oakley, CEO<br>301 Drum Point Road<br>Brick, NJ 08723<br>Email: info@navcctv.com<br>Fax: 732-477-0886<br>Phone: 732-477-0686 | Trade Payable | | $920,266.14 |
| 20 | MICROSTRATEGY SERVICES CORP | MICROSTRATEGY SERVICES CORP<br>Attn: Jonathan Klein, General Counsel<br>1850 Towers Crescent Plaza<br>Tysons Corner, VA 22182<br>Email: info@microstrategy.com<br>Fax: 703-848-8610<br>Phone: 703-848-8600 | Trade Payable | | $865,061.25 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|------|------------------|-----------------------------------------------------------------------------------|--------------------------------------------------------------------|--------------------------------------------------------------------------------|------------------------------------------------------------|
| 21 | GRAVITY MEDIA LLC | GRAVITY MEDIA LLC<br>Attn: Yuriy Boykiv, CEO<br>114 West 26th Street 8th Floor<br>New York, NY 10001<br>Email: hello@mediagravity.com<br>Fax: 646-486-0030<br>Phone: 646-486-0000 | Trade Payable | | $817,178.38 |
| 22 | DCR WORKFORCE | DCR WORKFORCE<br>Attn: Naveen Dua, Chief Executive Officer<br>7815 NW Beacon Square Boulevard Suite 224<br>Boca Raton, FL 33487<br>Email: info@dcrworkforce.com<br>Fax: 888-880-1584<br>Phone: 888-327-4867 | Trade Payable | | $812,121.79 |
| 23 | A J BROWN INC. | A J BROWN INC.<br>Attn: Daniel B. Steuber<br>635 Trade Center Blvd.<br>Chesterfield, MO 63005-1247<br>Email: dan@ajbrown.com<br>Fax: (636) 537-3335<br>Phone: (636) 537-3636 | Trade Payable | | $776,960.12 |
| 24 | BALLY GAMING INC. | BALLY GAMING INC.<br>Attn: Richard Haddrill, Chief Executive Officer<br>6601 South Bermuda Road<br>Las Vegas , NV 89119<br>Email: N/A<br>Fax: 702-584-7710<br>Phone: 702-584-7700 | Trade Payable | | $757,241.29 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 25 | IBS SOFTWARE SERVICES | IBS SOFTWARE SERVICES<br>Attn:  Rajiv Shah, CEO<br>900 Circle 75 Parkway<br>Suite 550<br>Atlanta, GA 30339<br>Email:  ibsusa@ibsplc.com<br>Fax:  (678) 391 6099<br>Phone:  (678) 391 6080 | Trade Payable | | $693,560.00 |
| 26 | THE PRINTER INC. | THE PRINTER INC.<br>Attn:  Bill Benskin, President<br>1220 Thomas Beck Road<br>Des Moines, IA 50315<br>Email:  Info@the-printer.com<br>Fax:  515-288-9234<br>Phone:  515-288-7241 | Trade Payable | | $656,038.82 |
| 27 | PEPSI BOTTLING GROUP | PEPSI BOTTLING GROUP<br>Attn:  Eric J. Foss, President and CEO<br>One Pepsi Way<br>Somers, NY 10589-2201<br>Email:  N/A<br>Fax:  914-767-7761<br>Phone:  914-767-6000 | Trade Payable | | $592,378.91 |
| 28 | AETNA LIFE INSURANCE COMPANY | AETNA LIFE INSURANCE COMPANY<br>Attn:  Scott Snyder, Sales V.P.<br>151 Farmington Avenue<br>Hartford, CT 06156<br>Email:  snydersa@aetna.com<br>Fax:  N/A<br>Phone:  (800) 872-3862 | Trade Payable | | $550,368.51 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 29 | AGILYSYS NV | AGILYSYS NV<br>Attn: Kyle C. Badger, General Counsel<br>1000 Windward Concourse, Suite 250<br>Alpharetta, GA 30005<br>Email: sales@agilysys.com;<br>kyle.badger@agilysys.com<br>Fax: 770.810.7892<br>Phone: 770.810.7800 | Trade Payable | | $546,524.33 |
| 30 | ARISTOCRAT TECHNOLOGIES INC. | ARISTOCRAT TECHNOLOGIES INC.<br>Attn: Atul Bali, President<br>7230 Amigo Street<br>Las Vegas, NV 89119<br>Email: atul.bali@aristocrat-inc.com;<br>mark.dunn@aristocrat-inc.com<br>Fax: (702) 270-1001<br>Phone: (702) 599-8000 | Trade Payable | | $521,932.14 |
| 31 | LLTQ ENTERPRISES LLC | LLTQ ENTERPRISES LLC<br>Attn: Rowen Seibel<br>c/o Certilman Balin Attorneys<br>Paul B. Sweeney<br>90 Merrick Avenue<br>East Meadow, NY 11554<br>Email: psweeney@certilmanbalin.com<br>Fax: (516) 296-7111<br>Phone: (516) 296-7000 | Trade Payable | | $506,412.22 |
| 32 | NOBU HOSPITALITY LLC | NOBU HOSPITALITY LLC<br>c/o Berdon LLP<br>Attn: Struan McKenzie<br>360 Madison Avenue<br>New York, NY 10017<br>Email: N/A<br>Fax: 212-371-1159<br>Phone: 212-832-0400 | Trade Payable | | $459,963.85 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 33 | HOSPITALITY NETWORK INC. | HOSPITALITY NETWORK INC.<br>Attn:  Chief Legal Officer<br>1700 Vegas Drive<br>Las Vegas, NV 89106<br>Email: Rob.Nickels@cox.com;<br>Charlotte.Barnett@cox.com<br>Fax:  702-435-4009<br>Phone:  702-435-4600 | Trade Payable | | $430,625.63 |
| 34 | HORNETS BASKETBALL LLC | HORNETS BASKETBALL LLC<br>Attn:  Fred Whitfield, President and COO<br>333 E Trade St<br>Charlotte, NC 28202-2331<br>Email:  info@hornets.com<br>Fax:  704-688-8727<br>Phone:  704-688-8600 | Trade Payable | | $393,750.00 |
| 35 | FISHNET SECURITY INC. | FISHNET SECURITY INC.<br>Attn:  Rich Fennessy, Chief Executive Office<br>6130 Sprint Pkwy Suite 400<br>Overland Park, KS  66211-1155<br>Email:  N/A<br>Fax:  816.421.6677<br>Phone:  816.421.6611 | Trade Payable | | $388,369.41 |
| 36 | SIMPLEX GRINNELL LP | SIMPLEX GRINNELL LP<br>Attn:  Robert Chauvin, President<br>50 Technology Dr<br>Westminster, MA 01441<br>Email:  N/A<br>Fax:  978-731-7839<br>Phone:  978-731-8519 | Trade Payable | | $386,742.32 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 37 | WIRTZ BEVERAGE NEVADA | WIRTZ BEVERAGE NEVADA<br>Attn: Kevin Roberts, Senior Vice President<br>1849 West Cheyenne Avenue<br>North Las Vegas, NV 89032<br>Email: N/A<br>Fax: N/A<br>Phone: (702) 735-9141 | Trade Payable | | $385,181.00 |
| 38 | TELEPERFORMANCE USA | TELEPERFORMANCE USA<br>Attn: Chief Legal Officer<br>6510 South Millrock Drive Suite 150<br>Holladay, UT 84121<br>Email: unitedstates@teleperformance.com<br>Fax: (801) 257-6246<br>Phone: (801) 257-5800 | Trade Payable | | $383,039.74 |
| 39 | INTERNATIONAL BUSINESS MACHINE (IBM) | INTERNATIONAL BUSINESS MACHINE (IBM)<br>Attn: Regional Counsel<br>425 Market Street, 21st Floor<br>San Francisco, CA 94105-2406<br>Email: N/A<br>Fax: (415) 545-4899<br>Phone: N/A | Trade Payable | | $370,498.00 |
| 40 | GET FRESH | GET FRESH<br>Attn: Jim Palladino, CEO<br>1548 18th Street<br>Santa Monica, CA 90404<br>Email: customerservice@getfresh.net<br>Fax: 310-315-2644<br>Phone: 310-315-0020 | Trade Payable | | $367,243.27 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|------|------------------|-----------------------------------------------------------------------------------|--------------------------------------------------------------------|--------------------------------------------------------------------------------|------------------------------------------------------------|
| 41 | AON CONSULTING | AON CONSULTING<br>Attn: Michael Mahoney<br>199 Fremont St Suite 1500<br>San Francisco, CA 94105<br>Email: michael.mahoney@aon.com<br>Fax: N/A<br>Phone: 415-486-7351 | Trade Payable | | $362,616.00 |
| 42 | CARTUS CORPORATION | CARTUS CORPORATION<br>Attn: Kevin Kelleher, President & CEO<br>40 APPLE RIDGE ROAD<br>Danbury, CT 08610<br>Email: officeofthepresident@cartus.com<br>Fax: (888) 767-9358<br>Phone: (888) 767-9358 | Trade Payable | | $359,931.34 |
| 43 | CHAOTIC MOON LLC | CHAOTIC MOON LLC<br>Attn: Ben Lamm, CEO<br>319 Congress Ave., Suite 200<br>Austin, TX 78701<br>Email: hello@chaoticmoon.com<br>Fax: 512-420-8801<br>Phone: 512-420-8800 | Trade Payable | | $351,406.86 |
| 44 | INSIGHT | INSIGHT<br>Attn: Steve Dodenhoff, President<br>6820 South Harl Avenue<br>Tempe, AZ 85283<br>Email: steve.dodenhoff@insight.com<br>Fax: N/A<br>Phone: (800) 467-4448 | Trade Payable | | $347,047.86 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|------|------------------|------------------------------------------------------------------------------------|---------------------------------------------------------------------|--------------------------------------------------------------------------------|------------------------------------------------------------|
| 45 | G & G SYSTEMS | G & G SYSTEMS<br>Attn: Robert Lisowski, President<br>4340 W. Hacienda Ave.<br>Las Vegas , NV 89118<br>Email: info@ggsystems.net<br>Fax: (702) 798-6584<br>Phone: (702) 798-0995 | Trade Payable | | $316,250.50 |
| 46 | GLOBAL CASH ACCESS | GLOBAL CASH ACCESS<br>Juliet A. Lim, General Counsel<br>7250 S Tenaya Way<br>Suite 100<br>Las Vegas, NV 89113<br>Email: corpinfo@gcamail.com<br>Fax: 702-364-8260<br>Phone: (702) 855-3000 | Deferred Income / Signing Bonus | | $312,500.00 |
| 47 | GORDON RAMSAY | GORDON RAMSAY HOLDINGS LIMITED<br>Attn: Gordon Ramsay<br>1 Catherine Place<br>London, SW1E 6X<br>UK<br>Email: mthomas@sheridans.co.uk<br>Fax: +44 (0) 20 7079 0200<br>Phone: N/A | Trade Payable | | $307,479.03 |
| 48 | QUADRILLION TECHNOLOGY PARTNERS LLC | QUADRILLION TECHNOLOGY PARTNERS LLC<br>Attn: George Stelling, Managing Partner<br>Park Seventeen Center<br>1717 MCKINNEY AVE SUITE 700<br>DALLAS, TX 75202<br>Email: gstelling@quadrillionpartners.com<br>Fax: N/A<br>Phone: (214) 301-5000 | Trade Payable | | $295,927.69 |

| Rank | Name Of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 49 | OBJECT SYSTEMS GROUP INC. | OBJECT SYSTEMS GROUP INC.<br>Attn:  President and/or General Counsel<br>8600 Freeport Pkwy Suite 400<br>Irving, TX 75063<br>Email:  N/A<br>Fax:  (972) 650-2020<br>Phone:  (972) 650-2026 | Trade Payable | | $289,387.50 |
| 50 | MAVAR, INC. | MAVAR, INC.<br>Attn:  Ronald G. Peresich, Esquire<br>Page, Mannino & Peresich<br>PO Drawer 289<br>Biloxi, MS  39533<br>Email:  ron.peresich@pmp.org<br>Fax:  (228) 432-5539<br>Phone:  (228) 374-2100 | Lease | | Undetermined |

## DECLARATION UNDER PENALTY
## OF PERJURY REGARDING CONSOLIDATED LIST OF CREDITORS

   Pursuant to 28 U.S.C. § 1746, I, Mary E. Higgins, declare under penalty of perjury that I have reviewed the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims and that it is true and correct to the best of my information and belief.


Dated:  January 15, 2015         */s/ Mary E. Higgins*
                Mary E. Higgins
                Authorized Signatory

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | )
| In re: | ) | Chapter 11 |
| | ) |
| HORSESHOE ENTERTAINMENT, | ) | Case No. 15-_____ (____) |
| | ) |
| Debtor. | ) |
| | ) |

### LIST OF EQUITY SECURITY HOLDERS[1]

| Debtor | Equity Holders | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|---|
| Horseshoe Entertainment | New Gaming Capital Partnership | One Caesars Palace Dr. Las Vegas, Nevada 89109 | 91.92% |
| | Horseshoe Gaming Holding, LLC | One Caesars Palace Dr. Las Vegas, Nevada 89109 | 8.08% |

### DECLARATION UNDER PENALTY OF PERJURY

I, Gary W. Loveman, the undersigned authorized signatory of Horseshoe Entertainment, declare under penalty of perjury that I have read the foregoing list of equity security holders and that it is true and correct to the best of my information and belief.

Dated: January 15, 2015

/s/ Gary W. Loveman
Gary W. Loveman
Authorized Signatory

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed are as of the date of commencement of the chapter 11 case.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| HORSESHOE ENTERTAINMENT, | )    Case No. 15-_____ (___) |
| | ) |
| Debtor. | ) |
| | ) |

### CORPORATE OWNERSHIP STATEMENT

Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| New Gaming Capital Partnership | 91.92% |

### DECLARATION UNDER PENALTY OF PERJURY

I, Gary W. Loveman, the undersigned authorized signatory of Horseshoe Entertainment declare under penalty of perjury that I have read the foregoing corporate ownership statement and that it is true and correct to the best of my information and belief.

Dated: January 15, 2015          */s/ Gary W. Loveman*
                                         Gary W. Loveman
                                         Authorized Signatory

01/2012

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:                                          )  Chapter 11
        HORSESHOE ENTERTAINMENT,                )  Bankruptcy Case No. 15-____ (__)
                                                )
                                                )
        Debtor(s)                               )

## DECLARATION REGARDING  ELECTRONIC FILING
## PETITION AND ACCOMPANYING DOCUMENTS

### DECLARATION OF PETITIONER(S)

A.      [To be completed in all  cases]

        I (We), <u>Gary W. Loveman</u>        and _____the undersigned
debtor(s), corporate officer, partner, or member hereby declare under penalty of perjury that
(1) the information I(we) have given my (our) attorney is true and correct; (2) I(we) have
reviewed  the petition, statements, schedules, and other  documents being filed with the petition;
and (3) the  document s are true and correct.

B.      [To be checked and applicable only if the petition is for a corporation or other limited
        liability entity.]

        ☑  I, <u>Gary W. Loveman</u>        , the undersigned, further declare under penalty of
        perjury that I have been authorized to file this petition on behalf of the debtor.

Gary W. Loveman
Printed or Typed Name of Debtor or Representative          Printed or Typed Name of Joint Debtor

Signature of Debtor or Representative                      Signature of Joint Debtor

1/15/2015
Date                                                       Date